EXHIBIT 1

District Court, City and County of Denver, Colorado
Court Address:
1437 Bannock St., Room 256
Denver, CO 80202

Plaintiff(s): Q ADVISORS, LLC

v.

Defendant(s): MERGENCE CORPORATION and JASON S. ELLIS

▲ COURT USE ONLY ▲

Attorney or Party Without Attorney (Name and Address):

John S. Phillips (Atty. Reg. #24884)
Sean C. Grimsley (Atty. Reg. #36422)
Bartlit Beck Herman Palenchar & Scott LLP
1899 Wynkoop Street, 8th Floor
Denver, Colorado 80202

Phone Number: 303-592-3100
FAX Number: 303-592-3140

E-mail: john.phillips@bartlit-beck.com
        sean.grimsley@bartlit-beck.com

Case Number:

Division          Courtroom

## DISTRICT COURT CIVIL (CV) CASE COVER SHEET FOR INITIAL PLEADING OF COMPLAINT, COUNTERCLAIM, CROSS-CLAIM OR THIRD PARTY COMPLAINT

1.   This cover sheet shall be filed with each pleading containing an initial claim for relief in every district court civil (CV) case, and shall be served on all parties along with the pleading.  It shall not be filed in Domestic Relations (DR), Probate (PR), Water (CW), Juvenile (JA, JR, JD, JV), or Mental Health (MH) cases. Failure to file this cover sheet is not a jurisdictional defect in the pleading but may result in a clerk's show cause order requiring its filing.

2.   Check one of the following:

☑ This case is governed by Chief Justice Directive ("CJD") 11-02 and the "Colorado Civil Access Pilot Project Rules Applicable to Business Actions in District Court" because:

-   The case is filed within the period of January 1, 2012 through June 30, 2015; AND

-   The case is filed in a Pilot Project participating jurisdiction (Adams County, Arapahoe County, Denver County, Gilpin County, or Jefferson County); AND

-   The case is a "Business Action" as defined in CJD 11-02, Amended Appendix A for inclusion in the Pilot Project.

☐ This case is not governed by the Colorado Civil Access Pilot Project Rules.

*NOTE: Cases subject to the Colorado Civil Access Pilot Project must be governed by the Rules in CJD 11-02 (available at http://www.courts.state.co.us/Courts/Supreme_Court/Directives/index.cfm).  The presiding judge will review Item 2 for accuracy.  The designation on this initial Cover Sheet will control unless the Court orders otherwise.*

3.   If this case is not governed by the Colorado Civil Access Pilot Project Rules as indicated in Item 2, check the following:

JDF 601   R8-14   DISTRICT COURT CIVIL (CV) CASE COVER SHEET          Page 1 of 2
©2013, 2014 Colorado Judicial Department for use in the Courts of Colorado

❏This case is governed by C.R.C.P. 16.1 because:

- The case is not a class action, domestic relations case, juvenile case, mental health case, probate case, water law case, forcible entry and detainer, C.R.C.P. 106, C.R.C.P. 120, or other similar expedited proceeding; AND

- A monetary judgment over $100,000 is not sought by any party against any other single party. This amount includes attorney fees, penalties, and punitive damages; it excludes interest and costs, as well as the value of any equitable relief sought.

❏This case is not governed by C.R.C.P. 16.1 because (check ALL boxes that apply):

❏The case is a class action, domestic relations case, juvenile case, mental health case, probate case, water law case, forcible entry and detainer, C.R.C.P. 106, C.R.C.P. 120, or other similar expedited proceeding.

❏A monetary judgment over $100,000 is sought by any party against any other single party. This amount includes attorney fees, penalties, and punitive damages; it excludes interest and costs, as well as the value of any equitable relief sought.

*NOTE: in any case to which C.R.C.P. 16.1 does not apply, the parties may elect to use the simplified procedure by separately filing a Stipulation to be governed by the rule within 49 days of the at-issue date. See C.R.C.P. 16.1(e). In any case to which C.R.C.P. 16.1 applies, the parties may opt out of the rule by separately filing a Notice to Elect Exclusion (JDF 602) within 35 days of the at-issue date. See C.R.C.P. 16.1(d).*

❏A Stipulation or Notice with respect to C.R.C.P. 16.1 has been separately filed with the Court, indicating:

❏C.R.C.P. 16.1 applies to this case.

❏C.R.C.P. 16.1 does not apply to this case.

4.  ☑This party makes a **Jury Demand** at this time and pays the requisite fee. See C.R.C.P. 38. (Checking this box is optional.)

Date: March 17, 2015

_____
Signature of Party or Attorney for Party

<table>
<tr><td colspan="2">

DISTRICT COURT

CITY AND COUNTY OF DENVER, COLORADO

Denver City & County Building
Clerk of the Court, Civil Division
1437 Bannock St., Room 256
Denver, CO 80202
</td></tr>
<tr><td>

Plaintiff:      Q ADVISORS LLC

v.

Defendants:   MERGENCE CORPORATION and
JASON S. ELLIS
</td><td>

▲ COURT USE ONLY ▲
</td></tr>
<tr><td>

John S. Phillips #24884
Sean C. Grimsley #36422

BARTLIT BECK HERMAN PALENCHAR &
  SCOTT LLP
1899 Wynkoop Street, 8th Floor
Denver, CO 80202

Telephone Number:  (303) 592-3100
Facsimile Number:  (303) 592-3140
Email:   john.phillips@bartlit-beck.com
         sean.grimsley@bartlit-beck.com
</td><td>

Case Number:

Div.:       Ctrm:
</td></tr>
<tr><td colspan="2">

**COMPLAINT**
</td></tr>
</table>

Plaintiff Q Advisors LLC ("Q Advisors"), for its Complaint against Mergence

Corporation ("Mergence") and Jason S. Ellis ("Ellis"), states as follows:

### Parties

1.       Q Advisors is a Colorado limited liability company headquartered in the City and

County of Denver, Colorado. Q Advisors is an investment bank that specializes in assisting

companies with business transactions such as mergers and acquisitions, debt and equity

financings, and recapitalizations.

2.      Mergence is a Nevada corporation headquartered in Salt Lake City, Utah at 3939 South Wasatch Boulevard.  Mergence was formed on August 2, 2005 to provide "technical products and services offered in both retail and wholesale markets."  Until November 2013, Mergence directly or indirectly owned Spring Communications, Inc., which was known and did business variously as "Spring," "Spring Mobile," "Spring Retail Group," and "Spring Communications Holding."  Mergence referred to these Spring entities and its Spring Mobile business "Spring Retail Group."  Mergence also itself did business as "Spring Retail Group" at the same business address as the Spring entities at 3939 South Wasatch Boulevard in Salt Lake City.

3.      Jason S. Ellis is an individual whose principal residence is in Utah.  He is and has at all relevant times been President and Chief Executive Officer of Spring Mobile and numerous other Spring entities (such as Chief Executive Officer of Spring Retail Group, President of Spring Communications, Inc., President of Spring Communications Holding, Inc., and the like) and also President and Treasurer of Mergence.  According to sworn Nevada Secretary of State filings, Ellis is and always has been a member of the Board of Directors of Mergence since Mergence was incorporated on August 2, 2005.  Ellis is currently President and Chief Executive Officer of Spring Mobile, which (like Mergence) is located at 3939 South Wasatch Boulevard in Salt Lake City.

4.      Though not currently named as defendants, other individuals who are important to this action are Brett M. Bradshaw ("Bradshaw") and Vernon G. Dickman ("Dickman").  Both Bradshaw and Dickman have been members of the Board of Directors of Mergence since Mergence was incorporated on August 2, 2005.  Bradshaw is and has always served as Mergence's Secretary.  Bradshaw is also currently Senior Vice President of Sales and Operations

of Spring Mobile, which (like Mergence) is located at 3939 South Wasatch Boulevard in Salt
Lake City. Dickman is the Founder of Spring Mobile and was, as of at least 2013, a Member of
the Board of Directors and Chairman of the Board of Spring Mobile and numerous other Spring
entities.

     5.     On information and belief, each of Ellis, Bradshaw, and Dickman were and are
shareholders or beneficial owners of Mergence – Ellis (23.5%), Bradshaw (7.5%), and Dickman
(69%) – and each personally benefited from the sale of Spring in November 2013 and from the
breaches described below.

## Jurisdiction and Venue

     6.     Plaintiff's claims arise under the contract attached to this Complaint as Exhibit A
(the "Contract") and common law.

     7.     This Court has subject matter jurisdiction over this action pursuant to Article 6,
Section 9, of the Colorado Constitution.

     8.     This Court has personal jurisdiction over the Defendants because Mergence,
Spring, and Ellis have had numerous, substantial contacts with the State of Colorado and the City
and County of Denver. For example, between December 2012 and July 2013, Mergence, Spring,
and Ellis placed dozens of telephone calls and sent dozens of e-mails to Q Advisors at Q
Advisors' offices in the City and County of Denver. These contacts related to the negotiation of
the Contract, the signing of the Contract, representations about Mergence's and Spring's
business activities, financial condition, and financing needs, communications with Fifth Third
bank representatives located in Denver, requests for services by Q Advisors to be provided in
Denver, and the actual provision of services in Denver by Q Advisors to Mergence and Spring

3

under the Contract. Spring also substantial ongoing business operations through at least two retail locations located in the City of County of Denver today.

9.      Venue is proper in the City and County of Denver pursuant to C.R.C.P. 98(c) because, among other things, Mergence, Spring, and Ellis requested that Q Advisors perform the services in the City and County of Denver, the Contract was in fact performed and the services were in fact provided by Q Advisors at Q Advisors' offices in the City and County of Denver, the damages have been felt and incurred by Q Advisors in the City and County of Denver, and Q Advisors is a resident of the City and County of Denver. The financing transaction in which Q Advisors assisted Mergence and Spring was done by the lending team of Fifth Third Bank located in the City and County of Denver. Spring currently transacts business in the City and County of Denver.

**Statement of Facts**

10.     In late 2012, Ellis and Spring's Chief Financial Officer Kent Forsgren asked Q Advisors to provide financial investment banking services to Mergence and Spring, including exploring possible financing transactions for Spring.

11.     In order to convince Q Advisors to enter into the Contract, Ellis informed Q Advisors that Mergence and Spring envisioned "a larger deal with Spring all in," meaning that Spring would likely be sold in the future. Mergence and Spring also informed Q Advisors that Mergence's largest shareholder (Dickman) intended to sell Spring "within twenty-four to thirty-six months."

12.     The parties negotiated the Contract between December 20, 2012 and January 18, 2013. Ellis, who was the President of both Mergence and Spring, and Spring's Chief Financial

4

Officer Kent Forsgren, negotiated the terms on behalf of Spring and "Mergence dba Sprint Retail Group." Q Advisors' Michael Crawford ("Crawford") negotiated on behalf of Q Advisors.

13.     Ellis and Crawford each signed the Contract on or about January 18, 2013.

14.     At the time Ellis signed the Contract, Ellis held himself out as an officer and agent of Mergence Corporation and an officer and agent of Spring.

15.     Ellis signed the Contract as "President."

16.     At the time Ellis signed the Contract, Mergence, Ellis, and Mergence's other officers and directors all knew or should have known that Mergence was not legally permitted to transact business under the law of it's state of incorporation.

17.     Unbeknownst to Q Advisors, Mergence was a Nevada corporation and Mergence's directors and officers had failed to follow Nevada corporate legal requirements since at least August 2009.

18.     Under Nevada law, Mergence was not permitted to transact business at the time Ellis signed the Contract in January 2013.

19.     In 2012 and 2013, Mergence held itself out as a Delaware corporation, which it never was.

20.     The Contract provides that "Mergence Corporation (dba Spring Retail Group) ("Mergence" or the "Company")" engaged Q Advisors "to provide financial advisory services on an exclusive basis (the "Services"), to the Company in connection with the private placement to qualified institutional buyers" of debt.

21.     The Contract provides that Mergence would compensate Q Advisors for Q Advisors' work.

5

22.     Section 15 of the Contract provides that "In the event Mergence elects to pursue a sale or recapitalization of the Company, whether this letter is in effect or within thirty-six (36) months of its termination, Q Advisors and Mergence **shall negotiate in good faith a new engagement letter** under which Q Advisors would be the Company's exclusive financial advisor for that assignment/transaction." (Emphasis added in bold.)

23.     Section 15 also reflects the parties' intent and agreement to "terms of an engagement that are commercially reasonable and that, when taken as a whole, are not materially inconsistent with those available at the time from investment banks or other organizations with experience and qualifications substantially similar to those of Q Advisors." The terms of such engagements are well-known, and the parties themselves had a history of two other engagements.

24.     With Q Advisors' assistance, Spring completed a debt transaction with Fifth Third Bank in July 2013.

25.     Between December 2012 and July 2013, Mergence and Spring officers and agents sent numerous e-mails to Q Advisors in Denver, Colorado in connection with the services Q Advisors provided under the Contract. Mergence and Spring officers and agents placed numerous telephone calls to Q Advisors in Denver, Colorado in connection with the services Q Advisors provided under the Contract. Q Advisors performed substantially all the services under the Contract at Q Advisors offices in Denver, Colorado.

26.     Without telling Q Advisors, the officers and directors of Mergence and Spring discussed the possible sale of Spring at various times between August 2013 and November 2013.

27.     Without telling Q Advisors, Mergence and Spring agreed that Spring would be sold.

6

28.     Without telling Q Advisors, Mergence sold Spring to a public company named Gamestop Corp. in November 2013 in a transaction with a total enterprise value of approximately $97 million.  Q Advisors had originally introduced Gamestop to Mergence and Spring Retail Group in connection with an earlier transaction for Mergence and Spring in 2012.

29.     Mergence and Spring never told Q Advisors that Spring was being sold at any time before Spring was sold to Gamestop in November 2013.

30.     Mergence and Spring never negotiated a new engagement letter with Q Advisors in connection with the November 2013 sale of Spring, as the Contract required.

31.     Defendants have never paid Q Advisors any fees in connection with the November 2013 sale of Spring.

32.     Defendants have failed and refused to pay Q Advisors any fees in connection with the November 2013 sale of Spring.

33.     Ellis knew or had reason to know that Mergence lacked capacity to do business as of 2012 and 2013.

34.     Ellis is personally liable for the debts of Mergence under the Contract.

35.     Ellis is a party to the Contract as a matter of agency and common law.

36.     Mergence and Ellis have failed to pay Q Advisors what they owe under the Contract.

### First Claim for Relief
### (Breach of Contract – Mergence)

37.     Plaintiff incorporates by reference all of the foregoing paragraphs.

38.     The Contract between Q Advisors and Mergence is valid and enforceable.

39.     Q Advisors performed its obligations under the Contract.

40.     Mergence breached its obligation to engage and pay Q Advisors for the sale of Spring according to the terms of the Contract.

41.     Q Advisors has suffered damage because of Mergence's breach of the Contract.

### Second Claim for Relief
### (Breach of Contract – Ellis)

42.     Plaintiff incorporates by reference all of the foregoing paragraphs.

43.     The Contract is valid and enforceable.

44.     Q Advisors performed its obligations under the Contract.

45.     Ellis held himself out as an agent for Mergence and Spring at the time he signed the Contract.

46.     At the time he signed the Contract and thereafter, Ellis knew or should have known that Mergence lacked capacity to be a party to a contract.

47.     Ellis is therefore personally liable under the Contract.

48.     Ellis breached his obligation to engage and pay Q Advisors for the sale of Spring according to the terms of the Contract.

49.     Q Advisors has suffered damage because of Ellis' breach of the Contract.

### Third Claim for Relief
### (Breach of Covenant of Good Faith and Fair Dealing – Mergence)

50.     Plaintiff incorporates by reference all of the foregoing paragraphs.

51.     The Contract included an implied covenant of good faith and fair dealing.

52.     Mergence breached the covenant of good faith and fair dealing by failing to inform Q Advisors that Mergence and Spring were pursuing a sale of Spring, by failing to inform Q Advisors that it had agreed to sell Spring, by failing to engage Q Advisors in connection with the sale, by hiding its intentions for Spring and the implications of that sale for Q Advisors under

the Contract, and by its bad faith failure and refusal to pay Q Advisors what it owes under the Contract.

### Fourth Claim for Relief
**(Breach of Covenant Good Faith and Fair Dealing – Ellis)**

53.     Plaintiff incorporates by reference all of the foregoing paragraphs.

54.     The Contract included an implied covenant of good faith and fair dealing.

55.     Ellis breached the covenant of good faith and fair dealing by failing to inform Q Advisors that Mergence and Spring were pursuing a sale of Spring, by failing to inform Q Advisors he and others were involved in negotiating and selling Spring, by failing to engage Q Advisors in connection with the sale, by hiding his, Mergence's and Spring's intentions for Spring and the implications of that sale for Q Advisors under the Contract, and by his bad faith failure and refusal to pay Q Advisors what he owes under the Contract.

### Prayer for Relief

WHEREFORE, Plaintiff requests a judgment in his favor and against Defendant, including the following:

A.     Compensatory damages;

B.     Costs, as provided by applicable law; and

C.     Such further and additional relief as the Court may deem just and equitable.

### Jury Demand

Plaintiff demands trial by jury of all issues so triable.

9

Dated: March 17, 2015                    Respectfully submitted,

                                         John S. Phillips #24884
                                         Sean C. Grimsley #36422
                                         BARTLIT BECK HERMAN PALENCHAR
                                            & SCOTT LLP

                                         Attorneys for Plaintiff

Address of Plaintiff Q Advisors:

Q Advisors LLC
1899 Wynkoop Street, Suite 200
Denver, Colorado 80202

*Document filed electronically. See C.R.C.P. 121, § 1-26. Original on file.*

| | |
|---|---|
| District Court, City and County of Denver, Colorado<br>Court Address:<br>1437 Bannock St., Room 256<br>Denver, CO 80202 | |
| Plaintiff: Q ADVISORS, LLC<br><br>and<br><br>Defendants: MERGENCE CORPORATION and JASON S. ELLIS | ▲       ▲<br><br>COURT USE ONLY |
| Attorney (Name and Address):<br><br>John S. Phillips (Atty. Reg. #24884)<br>Sean C. Grimsley (Atty. Reg. #36422)<br>Bartlit Beck Herman Palenchar & Scott LLP<br>1899 Wynkoop Street, 8th Floor<br>Denver, Colorado 80202<br><br>Phone Number: 303-592-3100<br>FAX Number: 303-592-3140<br><br>E-mail: john.phillips@bartlit-beck.com<br>          sean.grimsley@bartlit-beck.com | Case Number:<br><br>Division         Courtroom |

## SUMMONS
### COLORADO CIVIL ACCESS PILOT PROJECT FOR BUSINESS ACTIONS

The People of the State of Colorado,
To the Defendant(s) named above:

       This action is within the Colorado Civil Access Pilot Project for Business Actions and is governed by Chief Justice Directive 11-02 and the Rules and time periods set forth at http://www.courts.state.co.us/Courts/Civil_Rules.cfm. Please note that the procedures and time periods are different from those typically required.

       You are hereby summoned and required to file with the clerk of this court an answer and any other responsive pleading to the attached complaint **within twenty-one (21) days after filing of Plaintiff's initial disclosure statement**. If you fail to file your answer to the compliant in writing within the applicable time period, judgment by default may be entered against you by the court for the relief demanded in the complaint, without any further notice.

       The following documents are also served with this summons: January 18, 2013 Contract

       Dated this 17th day of March, 2015.

_____
Signature of Attorney for Plaintiff

JDF 600.5  12/11  Summons Colorado Civil Access Pilot Project
This summons is issued pursuant to C.R.C.P. 4 and Colorado's Civil Access Pilot Project ("CAPP") for Business Actions. A copy of the complaint must be served with this summons.

**Exhibit A**



**Q Advisors**
An Investment Banking Partnership

### ENGAGEMENT LETTER

January 18, 2013

Mr. Jason Ellis
Chief Executive Officer
Mergence Corporation (dba Spring Retail Group)
3939 South Wasatch Boulevard
Suite 1
Salt Lake City, UT 84124

Dear Jason:

Pursuant to our recent discussions, I am pleased to confirm the arrangements under which Mergence Corporation (dba Spring Retail Group). ("Mergence" or the "Company") will engage Q Advisors LLC ("Q Advisors") to provide financial advisory services on an exclusive basis (the "Services"), to the Company in connection with a private placement to qualified institutional buyers of (a) senior debt securities (including revolving or term bank debt, hereinafter referred to as "Senior Debt"); or (b) debt securities that combine Senior Debt and Junior Debt into an integrated instrument (including unitranche debt, hereinafter referred to as "Blended Debt"). Together or independently, the private placement of Senior Debt or Blended Debt is hereinafter referred to as the "Financing".

1. **Retention.** During the term of our engagement, Q Advisors will provide the Company with a range of Services in connection with the Financing, including advice and assistance with respect to defining funding objectives and approaching potential investors. More specifically, in connection with the proposed Financing, Q Advisors will (a) assist the Company in developing and preparing its business plan and strategy, (b) identify and contact, on a best-efforts basis, potential financing sources, (c) work with the Company to prepare marketing materials describing the Company and the Financing, (d) recommend transaction structures and prepare or comment on term sheets, (e) assist in setting negotiation strategies and in conducting negotiations as reasonably requested by the Company, (f) review transaction documents, and (g) attend meetings of the Board of Directors or stockholders of the Company when requested.

The Company shall have final determination over any information and strategies developed by Q Advisors. In providing the Services, Q Advisors acknowledges that all terms and conditions of any Financing shall be subject to the approval of the Company's management or the Board of Directors of the Company, including, but not limited to, the type of security and the institutional investors that participate.

During the term of this letter agreement, the Company shall promptly refer any potential investors who approach the Company concerning a Financing to Q Advisors, and Q Advisors will then become the primary point of contact with any such investors.

Mr. Jason Ellis                                                        *Confidential*
January 18, 2013

2.  **Fees and Expenses.**  As we discussed, in consideration of the Services rendered to the Company under this letter agreement, the Company shall pay Q Advisors a monthly fee (the "Retainer") of $10,000, billed in advance (partial months will be pro rated accordingly) and payable within 10 days of receipt of invoice.

On consummation of the Financing, the Company shall pay Q Advisors a fee (the "Financing Fee") equal to (a) two percent (2.0%) of the Value of the Senior Debt; plus (b) two and three-quarters percent (2.75%) of the Value of the Blended Debt. For purposes of this letter agreement, Value shall mean the face amount of debt (without deducting fees or expenses) raised by the Company from third parties in connection with the Financing. Furthermore, Value shall include any amounts committed to by the investor(s) but unused or undrawn at closing. However, if Prudential Capital (or an affiliate thereof) is the largest investor in the Senior Debt or Blended Debt, the Financing Fee will be reduced by ten percent (10.0%).

If the Financing closes, Q Advisors shall receive a Financing Fee of not less than $475,000 (the "Minimum Fee"), except, however, if Prudential Capital (or affiliates thereof) is the largest investor in the Financing, in which case the Minimum Fee will be $425,000. All Retainer payments shall be credited against and reduce the Financing Fee.

In addition, whether or not the Financing closes, the Company will reimburse Q Advisors, on a monthly basis, for reasonable and documented out-of-pocket expenses incurred by Q Advisors in connection with this letter agreement. Typically, these expenses may include travel, lodging, telephone and outside services incurred by Q Advisors. In no event shall Q Advisors incur any single expense in excess of $2,000 without the prior consent of the Company. Q Advisors anticipates that monthly reimbursable expenses will not be greater than $4,000, and it will make a good-faith effort to promptly alert Mergence, if it expects expenses to exceed that level.

3.  **Termination.**  Services hereunder may be terminated with or without cause by either party at any time on 30 days' written notice and without liability or continuing obligation to the other (except for any compensation earned and expenses incurred by Q Advisors to the date of termination, including without limitation Financing Fees and except, in the case of termination by the Company for any reason other than the material breach of this agreement by Q Advisors, for Q Advisors' right under the "tail" provisions described immediately hereafter in this Section 3). After termination of Q Advisors' engagement for any reason other than the material breach by Q Advisors, Q Advisors will provide the Company with a true and correct list of parties with whom Q Advisors, on Mergence's behalf, has been in contact regarding the Financing ("Tail List"). If, within twelve (12) months following the termination of Q Advisors' engagement, the Company (a) closes a Financing or (b) (i) enters into a Letter of Intent, Memorandum of Understanding, or substantially similar agreement (even if such agreement is non-binding) describing key terms and conditions of a Financing and (b) (ii) closes a Financing with that same entity, or an affiliate thereof (whether or not that closing occurs within the twelve (12) months referenced above) and the Financing is with any party who is on the Tail List, Q Advisors shall be entitled, as applicable, to the Financing Fee as set forth above. Notwithstanding any termination of this letter agreement, the numbered paragraphs 2, 3, 5, 6 and 15 herein will remain operative regardless of any such termination.

4.  **Independent Contractor.**  Q Advisors will act under this letter agreement as an independent contractor with duties solely to the Company, and nothing herein shall be construed as creating any other relationship between the Company and Q Advisors hereto including, but not limited to, partnership, agency or joint venture. The relationship between Q Advisors and the Company under this letter agreement shall be solely that of consultant and client. The Company, its agents, employees, representatives or affiliates shall under no circumstance be deemed agents or

*Page 2 of 7*

Mr. Jason Ellis                                                      *Confidential*
January 18, 2013

representatives of Q Advisors. Neither Q Advisors nor its agents, employees, representatives or affiliates, shall be deemed for any purpose to be employees of the Company. Furthermore, it is understood that Q Advisors is being engaged hereunder solely to provide the Services described above to the Company and that Q Advisors is not acting as an agent or fiduciary of, and shall have no duties or liability to, the directors or equity holders of the Company or any other third party in connection with its engagement hereunder, all of which are expressly waived. Any purchases of securities from, or other transactions involving, the Company shall be effected by the Company. Q Advisors and its employees, agents and representatives shall have no authority to bind the Company. Q Advisors understand that the Company may modify, suspend, terminate or withdraw entirely any Financing transaction or efforts to pursue such a transaction at any time.

5.  **General Indemnity.** The Company agrees to indemnify Q Advisors and its members, directors, officers, agents and employees (each, an "Indemnified Party") of and from any losses, actions, claims, damages or liabilities (or actions in respect thereof) resulting from any claim raised by a third party relating to or arising out of the performance of the Services noted hereunder, other than the gross negligence or wilful misconduct by an Indemnified Party, and will reimburse the Indemnified Party hereunder for all expenses (including reasonable attorneys' fees and expenses) reasonably incurred by the Indemnified Party in connection with investigating, preparing or defending any such action or claim. The Company agrees that neither Q Advisors nor any Indemnified Party shall have any liability to the Company for or in connection with this engagement except for any such liability for losses, actions, claims, damages, liabilities or expenses incurred by the Company that result from Q Advisors' gross negligence or wilful misconduct. In the event that an indemnifiable claim arises hereunder, the Indemnified Party shall give prompt written notice of the claim to the Company and the Company shall have the right to assume the defense of such claim provided that there is no ~~conflict of interest between the Company, on the one hand, and the Indemnified Party on the other~~ hand. The Company will not settle any action by a third party against any Indemnified Party relating to this engagement without securing appropriate releases or other protection for such Indemnified Party. No Indemnified Party will settle any action without the consent of the Company, which consent shall not be unreasonably withheld.

If the indemnification provided for in the preceding paragraph shall for any reason be unavailable to an otherwise Indemnified Party, then the Company shall, in lieu of indemnifying such Indemnified Party, contribute to the amount paid or payable by such Indemnified Party (a) in such proportion as shall be appropriate to reflect the relative benefits received by the Company on the one hand and Q Advisors on the other from the engagement or the Financing or (b) if the allocation provided by clause (a) is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (a) but also the relative fault of the Company on the one hand and Q Advisors on the other with respect to the conduct or omission which resulted in a loss, action, claim, damage or liability, or action in respect thereof, as well as any other relevant equitable considerations. The relative benefits received by the Company on the one hand and Q Advisors on the other with respect to the Financing shall be deemed to be in the same proportion as the aggregate consideration or value received by the Company in the Financing (as the same may be reduced by damages incurred as a result thereof) bears to the Financing Fee received by Q Advisors under this letter agreement. Under no circumstances shall Q Advisors or any Indemnified Party be liable for any indirect, consequential, incidental, special, punitive or exemplary damages arising from any losses, actions, claims, damages or liabilities (or actions in respect thereof) resulting from any claim raised by a third party relating to or arising out of the performance of the Services, regardless of whether Q Advisors has been apprised of the likelihood of such damages occurring.

In the event the Company requests that Q Advisors deliver certain documents and information relating to this engagement via electronic transmissions, the Company acknowledges and agrees that

the privacy and integrity of electronic transmissions cannot be guaranteed due to the possibility that third parties could intercept, view or alter such electronic transmissions. To the extent that any documents or information relating to this engagement are transmitted electronically, the Company agrees to release Q Advisors from any loss or liability incurred in connection with the electronic transmission of any such documents and information, including the unauthorized interception, alteration or fraudulent generation and transmission of electronic transmissions by third parties. Under no circumstances shall Q Advisors be liable for any ordinary, direct, indirect, consequential, incidental, special, punitive or exemplary damages arising out of the foregoing, regardless of whether Q Advisors has been apprised of the likelihood of such damages occurring.

6.  **Reliance on Information; Confidentiality.** The Company understands and confirms (a) that Q Advisors will be using and relying on data, material and information about the Company furnished to Q Advisors by the Company, its employees and representatives and (b) that Q Advisors does not assume responsibility for independently verifying such information. The Company hereby represents and warrants to Q Advisors that the information furnished by the Company for the purposes contemplated by this letter agreement will not contain any untrue statement of a material fact or omit to state any material fact necessary to make statements therein not misleading.

Any advice or opinions provided by Q Advisors may not be disclosed or referred to publicly or to any third party except in accordance with Q Advisors' prior written consent, which shall not be unreasonably withheld or denied, or as required by law or regulation. Q Advisors acknowledges that all information about the Company, its business, operations and customers that Q Advisors and its representatives learn in any way and from any source as a result of this letter agreement constitutes a trade secret, or is confidential or proprietary to the Company (the "Confidential Information"). Q Advisors shall receive and hold such Confidential Information in confidence, shall hold the same in trust, shall not disclose or furnish the same to any third party without the Company's prior written consent, and shall not use the same for any purpose other than the performance of its obligations under this letter agreement or otherwise in direct connection with the operation of this letter agreement. Notwithstanding the foregoing, Confidential Information shall not encompass information about the Company that is or becomes publicly available through no fault of Q Advisors', is already lawfully in Q Advisors' possession, is independently developed by Q Advisors, or is legitimately and lawfully obtained by Q Advisors from third parties not under obligations of confidentiality to the Company.

Upon termination of this letter agreement, Q Advisors shall return or, at the discretion of the Company, destroy all the Company's Confidential Information in its care, custody or control that is capable of being retrieved for such purpose(s) without undue burden to Q Advisors, with the exception of any materials required to be kept for FINRA or other regulatory purposes.

Q Advisors acknowledges that the Confidential Information under this letter agreement constitutes unique, valuable and special trade secret and business information of the Company, and that disclosure may cause irreparable injury to the Company. Accordingly, Q Advisors agrees that the remedy at law for any breach of the covenants contained in this paragraph 6 may be inadequate, and in recognition, agrees that the Company shall, in addition, be entitled to seek injunctive relief without bond including reasonable attorneys' fees and other court costs and expenses, in the event of a breach or threatened breach of the provisions of this paragraph 6, which relief shall be in addition to and not in derogation of any other remedies which may be available to the Company as a result of such breach.

7.  **Notices.** Notice given pursuant to any of the provisions of this letter agreement shall be in writing and shall sent by overnight delivery by an internationally recognized delivery company or hand-

Mr. Jason Ellis                                                                    *Confidential*
January 18, 2013

delivered (a) to the Company at the address set forth above, to the attention of Mr. Jason Ellis, and (b) to Q Advisors at 1899 Wynkoop Street, Ste. 200, Denver, Colorado 80202, Attention: Mr. Michael Crawford. Parties may change the foregoing addresses with a prior written notice to the other party.

8.  **Construction.** This letter agreement shall be governed by and construed in accordance with the laws of the State of Utah as applied to contracts made and performed in such State, exclusive of Utah's choice of law provisions.

9.  **Severability.** Any determination that any provision of this letter agreement may be, or is, unenforceable shall not affect the enforceability of the remainder of this letter agreement.

10. **Headings.** The paragraph headings in this letter agreement have been inserted as a matter of convenience of reference and are not part of this letter agreement.

11. **Counterparts.** This letter agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. This letter agreement may be executed by facsimile.

12. **Third Party Beneficiaries.** This letter agreement has been and is made solely for the benefit of the Company and Q Advisors and their respective successors and permitted assigns, and no other person shall acquire or have any right under or by virtue of this letter agreement.

13. **Modification.** This letter agreement may not be modified, amended or assigned except in writing, duly executed by the parties hereto.

14. **Announcements.** It is understood that if a Financing is completed, Q Advisors will be entitled, at its expense, to place an announcement in such publications and mailings as Q Advisors desires, stating that Q Advisors has acted as financial advisor to the Company in connection with the Financing. Any such announcements shall be subject to the Company's approval, which shall not be unreasonably withheld or delayed.

15. **Future Sale or Recapitalization.** In the event that Mergence elects to pursue a sale or recapitalization of the Company, whether while this letter is in effect or within thirty six (36) months of its termination, Q Advisors and Mergence shall negotiate in good faith a new engagement letter under which Q Advisors would be the Company's exclusive financial advisor for that assignment/transaction. The intent of both parties would be to agree to terms of an engagement that are commercially reasonable and that, when taken as a whole, are not materially inconsistent with those available at the time from investment banks or other organizations with experience and qualifications substantially similar to those of Q Advisors.



*Page 5 of 7*

Mr. Jason Ellis                                                                    *Confidential*
January 11st, 2013
        *18*

If the terms of our engagement as set forth in this letter are satisfactory, kindly sign the enclosed copy of this letter agreement and return it to us.  We look forward to working with the Company on this assignment.

Very truly yours,

Q ADVISORS LLC, a Colorado limited liability company

By:        Q Consulting & Advisors Inc., Manager

By:

Michael Crawford, Vice President

Accepted:

By:

Title: President

Date: 1/18/13

*Page 6 of 7*