EXHIBIT 6

Steven G. Loosle (4874)
Platte S. Nielson (13312)
KRUSE LANDA MAYCOCK & RICKS, LLC
136 East South Temple, Suite 2100
P. O. Box 45561
Salt Lake City, Utah 84145-0561
Telephone: (801) 531-7090
sloosle@klmrlaw.com
pnielson@klmrlaw.com
*Attorneys for Plaintiff*

## IN THE THIRD JUDICIAL DISTRICT IN AND FOR
## SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| MERGENCE CORPORATION, dba SPRING RETAIL GROUP, a Delaware corporation, | **MEMORANDUM IN OPPOSITION TO MOTION TO STAY PROCEEDINGS** |
| Plaintiff, | **(Oral Argument Requested)** |
| vs. | |
| Q ADVISORS LLC, a Colorado limited liability company, | Civil No. 150901798 Judge James Gardner |
| Defendant. | |

Defendant Q Advisors LLC ("Q Advisors") has moved the Court to stay these proceedings until resolution of the lawsuit between the parties currently pending in Colorado state court. Plaintiff Mergence Corporation, dba Spring Retail Group, a Delaware corporation ("Mergence-Delaware") hereby submits this memorandum in opposition to Q Advisors' motion to stay. The Court should not exercise its discretion to stay this action because the applicable factors to be considered by the Court weigh against granting a stay. Q Advisors' motion to stay these proceedings should be denied.

{00299114/1 }                          1

## FACTUAL BACKGROUND

**A.    The parties.**

1.    Mergence-Delaware is a Delaware corporation with its principal place of business and primary operations in Salt Lake City, Utah. Mergence-Delaware is a holding company for technology businesses. (*See* Declaration of Jason S. Ellis, ¶ 2, filed concurrently herewith.)

2.    Q Advisors is a Colorado limited liability company headquartered in Denver, Colorado. It specializes in assisting companies with business transactions such as mergers and acquisitions, debt and equity financings, and recapitalizations. Q Advisors is registered with the United States Securities and Exchange Administration as a broker-dealer. Q Advisors is also registered in the states of California and Colorado as a broker-dealer, but not in Utah. (*See* FINRA BrokerCheck, pp. 8-9, attached hereto as Exhibit 1.)

**B.    Q Advisors helps Mergence-Delaware sell one of its Utah subsidiaries, Simply Mac.**

3.    On March 15, 2012, Mergence-Delaware entered into an agreement with Q Advisors whereby Q Advisors would provide investment banking services in connection with the sale of a subsidiary of Mergence-Delaware known as Simply Mac, Inc. ("Simply Mac"), a Utah corporation ("Engagement Letter No. 1"). (*See* a copy of Engagement Letter No. 1 attached as Exhibit A to Declaration of Jason S. Ellis.) At the time of Engagement Letter No. 1, the principal place of business of Mergence-Delaware and Simply Mac was in Salt Lake City, Utah. (Declaration of Jason S. Ellis, ¶ 3.)

4.    Paragraph eight of Engagement Letter No. 1 provides that "This letter agreement shall be governed by and construed in accordance with the laws of the State of Utah as applied to contracts made and performed in such state." (Engagement Letter No. 1, p. 5.)

{00299114/1 }                                    2

5.     Pursuant to Engagement Letter No. 1, Q Advisors assisted Mergence-Delaware in the sale of Simply Mac, and Q Advisors received fees of $690,000 plus expenses for its services. Q Advisors has never claimed that it is owed additional fees in connection with the sale of Simply Mac. (Declaration of Jason S. Ellis, ¶ 4.)

6.     The sale of Simply Mac took place in two transactions, the first in October, 2012, and the second in November, 2013. (*See* excerpts from the first Stock Purchase Agreement attached as Exhibit B to the Declaration of Jason S. Ellis.) The Stock Purchase Agreement shows that in addition to Mergence-Delaware, the other selling shareholders were four individuals who were Utah residents, including Steve Bain, Tyler Dickman, Kent Thomas, and Kent Forsgren. (*Id.*)

## C.     Q Advisors helps raise capital for Mergence-Delaware's subsidiary Spring Communications Holding, Inc., which had its principal place of business in Utah.

7.     On January 18, 2013, Mergence-Delaware entered into a second agreement with Q Advisors whereby Q Advisors would provide investment banking services ("Engagement Letter No. 2"). (*See* a copy of Engagement Letter No. 2 attached as Exhibit C to the Declaration of Jason S. Ellis.) Pursuant to Engagement Letter No. 2, Q Advisors agreed to provide services in raising capital "in connection with a private placement to qualified institutional buyers." (*Id.* at p. 1.)

8.     Paragraph eight of Engagement Letter No. 2 provides that "This letter agreement shall be governed by and construed in accordance with the laws of the State of Utah as applied to contracts made and performed in such state." (*Id.* at p. 5.)

9.     Paragraph 15 of Engagement Letter No. 2 also provided that in the event Mergence-Delaware pursued a sale or recapitalization of Mergence-Delaware, the parties would "negotiate in good faith a new engagement letter under which Q Advisors would be [Mergence-Delaware's] exclusive financial advisor for that assignment/transaction." (*Id.* at p. 5.) Paragraph 15 does not

{00299114/1 }                                              3

set forth any material or essential terms – including pricing or payment terms – with respect to the possible future agreement to be negotiated by the parties.

10.     At the time of Engagement Letter No. 2, Mergence-Delaware was the 100% owner of a subsidiary known as Spring Communications Holding, Inc., a Delaware corporation ("Spring Communications"). Spring Communications in turn was the 100% owner of various corporate entities, including Spring Communications, Inc., a Utah corporation ("Spring"). (Declaration of Jason S. Ellis, ¶ 7.)

11.     At all times relevant to Engagement Letter No. 2, the principal place of business of Mergence, Spring Communications, and Spring was Salt Lake City, Utah. (*Id.* ¶ 8.)

12.     In 2013, Spring operated 60 stores as an exclusive retailer of AT&T wireless devices and services. The stores were located in many different states, and a few of those stores were located in Colorado. (*Id.* ¶ 9.)

13.     Pursuant to Engagement Letter No. 2, Q Advisors assisted Spring Communications and its subsidiaries, including Spring, in obtaining financing from Fifth Third Bank. Spring Communications and its subsidiaries entered into a loan and security agreement with Fifth Third Bank in connection with this financing transaction. This financing transaction closed in July 2013. (*Id.* ¶¶ 10-11.)

14.     Mergence-Delaware was not a party to the loan and security agreement and did not receive any of the proceeds from the financing. (*Id.* ¶ 11; *see also* excerpts from loan and security agreement for this financing transaction attached as Exhibit D to the Declaration of Jason S. Ellis.)

15.     Q Advisors was paid for the services it performed under Engagement Letter No. 2. Specifically, Spring Communications and related entities paid $670,000 in fees plus expenses to

Q Advisors for its investment banking services in raising the debt capital pursuant to Engagement Letter No. 2. Q Advisors has never claimed that it is owed additional fees related to this transaction. (Declaration of Jason S. Ellis, ¶ 12.)

**D.      Mergence-Delaware sells Spring Communications without the help of Q Advisors.**

16.      In October 2013, Mergence-Delaware sold 100% of its shares in Spring Communications to GameStop Corp. ("GameStop), a company with its principal office in Texas. (*Id.* ¶¶ 13-14; *see also* excerpts from the stock purchase agreement attached as Exhibit E to the Declaration of Jason S. Ellis.)

17.      In its Counterclaim, Q Advisors seeks compensation related to the sale of Spring Communications to GameStop. (*See* Counterclaim; *see also* Declaration of Jason S. Ellis, ¶ 14.)

18.      Q Advisors had no involvement in the transaction between Mergence-Delaware and GameStop for the sale of Spring Communications. Neither Mergence-Delaware nor Spring Communications had any need for Q Advisors' services or involvement. Q Advisors has none of the files or documents related to this transaction, all of which are stored in the records of Mergence-Delaware in Salt Lake City, Utah or the offices of GameStop in Texas. None of the events related to this transaction occurred in Colorado. None of the individuals who were involved in this transaction reside in Colorado, but reside in Utah and Texas. (Declaration of Jason S. Ellis, ¶ 15.)

19.      Mergence-Delaware did not retain the services of any investment banker in connection with the sale of Spring Communications to GameStop because it did not need any such services for this transaction. (*Id.* ¶ 16.)

20.      As noted above, Spring did have operations in Colorado at the time of the sale of Spring Communications to GameStop in October 2013. However, Mergence-Delaware has never

had any employees, officers, agents, offices, bank accounts, or phone listings in Colorado. Mergence-Delaware has never advertised or registered to do business in Colorado nor has it sold any products or services in Colorado. (*Id.* ¶ 17.)

**E.     Q Advisors sues Mergence-Nevada and Jason Ellis for not negotiating a new agreement with Q Advisors in connection with the sale of Spring Communications to GameStop.**

21.     On March 17, 2015, Q Advisors filed a complaint in Colorado state court against Mergence Corporation, a Nevada Corporation ("Mergence-Nevada") and Jason S. Ellis, the president of Mergence-Nevada.  In the complaint, Q Advisors alleged that the parties to Engagement Letter No. 2 are Mergence-Nevada and Q Advisors and that Mergence-Nevada breached paragraph 15 of Engagement Letter No. 2 and the implied covenant of good faith and fair dealing because it did not negotiate a new engagement letter with Q Advisors prior to the sale of Spring Communications to GameStop. The Colorado complaint named Ellis personally as a defendant based on Q Advisors' theory that Ellis, as an officer of Mergence-Nevada, was personally liable for Engagement Letter No. 2 because Mergence-Nevada was not permitted to transact business at the time of Engagement Letter No. 2. (*See* copy of Q Advisors' Colorado complaint attached as Exhibit 2.)

22.     Q Advisors sued Mergence-Nevada under Engagement Letter No. 2 despite the fact that the actual party to Engagement Letter No. 2 – Mergence-Delaware – had held itself out to Q Advisors as a Delaware corporation. (*See id.* ¶ 19.)

23.     Mergence-Nevada is an actual entity that is separate and distinct from Mergence-Delaware. It is a Nevada corporation that was formed in August 2005. Mergence-Nevada has

never conducted any business in Colorado or with Q Advisors. (Affidavit of Jason Ellis, ¶¶ 3, 4, and 7, attached hereto as Exhibit 3.)

**F.    Mergence-Delaware files a complaint against Q Advisors in this Court.**

24.    On March 18, 2015, Mergence-Delaware filed this action against Q Advisors seeking a judgment from this Court declaring that Mergence-Delaware owes no fees to Q Advisors as a result of the sale of Spring Communications to GameStop. In support of its claim for declaratory relief, Mergence-Delaware asserts in its complaint that Mergence-Delaware is a party to Engagement Letter No. 2; that Mergence-Delaware has not been sold or recapitalized since Engagement Letter No. 2; that Q Advisors has already been paid in full for the services it rendered under Engagement Letter No. 2; that Q Advisors provided no services to Mergence-Delaware or Spring Communications in connection with Mergence-Delaware's sale of Spring Communications to GameStop; and that Utah law does not recognize a duty to negotiate an agreement.

25.    Mergence-Delaware did not name Mergence-Nevada or Ellis as parties to this Utah action because they are not parties to or liable under Engagement Letter No. 2.

26.    Q Advisors was served with the Utah complaint on March 31, 2015. It answered the Utah complaint and filed a counterclaim against Mergence-Delaware on April 30, 2015.

**G.    Mergence-Nevada and Ellis move to dismiss Q Advisors' Colorado complaint and Q Advisors moves to add Mergence-Delaware as a party to the Colorado complaint.**

27.    On March 30, 2015, Mergence-Nevada and Ellis moved the Colorado state court to dismiss Q Advisors' complaint on account of their not having transacted business in Colorado within the meaning of Colorado's long-arm statute and not having sufficient minimum contacts with Colorado to be subject to personal jurisdiction there. They provided evidence to the court that Mergence-Nevada had never conducted business in Colorado, had never transacted business

with Q Advisors, was not a party to Engagement Letter No. 2, and had not sold Spring Communications to GameStop.

28.     In response to the motion to dismiss for lack of personal jurisdiction, Q Advisors conceded that Mergence-Nevada was not a party to Engagement Letter No. 2. However, Q Advisors opposed dismissal of the Colorado complaint and moved the court for permission to amend its complaint to drop Mergence-Nevada and Ellis as defendants to the action and to add a new party, Mergence-Delaware, as the sole defendant.

29.     On May 5, 2015, the Colorado state court ruled on the parties' respective motions to dismiss and for leave to amend. The court dismissed Mergence-Nevada and Ellis as defendants to the Colorado suit, but, under the liberal standard applied to motions for leave to amend, permitted Q Advisors to amend its complaint to add Mergence-Delaware as the sole defendant. Q Advisors filed its amended complaint against Mergence-Delaware on the same day, May 5, 2015. (*See* copy of Q Advisors' Amended Complaint attached hereto as Exhibit 4.)

30.     Mergence-Delaware accepted service of the amended complaint on May 6, 2015. Its deadline to answer or otherwise respond to the amended complaint is May 26, 2015. Mergence-Delaware intends to move the Colorado court to dismiss the Colorado amended complaint for lack of personal jurisdiction and/or to stay the Colorado action pending resolution of this Utah action.

## ARGUMENT

## A.     It is not imperative that the Court exercise its discretionary stay powers in this matter.

The fact that the parties have another similar action pending in Colorado does not necessitate a stay of this case. The Supreme Court of Utah explained the following in *Power Train, Inc.* v. *Stuver*, 550 P.2d 1293, 1294 (Utah 1976):

{00299114/1 }                                    8

> where two identical actions between the same parties are initiated, first in one state
> and then in another, it is generally held that such identical actions can co-exist in
> different states, provided that a judgment in one may be pleaded in bar or in
> abatement to the other. An action in personam pending in one state is not sufficient
> ground to sustain a plea in abatement to an action on the same cause between the
> same parties in a second state.

(internal citations omitted). This principle and standard applies in this case. The parties' suits in

Utah and Colorado are based upon the same set of facts and circumstances, and a judgment in one

action would preclude, through *res judicata*, a subsequent inconsistent judgment in the other. The

parties' separate suits can co-exist. There is no requirement for a stay and the Court need not feel

compelled to order a stay on account Q Advisors' motion.

It is true, however, that a Utah court has discretion to stay a case on its docket if there is

already an identical action between the parties pending in another state, but such a decision must

be made cautiously after careful analysis of specific factors set forth in Utah law. *See id.* at 1294-

1295. This memorandum shows how each of the applicable stay factors to be considered by the

Court weigh against staying this matter in deference to the Colorado action. Q Advisors' motion

to stay this matter should therefore be denied.

**B.    The Colorado action between Q Advisors and Mergence-Delaware was not the first-filed suit between the parties and it should not be given priority.**

Q Advisors argues that this Court should give priority to the Colorado action, and therefore

stay this Utah action, because the Colorado action was filed first. This is incorrect. Q Advisors'

amended complaint alleging causes of action against Mergence-Delaware was not filed in

Colorado until May 5, 2015. Mergence-Delaware was not made a party to the Colorado action

until May 5, 2015. On the other hand, Mergence-Delaware filed this Utah action against

Q Advisors on March 18, a full 47 days before Mergence-Delaware was added as a defendant to

the Colorado action. Furthermore, Mergence-Delaware achieved service of process on Q Advisors in connection with its Utah complaint before Q Advisor's achieved service of process on Mergence-Delaware in connection with its Colorado complaint. The fact that Q Advisors sued Mergence-Nevada before Mergence-Delaware filed this suit is irrelevant since "Utah law has long recognized the importance of the separate legal identity of corporations and has been unwilling to permit parties to ignore those distinctions." *Sachs v. Lesser*, 2007 UT App 169, ¶ 51, 163 P.3d 662. A lawsuit against Mergence-Nevada is not the same as a lawsuit against Mergence-Delaware.

This action should be given priority over the Colorado suit not only for the reason that it was filed and served first, but for all the reasons set forth below demonstrating why Utah is the most appropriate and convenient forum given the facts, available evidence, and controlling law of the parties' dispute. After all, the determination regarding whether to stay or not stay this action does not hinge upon which party filed first, but on the consideration of the applicable stay factors set forth in Utah case law. The first-to-file rule is not mechanically applied, but is left to the discretion of the court. *See, e.g.*, *Hospah Coal Co. v. Chaco Energy Co.*, 673 F.2d 1161, 1164 (10th Cir. 1982).

## C. The applicable factors to be considered by the Court weigh against granting a stay.

Q Advisors misapplies several of the factors the Court must consider in determining whether it is appropriate to order a stay of this matter. Q Advisors also ignores other relevant factors, such as the key factor regarding which state's law applies. Below is a list of relevant factors, as referenced in *Power Train*, which Utah courts should consider when deciding whether to grant a stay in light of parties having actions pending simultaneously in different jurisdictions:

{00299114/1 }                                                    10

the importance of discouraging multiple litigation designed solely to harass an adverse party, and of avoiding unseemly conflicts with the courts of other jurisdictions;

whether the rights of the parties can best be determined by the court of the other jurisdiction because of the subject matter, the availability of witnesses, or the stage to which the proceedings in the other court have already advanced;

the relative ease of access to proof;

the availability of compulsory process for witnesses;

all other practical problems that would make the trial of the case easy, expeditious and inexpensive;

whether the controversy is dependent upon the application of the law of this State which the courts herein more properly should decide than those of another jurisdiction.

*Id.* at 1295 (internal citations omitted); *see also Nationwide Mut. Ins. Co. v. Mayer,* 833 P.2d 60, 62 (Colo. App. 1992) (Colorado court of appeals applying these stay factors and citing *Power Train*). As explained below, each of the factors above weigh against ordering a stay of this Utah action in deference to the parties' pending Colorado action.

**1.      The parties' dispute is governed by and dependent upon the application of Utah law, making it more proper for this Court to decide the case than the Colorado state court.**

The parties' dispute centers on whether Mergence-Delaware breached paragraph 15 of Engagement Letter No. 2.  Paragraph eight in Engagement Letter No. 2 specifies that the Agreement is governed by Utah law, meaning resolution of the parties' dispute turns upon application of Utah law.  In addition, Q Advisors' claim for damages resulting from Mergence-Delaware's alleged breach of paragraph 15 turns on whether current Utah law should be reversed, modified, or extended, as current Utah law provides that indefinite and incomplete agreements to negotiate an agreement in the future – which paragraph 15 of Engagement Letter No. 2 plainly is

– are unenforceable. *See King v. Nev. Elec. Inv. Co.*, 893 F. Supp. 1006, 1015-18 (D. Utah 1994). Certainly, this Court is better positioned than the Colorado court to not only apply Utah law, but to decide whether Utah law should be reversed, modified, or extended.

It is well established that indefinite and incomplete agreements to negotiate an agreement in the future are not enforceable under Utah law. In *King*, the agreement at issue contained a provision very similar to paragraph 15 of Engagement Letter No. 2, as it required the parties to negotiate a mining agreement in the future, but did not contain any material terms of the contemplated future mining agreement. *Id.* at 1015-16. Plaintiffs alleged that defendant breached the provision by not negotiating a mining agreement with them. *Id.* at 1017. The provision at issue in *King* states in relevant part:

> During the Option Period, NEICO and Andy King . . . will negotiate in good faith to conclude a Mine Management Agreement (MINE AGREEMENT) under which Andy King will operate the GENWAL MINE for us. The MINE AGREEMENT would take effect upon the closing of the Option Agreement by NEICO or its nominee purchasing all of the stock of GENWAL.

*Id.* at 1015.

The court in *King* found that the provision was nothing more than an agreement to negotiate a new agreement, that it "leaves open essentially every material and/or major term of the contemplated Mine Agreement," and that, accordingly, it was "too indefinite and uncertain to be enforceable." *Id.* at 1017. The court cited the Tenth Circuit as support for its ruling that Utah law does not enforce incomplete or indefinite agreements to negotiate a new agreement.

> As concerns an agreement to enter into a contract, the general rule is that where the agreement itself contains all essential terms it may be specifically enforced even though the parties contemplated the subsequent execution of a formal contract. *The converse of this proposition is that an agreement to enter into a contract will not be specifically enforced where the agreement is incomplete or indefinite as to substantial and material matters. . . .*

> Utah would appear to be in accord with the general contract law set forth above.
> . . .

*Id.* (citing *D.H. Overmyer Co. v. Brown*, 439 F.2d 926, 929 (10th Cir. 1971)) (emphasis added).

The court also summarized general contract law in Utah to support its ruling, explaining that

> A condition precedent to the enforcement of any contract is that there be a
> meeting of the minds of the parties, which must be spelled out, either expressly
> or impliedly, with sufficient definiteness to be enforced. This statement reflects
> the well-established rule in Utah that an agreement will only be enforced where
> its terms are set forth with sufficient definiteness to allow the court to enforce
> the agreement of the parties.

> Sufficient definiteness is required so that the Court is not left with the task of
> writing an agreement for the parties. The court cannot fabricate the kind of
> contract the parties ought to have made and enforce it. Although it is not
> necessary that the contract provide for every collateral matter or possible
> contingency, the parties themselves must have set forth with sufficient
> definiteness at least the essential terms of the contract.

*Id.* at 1016 (internal citations and quotations omitted); *see also Candland v. Oldroyd*, 248 P. 1101,

1102 (Utah 1926) ("So long as there is any uncertainty or indefiniteness, or future negotiations or

considerations to be had between the parties, there is not a completed contract. In fact, there is no

contract at all.").

The court in *King* specified that its analysis on agreements to negotiate a new agreement

applied to claims for specific performance and to claims for damages. *Id.* at 1017. It cited

decisions from the Second and Eighth Circuit courts explaining how damages are impossible to

calculate in cases of indefinite agreements to negotiate a new agreement and how such agreements

are unenforceable because they don't provide an appropriate remedy. *Id.* (citing *Necchi v. Necchi*

*Sewing Machine Sales Corp.*, 348 F.2d 693, 698 (2nd Cir. 1965) (holding that it would be

impossible for the court to assess damages stemming from an agreement that was not negotiated

or entered into by the parties); *Ohio Calculating, Inc. v. CPT Corp.*, 846 F.2d 497, 501 (8th Cir. 1988) (holding that agreement to negotiate in good faith was not enforceable because it "provide[d] neither a basis for determining the existence of a breach nor for giving an appropriate remedy.")). The court in *King* found the reasoning of these decision to be "sound."

It is important to note that the plaintiffs in *King*, like Q Advisors, asserted not only a claim for breach of contract for defendant's failure to abide by the provision requiring negotiation of a mining agreement in the future, but they also asserted a claim for breach of the duty of good faith and fair dealing on the same grounds. However, the court rejected this claim, reasoning that

> [T]he court finds as a matter of law that the agreement to negotiate is unenforceably vague and indefinite. Consequently, there is no enforceable contract to support plaintiff's claim for breach of the attendant duty of good faith and fair dealing.

*King*, 893 F. Supp. at 1020.

Given the application of Utah law and Q Advisors' need to reverse, modify, or extend Utah law in order to prevail on its claims, this Court should hear and decide the parties' dispute. It would not be prudent to leave resolution of these Utah law issues to the Colorado court.

**2. The Colorado court is not better positioned to determine the parties' rights.**

This factor inquires as to whether the Colorado state court is in a better position to determine the parties' rights in light of the subject matter of the parties' dispute, available witnesses, and the progress of the Colorado action. The answer to this inquiry is no, as each of these considerations demonstrate that this Court, not the Colorado state court, is in the best position to hear and decide the parties' dispute.

With respect to subject matter, as set forth above, it is clear that this Court is better positioned than the Colorado court to hear and decide this case because Utah law governs and controls the parties' claims.

Regarding availability of witnesses, none of the potential witnesses involved with the sale of Spring Communications – which transaction forms the basis of the parties' dispute – resides in Colorado. None of the events related to this transaction occurred in Colorado and none of the files or documents for this transaction are stored in Colorado. As described in Mergence-Delaware's initial disclosures filed with this Court on May 20, 2015, most of the potential witnesses reside in Utah. Such witnesses would be more readily available and accessible for purposes of being deposed or testifying at a trial in Utah as opposed to in Colorado.

Q Advisors asserts that key witnesses to this case are located in Colorado, but all such witnesses relate not to the complained-of sale of Spring Communications, but to the services Q Advisors provided in obtaining financing from Fifth Third Bank and in the sale of Simply Mac. There is no dispute regarding Q Advisors' performance of these services or payment of fees for these services. What is at dispute between the parties is the sale of Spring Communications, and that transaction and the potential witnesses who were involved in that transaction have no connection to Colorado. Utah is far more convenient forum with respect to the availability of witnesses.

Q Advisors' assertion that the Colorado action has progressed beyond this Utah action is not true. Mergence-Delaware was not a party to the briefing in Colorado on Mergence-Nevada and Ellis's motion to dismiss or Q Advisors' motion for leave to amend. Indeed, Mergence-Delaware was not made a party to the Colorado action until May 5, 2015. Mergence-Delaware

{00299114/1 }                                                          15

has not filed an answer to Q Advisors' amended complaint in Colorado nor has it provided any initial disclosures to Q Advisors in the Colorado action. Also, no discovery has been done in the Colorado action. On the other hand, in the Utah action, Q Advisors has filed an answer to Mergence-Delaware's complaint and it has also filed a counterclaim against Mergence-Delaware. In addition, Mergence-Delaware has provided its initial disclosures to Q Advisors and has served Q Advisors with Mergence-Delaware's first set of interrogatories and requests for production of documents. The dispute between Mergence-Delaware and Q Advisors has progressed further in this Utah action than it has in the Colorado action.

Utah also has an important interest in resolving this dispute under the state's securities laws. Q Advisors is a securities broker-dealer that has rendered multiple services for Utah businesses, but it has never been licensed in Utah. *See* UTAH CODE ANN. § 61-1-3(1) and § 61-1-13(1)(c). Q Advisors bears the burden of establishing an exception to the licensing requirement. UTAH CODE ANN. § 61-1-14.5.

**3.     It makes practical and economic sense for the parties' dispute to proceed in Utah, not Colorado.**

This factor references the importance of discouraging multiple litigation designed solely to harass an adverse party. This factor does not weigh in favor of staying this action, as Mergence-Delaware did not file this suit against Q Advisors in order to harass Q Advisors. Mergence-Delaware filed this action because it was not a party to Q Advisors' suit in Colorado and because it made no sense to initiate litigation in Colorado regarding a contract governed by Utah law and a transaction between parties in Utah and Texas. Mergence-Delaware agrees with Q Advisors that it makes little practical or economic sense for the parties and both courts to expend resources

litigating the parties' dispute in two different jurisdictions. But given the circumstances, it does make sense practically and economically for the litigation to proceed in Utah, not Colorado.

The issues to be litigated by the parties are whether paragraph 15 of Engagement Letter No. 2 is enforceable and whether Mergence-Delaware violated paragraph 15 or a covenant of good faith and fair dealing when it sold Spring Communications to GameStop without the assistance of Q Advisors. Utah law governs and controls both of these issues. The transaction involving Mergence-Delaware, Spring Communications, and GameStop occurred in Utah and Texas, not Colorado. None of the persons directly involved in the complained of transaction are in Colorado. The majority of potential witnesses qualified to testify about the transaction with GameStop are in Utah, and others are in Texas. The relevant discovery pertaining to the transaction with GameStop is not housed in Colorado, but in Utah with Mergence-Delaware. It makes no economic or practical sense to litigate in Colorado state court the enforceability of paragraph 15 and the hypothetical damages stemming from an alleged breach thereof by way of a transaction that occurred between Mergence-Delaware in Utah and GameStop in Texas.

This factor weighs against granting a stay, as Utah is the most practical forum in which to litigate the parties' dispute. As mentioned above, Mergence-Delaware intends to move the Colorado court to dismiss the Colorado action for lack of personal jurisdiction and/or to stay the Colorado action pending resolution of this Utah action. After all, Mergence-Delaware has never had any employees, officers, agents, offices, bank accounts, or phone listings in Colorado, nor has it ever advertised, registered to do business, or sold any products or services in Colorado. Q Advisors points out that Spring had operations in Colorado at the time Q Advisors helped raise debt capital pursuant to Engagement Letter No. 2. Spring is a subsidiary of Spring

Communications, and Spring Communications is a subsidiary of Mergence-Delaware. The operations of Mergence-Delaware's subsidiaries in Colorado do not subject Mergence-Delaware to personal jurisdiction in Colorado. *See Good v. Fuji Fire & Marine Ins. Co.*, 271 F. App'x 756, 759 (10th Cir. 2008) ("For purposes of personal jurisdiction, 'a holding or parent company has a separate corporate existence and is treated separately from the subsidiary in the absence of circumstances justifying disregard of the corporate entity.'" (quoting *Quarles v. Fuqua Indus., Inc.*, 504 F.2d 1358, 1362 (10th Cir. 1974) and citing *Benton V. Cameco Corp.*, 375 F.3d 1070, 1081 (10th Cir. 2004)). Moreover, Mergence-Delaware no longer has an interest in Spring Communications or its Spring entities.

Q Advisors also argues that Colorado is a more convenient venue because a majority of the services it performed under Engagement Letter No. 2 were performed in Colorado. However, Q Advisors rendered services as a securities broker-dealer for companies with their principal places of business in Utah, giving this dispute a far greater connection to Utah than Colorado. In both Engagement Letter No. 1 and No. 2, Q Advisors agreed in paragraph eight that "This letter agreement shall be governed by and construed in accordance with the laws of the state of Utah *as applied to contracts made and performed in such state*." (emphasis added.) In other words, contrary to Q Advisors' assertions, it contractually agreed that the agreement in question was made and performed in Utah, not Colorado. Furthermore, those services, and payment for those services, are not at issue in this case. The transaction presently at issue between the parties is Mergence-Delaware's transaction in selling Spring Communications. Q Advisors had no involvement in that transaction and the transaction took place between Mergence-Delaware in Utah and GameStop in Texas. The transaction has no connection to Colorado.

{00299114/1 }

18

**4.     Evidence and proof related to parties' dispute is more easily accessible in Utah.**

This factor weighs in favor of not granting a stay because most of the relevant evidence is stored by Mergence-Delaware in Salt Lake City, Utah. None of the events related to the complained-of sale of Spring Communications occurred in Colorado and none of the files or documents for this transaction are stored in Colorado. Also, the majority of potential witnesses reside in Utah, making their appearance at trial in Utah, if necessary, less complicated and burdensome.

**5.     Many of the potential witnesses could not be compelled to testify at trial in Colorado because they are Utah residents.**

Most of the potential witnesses who have knowledge about or who had involvement in Mergence-Delaware's transaction with GameStop are residents of Utah. As a result of residing in Utah, most of these individuals would not be required to comply with a subpoena to testify at trial in Colorado as part of the parties' Colorado action. Even if such witnesses voluntarily agreed to appear at trial in Colorado, the travel and related expenses would likely be inconvenient, burdensome, and expensive for the witnesses and parties. On the other hand, compelling these same Utah residents to testify at trial here in Utah as part of this Utah action would not be an issue. None of the potential witnesses who were actually involved with the GameStop transaction reside in Colorado. This factor weighs in favor of not granting a stay of this Utah matter.

**D.     Mergence-Delaware's complaint for declaratory relief is procedurally proper.**

Q Advisors argues that this Utah declaratory relief action should be stayed or dismissed because it was procedurally improper for Mergence-Delaware to file it after Q Advisors had filed its complaint in Colorado. Q Advisors' argument is unavailing and the cases it cites in support of its position are distinguishable from this case.

At the time Mergence-Delaware filed its complaint in this action, it was not named as a party to the Colorado lawsuit filed by Q Advisors. Q Advisors filed its Colorado complaint against Mergence-Nevada and Ellis, not Mergence-Delaware. Although Q Advisors later claimed that this was a simple mistake, it specifically alleged in in its complaint that the Mergence corporation liable under Engagement Letter No. 2 was "never" a Delaware corporation, even though it held itself out as such. That Mergence-Delaware was not a party to the Colorado action at the time it filed this declaratory relief action distinguishes this case from the cases cited in Q Advisors' memorandum in support of motion to stay proceedings. *See Hercules, Inc. v. Utah State Tax Comm'n*, 1999 UT 12, ¶¶ 2-4, 974 P.2d 286 (holding that it was improper for plaintiff to file a declaratory relief action seeking review of an interlocutory order from a tax commission proceeding in which plaintiff was also a party); *McRae & Deland v. Feltch*, 669 P.2d 404, 405 (Utah 1983) (deciding that it was procedurally improper for plaintiffs to file a declaratory relief action involving identical questions currently pending in another proceeding in which plaintiffs were also parties); *Hospah Coal Co. v. Chaco Energy Co.*, 673 F.2d 1161 (10th Cir. 1982) (holding that it was procedurally improper for persons named as defendants in a pending action in Texas to file a declaratory judgment action in New Mexico against the plaintiffs in the Texas action).

Mergence-Delaware filed this action against Q Advisors because it was not named as a party to Q Advisors' initial Colorado complaint; because the events forming the basis for the parties' dispute (Mergence-Delaware's sale of Spring Communications to GameStop) arose in and are connected to Utah, not Colorado; because Engagement Letter No. 2 by its express terms is governed by Utah law and the contract was made and performed in Utah; because nearly all the evidence and potential witnesses relevant to the complained-of sale of Spring Communications are

located in Utah; and because Mergence-Delaware has never done business in Colorado and is not subject to jurisdiction there. Mergence-Delaware was not forum shopping. It was simply filing suit in the forum most appropriate, practical, and convenient to resolve the parties' dispute.

## CONCLUSION

The parties' pending action in Colorado stay court does not necessitate a stay of this Utah action. This action was filed first, has progressed further than the parties' Colorado action, and should be given priority. Each of the applicable stay factors weigh against staying this matter. For the foregoing reasons, the Court should deny Q Advisors' motion to stay proceedings.

DATED this 20th day of May, 2015.

KRUSE LANDA MAYCOCK & RICKS, LLC

/s/ Steven G. Loosle
Steven G. Loosle
Platte S. Nielson
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of May, 2015, I electronically filed the foregoing

MEMORANDUM IN OPPOSITION TO MOTION TO STAY PROCEEDINGS with the Clerk

of the Court by using the electronic filing system which will send a notice of electronic filing to

the following:

> Royce B. Covington
> J. Mason Kjar
> PARR BROWN GEE & LOVELESS, P.C.
> 101 South 200 East, Suite 700
> Salt Lake City, UT 84111
> *Attorneys for Q Advisors, LLC*

/s/ Lynn Javadi

22

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:15-cv-01093-KMT

Q ADVISORS LLC,

      Plaintiff,

vs.

MERGENCE CORPORATION,

      Defendant.

---

## DECLARATION OF JASON S. ELLIS

---

Jason S. Ellis hereby declares under penalty of perjury as follows:

1.      I am over 18 years of age and I have personal knowledge of the facts set forth below.  I was an officer and director of Mergence Corporation, dba Spring Retail Group, a Delaware corporation ("Mergence") at all times relevant to this declaration.

2.      Mergence is a holding company for technology businesses.

3.      On March 15, 2012, Mergence entered into an agreement with Q Advisors whereby Q Advisors would provide investment banking services in connection with the sale of a subsidiary known as Simply Mac, Inc, a Utah corporation ("Engagement Letter No. 1").  A copy of Engagement Letter No. 1 is attached as Exhibit A.  At the time on Engagement Letter No. 1, the principal place of business of Mergence and Simply Mac was in Salt Lake City, Utah.

4.      Pursuant to Engagement Letter No. 1, Q Advisors assisted Mergence in the sale of Simply Mac, and Q Advisors received fees of $690,000 plus expenses for its services.

{00301993/1 }

1

Q Advisors has never claimed that it is owed additional fees in connection with the sale of Simply Mac.

5.      The sale of Simply Mac took place in two transactions, the first in October, 2012, and the second in November, 2013.  Excerpts from the first Stock Purchase Agreement are attached as Exhibit B.  The Stock Purchase Agreement shows that in addition to Mergence, the other selling shareholders were four individuals who were Utah residents, including Steve Bain, Tyler Dickman, Kent Thomas, and Kent Forsgren.  (See Excerpts from October 2012 Stock Purchase Agreement, attached as Exhibit B).

6.      On January 18, 2013, Mergence entered into a second agreement with Q Advisors whereby Q Advisors would provide investment banking services ("Engagement Letter No. 2"). A copy of Engagement Letter No. 2 is attached as Exhibit C.  Pursuant to Engagement Letter No. 2, Q Advisors agreed to provide services in raising capital "in connection with a private placement to qualified institutional buyers." (*Id.*, p. 1.)

7.      At the time of Engagement Letter No. 2, Mergence was the 100% owner of a subsidiary known as Spring Communications Holding, Inc., a Delaware corporation ("Spring Communications").  Spring Communications in turn was the 100% owner of various corporate entities, including Spring Communications, Inc., a Utah corporation ("Spring").  At all relevant times, I was also an officer and director of Spring Communications and Spring.

8.      At all times relevant to Engagement Letter No. 2, the principal place of business of Mergence, Spring Communications, and Spring was Salt Lake City, Utah.

9.     In 2013, Spring operated 60 stores as an exclusive retailer of AT&T wireless devices and services. The stores were located in many different states, and a few of those stores were located in Colorado.

10.     Pursuant to Engagement Letter No. 2, Q Advisors assisted Spring Communications and its subsidiaries, including Spring, in obtaining financing from Fifth Third Bank. Attached as Exhibit D are excerpts from the loan and security agreement for this financing transaction.

11.     Mergence was not a party to the loan and security agreement with Fifth Third Bank and did not receive any of the proceeds from the financing. (See Loan and Security Agreement, attached as Exhibit D). This financing transaction closed in July, 2013.

12.     Spring Communications and related entities paid $670,000 in fees plus expenses to Q Advisors for its investment banking services in raising the debt capital pursuant to Engagement Letter No. 2. Q Advisors has never claimed that it is owed additional fees related to this transaction.

13.     In October 2013, Mergence sold 100% of its shares in Spring Communications to GameStop Corp. Attached as Exhibit E are excerpts from the stock purchase agreement.

14.     I have reviewed the amended complaint filed in this action by Q Advisors. In the amended complaint, Q Advisors seeks fees related to Mergence's sale of Spring Communications to GameStop in October 2013. Q Advisors bases its claim upon paragraph 15 of Engagement Letter No. 2. GameStop is a company with its principal place of business in Texas.

15.     Q Advisors had no involvement in the transaction between Mergence and GameStop for the sale of Spring Communications. Neither Mergence nor Spring Communications had any need for Q Advisors' services or involvement. Q Advisors has none of the files or documents related to this transaction, all of which are stored in the records of Mergence in Salt Lake City, Utah or the offices of GameStop in Texas. None of the events related to this transaction occurred in Colorado.   None of the individuals who were involved in this transaction reside in Colorado, but reside in Utah and Texas.

16.     Mergence did not retain the services of any investment banker in connection with the sale of Spring Communications to GameStop. Mergence did not retain an investment banker because it did not need any such services for this transaction.

17.     As noted above, Spring had operations in Colorado at the time of the sale of Spring Communications to GameStop. However, Mergence has never had any employees, officers, agents, offices, bank accounts or phone listings in Colorado. Mergence has never advertised or registered to do business in Colorado nor has it sold any products or services in Colorado. Mergence has never owned or leased any real property in Colorado.

I verify under penalty of perjury that the foregoing is true and correct.

DATED this _27th_ day of May, 2015.

_____
JASON S. ELLIS

## CERTIFICATE OF SERVICE

I hereby certify that on May 27, 2015, I electronically filed the foregoing DECLARATION

OF JASON S. ELLIS electronically through the CM/ECF system which caused the following to

be served by electronic means:

> John S. Phillips
> Sean C. Grimsley
> BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
> 1899 Wynkoop Street, 8th Floor
> Denver, CO 80202

_____

EXHIBIT A



An Investment Banking Partnership

ENGAGEMENT LETTER

March 15, 2012

Mr. Jason Ellis
Chief Executive Officer
Mergence Corporation (dba Spring Retail Group)
3939 South Wasatch Boulevard
Suite 1
Salt Lake City, UT 84124

Dear Jason:

Pursuant to our recent discussions, I am pleased to confirm the arrangements under which Mergence Corporation (dba Spring Retail Group) ("Mergence") will engage Q Advisors LLC ("Q Advisors") to provide financial advisory services on an exclusive basis (the "Services"), to Mergence in connection with Mergence's review of strategic alternatives available to it regarding its subsidiary Simply Mac, Inc. ("Simply Mac" or the "Company"), including the possible acquisition, by way of a purchase, business combination, merger or other transaction (the "Transaction") by a corporation or other business entity of all or part of the Company's outstanding capital stock or all or substantially all of the Company's assets.

1. **Retention.** During the term of our engagement, Q Advisors will provide Mergence or the Company with a range of financial advisory services in connection with the Transaction. More specifically, in connection with the proposed Transaction, Q Advisors will (a) prepare an Offering Memorandum or other suitable offering materials for use in informing prospective purchasers about the Company, (b) advise and assist the Company in preparation of a presentation which will be given by management to selected qualified prospective purchasers, (c) develop a plan for marketing the Company including the identification and contact of potential qualified purchasers for the Company, (d) assist in the negotiation of the Transaction, (e) advise the Company, Mergence or their respective Boards of Directors, if requested, on the financial aspects of any proposed Transaction, (f) work with legal counsel, as appropriate, on any letter of intent or definitive agreement and until the Transaction is completed, and (g) attend meetings of the Board of Directors or stockholders of Mergence or the Company when requested.

During the term of this engagement, Q Advisors will serve as the exclusive representative to Mergence and the Company in a Transaction. Mergence and the Company agree to refer any potential financial and strategic partners to Q Advisors, including those parties that contact Mergence or the Company regarding a Transaction.

Mergence and the Company shall have final determination over any information and strategies developed by Q Advisors. In providing the Services, Q Advisors acknowledges that all terms and conditions of any Transaction shall be subject to the approval of Mergence's or the Company's management or Board of Directors.

Mr. Jason Ellis                                                                          *Confidential*
March 15, 2012

2.  **Fees and Expenses.**

    2.1  **Monthly Retainer.** In consideration of the Services rendered to Mergence and the Company under this letter agreement, Mergence or the Company shall pay Q Advisors a monthly retainer of $10,000 payable in advance. All monthly retainer payments (or portions thereof) paid pursuant to this paragraph shall be credited against any Transaction Fee that ultimately may be due, but shall not be refunded if a Transaction is not ultimately consummated.

    2.2  **Transaction Fee.** On consummation of the Transaction, Mergence or the Company shall pay Q Advisors a cash fee (the "Transaction Fee") equal to the aggregate sum of:

a)  3.5% of the Transaction Value (defined below) up to and including $15 million; and

b)  5.5% of the portion of the Transaction Value greater than $15 million.

For example, if Mergence or the Company closes a Transaction with a Transaction Value of $20 million, the Transaction Fee would be calculated as follows: (.035 x $15,000,000) + (.055 x $5,000,000), which equals $525,000 plus $275,000, or a total of $800,000.

If, however, the Transaction is consummated with (a) ZAGG Inc.; (b) an affiliate company of ZAGG, Inc.; and/or (c) a new company owned by the current shareholders of ZAGG, Inc. (all of which are subsequently referred to as "ZAGG"), the resulting fee will be reduced by 10.0%, subject to the minimum fee described at the bottom of this section 2.2. For example, if Mergence or the Company closes a Transaction with ZAGG with a Transaction Value of $20 million, the Transaction Fee would be $720,000, or 10.0% less than the $800,000 fee calculated above.

For purposes of this letter agreement, the term "Transaction Value" means the sum of (a) the total amount of cash paid, directly or indirectly, for the assets, business or capital stock of the Company and any indebtedness or other non-ordinary course liabilities of the Company assumed by the purchaser; (b) any assets, securities, Corporate Earnout (defined below) or other property or rights transferred, directly or indirectly, in payment for the assets, business or stock of the Company; and (c) the aggregate amount of any dividends or other distributions declared by the Company with respect to its stock after the date hereof, other than normal recurring cash dividends in amounts not materially greater than currently paid. "Corporate Earnout" shall be defined as any cash, securities, or other remuneration received by Mergence, the Company, their affiliates, or stockholders as a result of the future performance of the Company, but excluding compensation resulting from reasonable employment agreements.

So long as the consideration in the Transaction includes sufficient cash, the Transaction Fee will be paid from the proceeds of the Transaction. If, however, the cash consideration is not sufficient, Mergence or the Company will pay any resulting shortfall from an alternative source of cash.

The Transaction Fee will become payable by Mergence or the Company immediately upon consummation of (a) the Transaction or (b) the acquisition, directly or indirectly, by another person or entity, in a single transaction or series of related transactions, of (i) all or a substantial portion of the assets or business of the Company or (ii) securities representing 50% or more of the total voting power of the Company in the election of Directors.

In no event shall the Transaction Fee be less than $550,000, if Mergence, the Company, or their affiliates or stockholders in the Transaction receive any proceeds as a result of closing a transaction.

Mr. Jason Ellis
March 15, 2012

*Confidential*

2.3 **Expense Reimbursement.** In addition, whether or not the Transaction closes, Mergence or the Company will reimburse Q Advisors, on a monthly basis, for reasonable out-of-pocket expenses incurred by Q Advisors in connection with this letter agreement. Typically, these expenses may include travel, lodging, telephone and outside services incurred by Q Advisors. In no event shall Q Advisors incur any single expense in excess of $2,000 without the prior consent of Mergence or the Company.

Q Advisors anticipates that monthly reimbursable expenses will not be greater than $4,000, and it will make a good-faith effort to promptly alert Mergence or the Company if it expects expenses to exceed that level.

3. **Termination.** Services hereunder may be terminated with or without cause by either party at any time on 30 days' written notice and without liability or continuing obligation to the other, except for any compensation earned and expenses incurred by Q Advisors to the date of termination, and except in the case of termination by Mergence or the Company for any reason other than the material breach of this letter agreement by Q Advisors, for Q Advisors' rights under the "tail" provisions described below in this paragraph 3. After termination of Q Advisors' engagement for any reason, Q Advisors will provide Mergence or the Company with a list of parties with whom Q Advisors has been in contact on Mergence's or the Company's behalf (the "Tail List"). If within twelve (12) months following the termination of Q Advisors' engagement, the Company (a) closes a Transaction; or (b) (i) enters into a Letter of Intent, Memorandum of Understanding, or substantially similar agreement (even if such agreement is non-binding) describing key terms and conditions of a Transaction; and (b) (ii) closes a Transaction with that same entity, or an affiliate thereof, (whether or not that closing occurs within the twelve (12) month time period referenced above) **and** the Transaction is with any party who is on the Tail List, then Q Advisors shall be entitled to the Transaction Fee as set forth in paragraph 2.2 of this letter agreement. Notwithstanding any termination of this letter agreement, the numbered paragraphs 2, 3, 5 and 6 of this letter agreement will remain operative regardless of such termination.

4. **Independent Contractor.** Q Advisors will act under this letter agreement as an independent contractor with duties solely to Mergence and the Company, and nothing herein shall be construed as creating any other relationship between Mergence or the Company and Q Advisors hereto including, but not limited to, partnership, agency or joint venture. The relationship between Q Advisors and Mergence or the Company under this letter agreement shall be solely that of consultant and client. Mergence or the Company, their agents, employees, representatives or affiliates shall under no circumstance be deemed agents or representatives of Q Advisors. None of Q Advisors or its agents, employees, representatives or affiliates shall be deemed for any purpose to be employees of Mergence or the Company. Furthermore, it is understood that Q Advisors is being engaged hereunder solely to provide the Services to Mergence and the Company and that Q Advisors is not acting as an agent or fiduciary of, and shall have no duties or liability to, the directors of Mergence or the Company, the equity holders of Mergence or the Company or any other third party in connection with its engagement hereunder, all of which are expressly waived.

5. **General Indemnity.** Mergence and the Company agree to indemnify Q Advisors and its members, directors, officers, agents and employees (each, an "Indemnified Party") of and from any losses, actions, claims, damages or liabilities (or actions in respect thereof) resulting from any claim raised by a third party relating to or arising out of the performance of the Services noted hereunder, other than the gross negligence or wilful misconduct by an Indemnified Party, and will reimburse the Indemnified Party hereunder for all expenses (including reasonable attorneys' fees and expenses) reasonably incurred by the Indemnified Party in connection with investigating, preparing or

Mr. Jason Ellis                                                                        *Confidential*
March 15, 2012

defending any such action or claim. Mergence and the Company agree that neither Q Advisors nor any Indemnified Party shall have any liability to Mergence or the Company for or in connection with this engagement except for any such liability for losses, actions, claims, damages, liabilities or expenses incurred by Mergence or the Company that result primarily from Q Advisors' gross negligence or wilful misconduct. In the event that an indemnifiable claim arises hereunder, the Indemnified Party shall give prompt written notice of the claim to Mergence or the Company, and Mergence or the Company shall have the right to assume the defense of such claim provided that there is no conflict of interest between Mergence or the Company, on the one hand, and the Indemnified Party on the other hand. Neither Mergence nor the Company will settle any action by a third party against any Indemnified Party relating to this engagement without securing appropriate releases or other protection for such Indemnified Party. No Indemnified Party will settle any action without the consent of Mergence or the Company, which consent shall not be unreasonably withheld.

If the indemnification provided for in the preceding paragraph shall for any reason be unavailable to an otherwise Indemnified Party, then Mergence or the Company shall, in lieu of indemnifying such Indemnified Party, contribute to the amount paid or payable by such Indemnified Party (i) in such proportion as shall be appropriate to reflect the relative benefits received by Mergence or the Company on the one hand and Q Advisors on the other from the engagement or the Transaction or (ii) if the allocation provided by clause (i) is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) but also the relative fault of Mergence or the Company on the one hand and Q Advisors on the other with respect to the conduct or omission which resulted in a loss, action, claim, damage or liability, or action in respect thereof, as well as any other relevant equitable considerations. The relative benefits received by Mergence or the Company on the one hand and Q Advisors on the other with respect to the Transaction shall be deemed to be in the same proportion as the aggregate consideration or value received by Mergence or the Company in the Transaction (as the same may be reduced by damages incurred as a result thereof) bears to the Transaction Fee received by Q Advisors under this letter agreement. Under no circumstances shall Q Advisors or any Indemnified Party be liable for any indirect, consequential, incidental, special, punitive or exemplary damages arising from any losses, actions, claims, damages or liabilities (or actions in respect thereof) resulting from any claim raised by a third party relating to or arising out of the performance of the Services, regardless of whether Q Advisors has been apprised of the likelihood of such damages occurring.

In the event Mergence or the Company requests Q Advisors to deliver certain documents and information relating to this engagement via electronic transmissions, Mergence and the Company acknowledge and agree that the privacy and integrity of electronic transmissions cannot be guaranteed due to the possibility that third parties could intercept, view or alter such electronic transmissions. To the extent that any documents or information relating to this engagement are transmitted electronically, Mergence and the Company agree to release Q Advisors from any loss or liability incurred in connection with the electronic transmission of any such documents and information, including the unauthorized interception, alteration or fraudulent generation and transmission of electronic transmissions by third parties. Under no circumstances shall Q Advisors be liable for any ordinary, direct, indirect, consequential, incidental, special, punitive or exemplary damages arising out of the foregoing, regardless of whether Q Advisors has been apprised of the likelihood of such damages occurring.

6. **Reliance on Information; Confidentiality.** Mergence and the Company understand and confirm (a) that Q Advisors will be using and relying on data, material and information about the Company furnished to Q Advisors by Mergence or the Company, its employees and representatives and (b) that Q Advisors does not assume responsibility for independently verifying such information. Mergence and the Company hereby represent and warrant to Q Advisors that the information furnished by

Mr. Jason Ellis                                                                                              *Confidential*
March 15, 2012

Mergence or the Company for the purposes contemplated by this letter agreement will not contain any untrue statement of a material fact or omit to state any material fact necessary to make statements therein not misleading.

Any advice or opinions provided by Q Advisors may not be disclosed or referred to publicly or to any third party except in accordance with Q Advisors' prior written consent, which shall not be unreasonably withheld or denied, or as required by law or regulation. Q Advisors acknowledges that all information about Mergence or the Company, its business, operations and customers that Q Advisors and its representatives learn in any way and from any source as a result of this letter agreement constitutes a trade secret, or is confidential or proprietary to Mergence and the Company ("Confidential Information"). Q Advisors shall receive and hold such Confidential Information in confidence, shall hold the same in trust, shall not disclose or furnish the same to any third party without Mergence's or the Company's prior written consent, and shall not use the same for any purpose other than the performance of its obligations under this letter agreement or otherwise in direct connection with the operation of this letter agreement.

Upon termination of this letter agreement, Q Advisors shall return or, at the discretion of Mergence or the Company, destroy all the Confidential Information in its care, custody or control that is capable of being retrieved for such purpose(s) without undue burden to Q Advisors, with the exception of any materials required to be kept for FINRA or other regulatory purposes. Notwithstanding the foregoing, the definition of Confidential Information shall not encompass information about Mergence or the Company that is or becomes publicly available through no fault of Q Advisors', is already lawfully in Q Advisors' possession, is independently developed by Q Advisors, or is legitimately and lawfully obtained by Q Advisors from third parties not under obligations of confidentiality to Mergence or the Company.

Q Advisors acknowledges that the Confidential Information under this letter agreement constitutes unique, valuable and special trade secret and business information of Mergence or the Company, and that disclosure may cause irreparable injury to Mergence or the Company. Accordingly, Q Advisors agrees that the remedy at law for any breach of the covenants contained in this paragraph 6 may be inadequate, and in recognition, agrees that Mergence or the Company shall, in addition, be entitled to seek injunctive relief without bond including reasonable attorneys' fees and other court costs and expenses, in the event of a breach or threatened breach relating thereto, which relief shall be in addition to and not in derogation of any other remedies which may be available to Mergence or the Company as a result of such breach.

7. **Notices.**  Notice given pursuant to any of the provisions of this letter agreement shall be in writing and shall be sent by overnight delivery by an internationally recognized delivery company or hand-delivered (i) to Mergence or the Company at the address set forth above, to the attention of Mr. Kent Forsgren, and (ii) to Q Advisors at 1899 Wynkoop Street, Ste. 200, Denver Colorado 80202, Attention: Mr. Michael Crawford. Parties may change the foregoing addresses by prior written notice to the other party.

8. **Construction.**  This letter agreement shall be governed by and construed in accordance with the laws of the State of Utah as applied to contracts made and performed in such State, exclusive of Utah's choice of law provisions.

9. **Severability.**  Any determination that any provision of this letter agreement may be, or is, unenforceable shall not affect the enforceability of the remainder of this letter agreement.

10. **Headings.**  The paragraph headings in this letter agreement have been inserted as a matter of convenience of reference and are not part of this letter agreement.

Mr. Jason Ellis                                                                    *Confidential*
March 15, 2012

11. **Counterparts**.  This letter agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument. This letter agreement may be executed by facsimile.

12. **Third Party Beneficiaries**.  This letter agreement has been and is made solely for the benefit of Mergence, the Company and Q Advisors and their respective successors and permitted assigns, and no other person shall acquire or have any right under or by virtue of this letter agreement.

13. **Mergence's Authority**.  Mergence acknowledges and agrees that (a) as the Company's controlling shareholder, Mergence has the authority to bind the Company to the terms and conditions of this letter agreement; and (b) Mergence will take whatever steps are necessary to cause the Company to comply with its obligations and duties under this letter agreement.

14. **Modification**.  This letter agreement may not be modified or amended except in writing, duly executed by the parties hereto.

15. **Announcements**.  It is understood that if any Transaction is completed, Q Advisors will be entitled, at its expense, to place an announcement in such publications and mailings as Q Advisors desires, stating that Q Advisors has acted as financial advisor to Mergence and the Company in connection with the Transaction.  Any such announcements shall be subject to Mergence or the Company's approval, which shall not be unreasonably withheld or delayed.  Based on the sensitive nature of a potential Transaction and the Company's current relationship with Apple, Mergence or the Company may require that the Transaction price be kept confidential and not included in any public announcement by Q Advisors.

If the terms of our engagement as set forth in this letter are satisfactory, kindly sign the enclosed copy of this letter agreement and return it to us.  We look forward to working with Mergence and the Company on this assignment.

Very truly yours,

Q ADVISORS LLC, a Colorado limited liability company

By:        Q Consulting & Advisors Inc., Manager

By:

Michael Crawford, Vice President

Accepted:

Mergence Corporation (dba Spring Retail Group)

By:        _____

Title:      _____

Date:      _____

EXHIBIT B

STOCK PURCHASE AGREEMENT

among

SIMPLY MAC, INC.

and

THE SHAREHOLDERS SET FORTH HEREIN

AS SELLERS

and

GAMESTOP CORP.

dated as of

October 31, 2012

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS .................................................................................................. 1

ARTICLE II PURCHASE AND SALE ................................................................................. 6

Section 2.01 Purchase and Sale. ......................................................................................... 6

Section 2.02 Purchase Price. ............................................................................................... 6

Section 2.03 Transactions to be Effected at the Closing. ................................................... 6

Section 2.04 Closing. .......................................................................................................... 7

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLERS ........................ 7

Section 3.01 Authority of Sellers. ...................................................................................... 7

Section 3.02 Organization, Authority and Qualification of the Company. ........................ 7

Section 3.03 Capitalization. ................................................................................................ 8

Section 3.04 No Subsidiaries. ............................................................................................. 8

Section 3.05 No Conflicts; Consents. ................................................................................. 9

Section 3.06 Financial Statements. ..................................................................................... 9

Section 3.07 Absence of Certain Changes, Events and Conditions. ................................... 9

Section 3.08 Material Contracts. ....................................................................................... 11

Section 3.09 Title to Assets; Real Property. ..................................................................... 12

Section 3.10 Intellectual Property ..................................................................................... 13

Section 3.11 Insurance. ..................................................................................................... 14

Section 3.12 Legal Proceedings; Governmental Orders. ................................................... 14

Section 3.13 Compliance With Laws; Permits. ................................................................. 14

Section 3.14 Employee Benefit Matters. ........................................................................... 15

Section 3.15 Employment Matters. ................................................................................... 16

Section 3.16 Taxes. ........................................................................................................... 16

Section 3.17 Environmental Matters. ................................................................................ 18

Section 3.18 Affiliate Transactions. .................................................................................. 18

Section 3.19 Working Capital Ratio; No Indebtedness. .................................................... 18

Section 3.20 Brokers. ........................................................................................................ 19

i

Section 3.21 No Other Representations and Warranties...............................................19

**ARTICLE IV** REPRESENTATIONS AND WARRANTIES OF BUYER ..................................19

Section 4.01 Organization and Authority of Buyer. ..................................................19

Section 4.02 No Conflicts; Consents. ......................................................................19

Section 4.03 Investment Purpose. ...........................................................................20

Section 4.04 Brokers..............................................................................................20

Section 4.05 Sufficiency of Funds. ..........................................................................20

Section 4.06 Legal Proceedings. .............................................................................20

Section 4.07 Independent Investigation. ..................................................................20

Section 4.08 No Other Representations and Warranties.............................................21

**ARTICLE V** COVENANTS ...........................................................................................21

Section 5.01 Public Announcements. .......................................................................21

Section 5.02 Further Assurances. ...........................................................................21

Section 5.04 Books and Records. ............................................................................21

Section 5.04 Loss Shares. ......................................................................................22

Section 5.05 Tax Sharing Agreements......................................................................22

Section 5.06 Straddle Period...................................................................................22

Section 5.07 Tax Periods Ending on or before Closing Date ......................................22

Section 5.08 Cooperation on Tax Matters ................................................................22

Section 5.09 Transfer Taxes. ..................................................................................23

**ARTICLE VI** INDEMNIFICATION ................................................................................23

Section 6.01 Survival..............................................................................................23

Section 6.02 Indemnification by Sellers ...................................................................23

Section 6.03 Recovery from Escrow Fund. ...............................................................24

Section 6.04 Exclusive Remedy; Limitations on Recovery..........................................24

Section 6.05 Distribution of Escrow Fund.................................................................25

Section 6.06 Indemnification Procedures. ................................................................26

Section 6.07 Tax Treatment of Indemnification Payments. .........................................27

**ARTICLE VII** MISCELLANEOUS .................................................................................27

ii

Section 7.01 Expenses. .................................................................................................27

Section 7.02 Notices. ....................................................................................................28

Section 7.03 Interpretation. ...........................................................................................29

Section 7.04 Headings. ..................................................................................................29

Section 7.05 Severability. ..............................................................................................30

Section 7.06 Entire Agreement. .....................................................................................30

Section 7.07 Successors and Assigns. ............................................................................30

Section 7.08 No Third-Party Beneficiaries. ...................................................................30

Section 7.09 Amendment and Modification; Waiver. .....................................................30

Section 7.10 Governing Law; Waiver of Jury Trial. ......................................................30

Section 7.11 Counterparts; Facsimile. ...........................................................................31

Section 7.12 Legal Representation. ................................................................................31

1697609.3

## STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement (this "**Agreement**"), dated as of October 31, 2012, is entered into among Simply Mac, Inc., a Utah corporation (the "**Company**"), Mergence Corporation, a Delaware corporation ("**Mergence**"), Steve Bain, an individual residing in the State of Utah ("**Bain**"), Tyler Dickman, an individual residing in the State of Utah ("**Dickman**"), Kent Forsgren, an individual residing in the State of Utah ("**Forsgren**"), and Kent Thomas, an individual residing in the State of Utah ("**Thomas**") (Mergence, Bain, Dickman, Forsgren, and Thomas may be referred to collectively as the "**Sellers**"), and GameStop Corp., a Delaware corporation (the "**Buyer**").

### RECITALS

WHEREAS, Sellers own all of the issued and outstanding shares of common stock, no par value per share (the "**Shares**"), of the Company; and

WHEREAS, Sellers wish to sell to Buyer, and Buyer wishes to purchase from Sellers, 49.9% of the Shares as set forth on **Section 3.03(c)** of the Disclosure Schedules (the "**Purchased Shares**"), subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I
#### DEFINITIONS

The following terms have the meanings specified or referred to in this **Article I**:

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the preamble.

"**Ancillary Agreements**" mean, collectively, the Shareholders Agreement, the Escrow Agreement, the Employment Agreement, the Services Agreement, the Working Capital Note, the Security Agreement and all other agreements, certificates, instruments, documents and writings delivered in connection with this Agreement.

"**Audited Financial Statements**" has the meaning set forth in **Section 3.06**.

"**Balance Sheet**" has the meaning set forth in **Section 3.06**.

"**Balance Sheet Date**" has the meaning set forth in **Section 3.06**.

transactions contemplated hereby shall be paid by the party incurring such costs and expenses; *provided, however*, that Mergence shall pay all amounts payable to Q Advisors, LLC.

     **Section 7.02   Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand; (b) on the first Business Day after mailed if sent for overnight delivery by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third Business Day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this **Section 7.02**):

If to the Company:

    Simply Mac, Inc.
    3939 Wasatch Boulevard, Suite 1
    Salt Lake City, Utah 84124
    Facsimile:    (801) 278-7322
    E-mail: steve.bain@simplymac.com

If to Sellers:

    Mergence Corporation
    3939 Wasatch Boulevard, Suite 1
    Salt Lake City, Utah 84124
    Facsimile:    (801) 278-7322
    E-mail: jellis@springmobile.com

    Steve Bain
    3939 Wasatch Boulevard, Suite 1
    Salt Lake City, Utah 84124
    Facsimile:    (801) 278-7322
    E-mail: steve.bain@simplymac.com

    Tyler Dickman
    3939 Wasatch Boulevard, Suite 1
    Salt Lake City, Utah 84124
    Facsimile:    (801) 278-7322
    E-mail: tyler.dickman@simplymac.com

    Kent Forsgren
    3939 Wasatch Boulevard, Suite 1
    Salt Lake City, Utah 84124
    Facsimile:    (801) 278-7322
    E-mail: kforsgren@springmobile.com

|  | Kent Thomas |
|---|---|
|  | 3939 Wasatch Boulevard, Suite 1 |
|  | Salt Lake City, Utah 84124 |
|  | Facsimile:     (801) 278-7322 |
|  | E-mail: kent@advancedcfo.com |

| with a copy (which shall not constitute notice) to: | Holland & Hart LLP |
|---|---|
|  | 222 South Main Street, Suite 2200 |
|  | Salt Lake City, UT 84101 |
|  | Facsimile:     801-799-5700 |
|  | E-mail: glindley@hollandhart.com |
|  | Attention:     Gregory E. Lindley |

| If to Buyer: | GameStop Corp. |
|---|---|
|  | 625 Westport Parkway |
|  | Grapevine, TX 76051 |
|  | Facsimile: 817-424-2820 |
|  | E-mail: RobLloyd@gamestop.com |
|  | Attention: Rob Lloyd |
|  | Chief Financial Officer |

| with a copy (which shall not constitute notice) to: | Bryan Cave LLP |
|---|---|
|  | 1290 Avenue of the Americas |
|  | New York, NY 10104 |
|  | Facsimile: (212) 541-1418 |
|  | E-mail: jmdorman@bryancave.com |
|  | Attention: Jay M. Dorman |

**Section 7.03   Interpretation.** For purposes of this Agreement: (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms. References to a Person are also to its permitted successors and assigns. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

**Section 7.04   Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above individually or by their respective officers thereunto duly authorized.

SIMPLY MAC, INC.

By: _____
Name: Steven B. Bain
Title: President

MERGENCE CORPORATION

By: _____
Name: Jason S. Ellis
Title: Director

STEVE BAIN

_____

TYLER DICKMAN

_____

KENT FORSGREN

_____

KENT THOMAS

_____

[Signature Page to Stock Purchase Agreement]

GAMESTOP CORP.

By: J. Paul Raines

Name: J. Paul Raines

Title: CEO

[Signature Page to Stock Purchase Agreement]

EXHIBIT C


An Investment Banking Partnership

## ENGAGEMENT LETTER

January 18, 2013

Mr. Jason Ellis
Chief Executive Officer
Mergence Corporation (dba Spring Retail Group)
3939 South Wasatch Boulevard
Suite 1
Salt Lake City, UT 84124

Dear Jason:

Pursuant to our recent discussions, I am pleased to confirm the arrangements under which Mergence Corporation (dba Spring Retail Group). ("Mergence" or the "Company") will engage Q Advisors LLC ("Q-Advisors")-to-provide-financial-advisory-services-on-an-exclusive-basis-(the-"Services"),-to-the Company in connection with a private placement to qualified institutional buyers of (a) senior debt securities (including revolving or term bank debt, hereinafter referred to as "Senior Debt"); or (b) debt securities that combine Senior Debt and Junior Debt into an integrated instrument (including unitranche debt, hereinafter referred to as "Blended Debt"). Together or independently, the private placement of Senior Debt or Blended Debt is hereinafter referred to as the "Financing".

1. **Retention.** During the term of our engagement, Q Advisors will provide the Company with a range of Services in connection with the Financing, including advice and assistance with respect to defining funding objectives and approaching potential investors. More specifically, in connection with the proposed Financing, Q Advisors will (a) assist the Company in developing and preparing its business plan and strategy, (b) identify and contact, on a best-efforts basis, potential financing sources, (c) work with the Company to prepare marketing materials describing the Company and the Financing, (d) recommend transaction structures and prepare or comment on term sheets, (e) assist in setting negotiation strategies and in conducting negotiations as reasonably requested by the Company, (f) review transaction documents, and (g) attend meetings of the Board of Directors or stockholders of the Company when requested.

The Company shall have final determination over any information and strategies developed by Q Advisors. In providing the Services, Q Advisors acknowledges that all terms and conditions of any Financing shall be subject to the approval of the Company's management or the Board of Directors of the Company, including, but not limited to, the type of security and the institutional investors that participate.

During the term of this letter agreement, the Company shall promptly refer any potential investors who approach the Company concerning a Financing to Q Advisors, and Q Advisors will then become the primary point of contact with any such investors.

Mr. Jason Ellis                                                                                          *Confidential*
January 18, 2013

2. **Fees and Expenses.** As we discussed, in consideration of the Services rendered to the Company under this letter agreement, the Company shall pay Q Advisors a monthly fee (the "Retainer") of $10,000, billed in advance (partial months will be pro rated accordingly) and payable within 10 days of receipt of invoice.

   On consummation of the Financing, the Company shall pay Q Advisors a fee (the "Financing Fee") equal to (a) two percent (2.0%) of the Value of the Senior Debt; plus (b) two and three-quarters percent (2.75%) of the Value of the Blended Debt. For purposes of this letter agreement, Value shall mean the face amount of debt (without deducting fees or expenses) raised by the Company from third parties in connection with the Financing. Furthermore, Value shall include any amounts committed to by the investor(s) but unused or undrawn at closing. However, if Prudential Capital (or an affiliate thereof) is the largest investor in the Senior Debt or Blended Debt, the Financing Fee will be reduced by ten percent (10.0%).

   If the Financing closes, Q Advisors shall receive a Financing Fee of not less than $475,000 (the "Minimum Fee"), except, however, if Prudential Capital (or affiliates thereof) is the largest investor in the Financing, in which case the Minimum Fee will be $425,000. All Retainer payments shall be credited against and reduce the Financing Fee.

   In addition, whether or not the Financing closes, the Company will reimburse Q Advisors, on a monthly basis, for reasonable and documented out-of-pocket expenses incurred by Q Advisors in connection with this letter agreement. Typically, these expenses may include travel, lodging, telephone and outside services incurred by Q Advisors. In no event shall Q Advisors incur any single expense in excess of $2,000 without the prior consent of the Company. Q Advisors anticipates that monthly reimbursable expenses will not be greater than $4,000, and it will make a good-faith effort to promptly alert Mergence, if it expects expenses to exceed that level.

3. **Termination.** Services hereunder may be terminated with or without cause by either party at any time on 30 days' written notice and without liability or continuing obligation to the other (except for any compensation earned and expenses incurred by Q Advisors to the date of termination, including without limitation Financing Fees and except, in the case of termination by the Company for any reason other than the material breach of this agreement by Q Advisors, for Q Advisors' right under the "tail" provisions described immediately hereafter in this Section 3). After termination of Q Advisors' engagement for any reason other than the material breach by Q Advisors, Q Advisors will provide the Company with a true and correct list of parties with whom Q Advisors, on Mergence's behalf, has been in contact regarding the Financing ("Tail List"). If, within twelve (12) months following the termination of Q Advisors' engagement, the Company (a) closes a Financing or (b) (i) enters into a Letter of Intent, Memorandum of Understanding, or substantially similar agreement (even if such agreement is non-binding) describing key terms and conditions of a Financing and (b) (ii) closes a Financing with that same entity, or an affiliate thereof (whether or not that closing occurs within the twelve (12) months referenced above) and the Financing is with any party who is on the Tail List, Q Advisors shall be entitled, as applicable, to the Financing Fee as set forth above. Notwithstanding any termination of this letter agreement, the numbered paragraphs 2, 3, 5, 6 and 15 herein will remain operative regardless of any such termination.

4. **Independent Contractor.** Q Advisors will act under this letter agreement as an independent contractor with duties solely to the Company, and nothing herein shall be construed as creating any other relationship between the Company and Q Advisors hereto including, but not limited to, partnership, agency or joint venture. The relationship between Q Advisors and the Company under this letter agreement shall be solely that of consultant and client. The Company, its agents, employees, representatives or affiliates shall under no circumstance be deemed agents or



Mr. Jason Bilis                                                              *Confidential*
January 18, 2013

representatives of Q Advisors. Neither Q Advisors nor its agents, employees, representatives or affiliates, shall be deemed for any purpose to be employees of the Company. Furthermore, it is understood that Q Advisors is being engaged hereunder solely to provide the Services described above to the Company and that Q Advisors is not acting as an agent or fiduciary of, and shall have no duties or liability to, the directors or equity holders of the Company or any other third party in connection with its engagement hereunder, all of which are expressly waived. Any purchases of securities from, or other transactions involving, the Company shall be effected by the Company. Q Advisors and its employees, agents and representatives shall have no authority to bind the Company. Q Advisors understand that the Company may modify, suspend, terminate or withdraw entirely any Financing transaction or efforts to pursue such a transaction at any time.

5.  **General Indemnity.** The Company agrees to indemnify Q Advisors and its members, directors, officers, agents and employees (each, an "Indemnified Party") of and from any losses, actions, claims, damages or liabilities (or actions in respect thereof) resulting from any claim raised by a third party relating to or arising out of the performance of the Services noted hereunder, other than the gross negligence or wilful misconduct by an Indemnified Party, and will reimburse the Indemnified Party hereunder for all expenses (including reasonable attorneys' fees and expenses) reasonably incurred by the Indemnified Party in connection with investigating, preparing or defending any such action or claim. The Company agrees that neither Q Advisors nor any Indemnified Party shall have any liability to the Company for or in connection with this engagement except for any such liability for losses, actions, claims, damages, liabilities or expenses incurred by the Company that result from Q Advisors' gross negligence or wilful misconduct. In the event that an indemnifiable claim arises hereunder, the Indemnified Party shall give prompt written notice of the claim to the Company and the Company shall have the right to assume the defense of such claim provided that there is no conflict of interest between the Company, on the one hand, and the Indemnified Party on the other hand. The Company will not settle any action by a third party against any Indemnified Party relating to this engagement without securing appropriate releases or other protection for such Indemnified Party. No Indemnified Party will settle any action without the consent of the Company, which consent shall not be unreasonably withheld.

If the indemnification provided for in the preceding paragraph shall for any reason be unavailable to an otherwise Indemnified Party, then the Company shall, in lieu of indemnifying such Indemnified Party, contribute to the amount paid or payable by such Indemnified Party (a) in such proportion as shall be appropriate to reflect the relative benefits received by the Company on the one hand and Q Advisors on the other from the engagement or the Financing or (b) if the allocation provided by clause (a) is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (a) but also the relative fault of the Company on the one hand and Q Advisors on the other with respect to the conduct or omission which resulted in a loss, action, claim, damage or liability, or action in respect thereof, as well as any other relevant equitable considerations. The relative benefits received by the Company on the one hand and Q Advisors on the other with respect to the Financing shall be deemed to be in the same proportion as the aggregate consideration or value received by the Company in the Financing (as the same may be reduced by damages incurred as a result thereof) bears to the Financing Fee received by Q Advisors under this letter agreement. Under no circumstances shall Q Advisors or any Indemnified Party be liable for any indirect, consequential, incidental, special, punitive or exemplary damages arising from any losses, actions, claims, damages or liabilities (or actions in respect thereof) resulting from any claim raised by a third party relating to or arising out of the performance of the Services, regardless of whether Q Advisors has been apprised of the likelihood of such damages occurring.

In the event the Company requests that Q Advisors deliver certain documents and information relating to this engagement via electronic transmissions, the Company acknowledges and agrees that

*Page 3 of 7*

Mr. Jason Ellis                                                                    *Confidential*
January 18, 2013

the privacy and integrity of electronic transmissions cannot be guaranteed due to the possibility that third parties could intercept, view or alter such electronic transmissions. To the extent that any documents or information relating to this engagement are transmitted electronically, the Company agrees to release Q Advisors from any loss or liability incurred in connection with the electronic transmission of any such documents and information, including the unauthorized interception, alteration or fraudulent generation and transmission of electronic transmissions by third parties. Under no circumstances shall Q Advisors be liable for any ordinary, direct, indirect, consequential, incidental, special, punitive or exemplary damages arising out of the foregoing, regardless of whether Q Advisors has been apprised of the likelihood of such damages occurring.

6. **Reliance on Information; Confidentiality.** The Company understands and confirms (a) that Q Advisors will be using and relying on data, material and information about the Company furnished to Q Advisors by the Company, its employees and representatives and (b) that Q Advisors does not assume responsibility for independently verifying such information. The Company hereby represents and warrants to Q Advisors that the information furnished by the Company for the purposes contemplated by this letter agreement will not contain any untrue statement of a material fact or omit to state any material fact necessary to make statements therein not misleading.

Any advice or opinions provided by Q Advisors may not be disclosed or referred to publicly or to any third party except in accordance with Q Advisors' prior written consent, which shall not be unreasonably withheld or denied, or as required by law or regulation. Q Advisors acknowledges that all information about the Company, its business, operations and customers that Q Advisors and its representatives learn in any way and from any source as a result of this letter agreement constitutes a trade secret, or is confidential or proprietary to the Company (the "Confidential Information"). Q Advisors shall receive and hold such Confidential Information in confidence, shall hold the same in trust, shall not disclose or furnish the same to any third party without the Company's prior written consent, and shall not use the same for any purpose other than the performance of its obligations under this letter agreement or otherwise in direct connection with the operation of this letter agreement. Notwithstanding the foregoing, Confidential Information shall not encompass information about the Company that is or becomes publicly available through no fault of Q Advisors', is already lawfully in Q Advisors' possession, is independently developed by Q Advisors, or is legitimately and lawfully obtained by Q Advisors from third parties not under obligations of confidentiality to the Company.

Upon termination of this letter agreement, Q Advisors shall return or, at the discretion of the Company, destroy all the Company's Confidential Information in its care, custody or control that is capable of being retrieved for such purpose(s) without undue burden to Q Advisors, with the exception of any materials required to be kept for FINRA or other regulatory purposes.

Q Advisors acknowledges that the Confidential Information under this letter agreement constitutes unique, valuable and special trade secret and business information of the Company, and that disclosure may cause irreparable injury to the Company. Accordingly, Q Advisors agrees that the remedy at law for any breach of the covenants contained in this paragraph 6 may be inadequate, and in recognition, agrees that the Company shall, in addition, be entitled to seek injunctive relief without bond including reasonable attorneys' fees and other court costs and expenses, in the event of a breach or threatened breach of the provisions of this paragraph 6, which relief shall be in addition to and not in derogation of any other remedies which may be available to the Company as a result of such breach.

7. **Notices.** Notice given pursuant to any of the provisions of this letter agreement shall be in writing and shall sent by overnight delivery by an internationally recognized delivery company or hand-

Mr. Jason Ellis
January 18, 2013

*Confidential*

delivered (a) to the Company at the address set forth above, to the attention of Mr. Jason Ellis, and (b) to Q Advisors at 1899 Wynkoop Street, Ste. 200, Denver, Colorado 80202, Attention: Mr. Michael Crawford. Parties may change the foregoing addresses with a prior written notice to the other party.

8. **Construction**. This letter agreement shall be governed by and construed in accordance with the laws of the State of Utah as applied to contracts made and performed in such State, exclusive of Utah's choice of law provisions.

9. **Severability**. Any determination that any provision of this letter agreement may be, or is, unenforceable shall not affect the enforceability of the remainder of this letter agreement.

10. **Headings**. The paragraph headings in this letter agreement have been inserted as a matter of convenience of reference and are not part of this letter agreement.

11. **Counterparts**. This letter agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. This letter agreement may be executed by facsimile.

12. **Third Party Beneficiaries**. This letter agreement has been and is made solely for the benefit of the Company and Q Advisors and their respective successors and permitted assigns, and no other person shall acquire or have any right under or by virtue of this letter agreement.

13. **Modification**. This letter agreement may not be modified, amended or assigned except in writing, duly executed by the parties hereto.

14. **Announcements**. It is understood that if a Financing is completed, Q Advisors will be entitled, at its expense, to place an announcement in such publications and mailings as Q Advisors desires, stating that Q Advisors has acted as financial advisor to the Company in connection with the Financing. Any such announcements shall be subject to the Company's approval, which shall not be unreasonably withheld or delayed.

15. **Future Sale or Recapitalization**. In the event that Mergence elects to pursue a sale or recapitalization of the Company, whether while this letter is in effect or within thirty six (36) months of its termination, Q Advisors and Mergence shall negotiate in good faith a new engagement letter under which Q Advisors would be the Company's exclusive financial advisor for that assignment/transaction. The intent of both parties would be to agree to terms of an engagement that are commercially reasonable and that, when taken as a whole, are not materially inconsistent with those available at the time from investment banks or other organizations with experience and qualifications substantially similar to those of Q Advisors.



Mr. Jason Ellis
January [14], 2013

*Confidential*

If the terms of our engagement as set forth in this letter are satisfactory, kindly sign the enclosed copy of this letter agreement and return it to us. We look forward to working with the Company on this assignment.

Very truly yours,

Q ADVISORS LLC, a Colorado limited liability company

By:        Q Consulting & Advisors Inc., Manager

By:

Michael Crawford, Vice President

Accepted:

By

Title: President

Date: 1/18/13

EXHIBIT D

EXECUTION VERSION

LOAN AND SECURITY AGREEMENT

by and among

SPRING COMMUNICATIONS HOLDING, INC.,

SPRING COMMUNICATIONS - BLUE WIRE, INC.,

SPRING COMMUNICATIONS DSW, INC.,

SPRING COMMUNICATIONS IDAHO, INC.,

SPRING COMMUNICATIONS - ILLINOIS, INC.,

SPRING COMMUNICATIONS MNP, INC.,

SPRING COMMUNICATIONS NEVADA, INC.,

SPRING COMMUNICATIONS, INC.,

SPRING COMMUNICATIONS - TEXAS, INC.,

and

FIFTH THIRD BANK

July 19, 2013

# TABLE OF CONTENTS

Page

1.    DEFINITIONS. ...................................................................................1

    1.1     General Terms. ......................................................................1
    1.2     Accounting Terms. ...............................................................26
    1.3     Other Terms Defined in Colorado Uniform Commercial Code. ...........26
    1.4     Other Definitional Provisions; Rules of Interpretation. ...................27

2.    CREDIT. ...........................................................................................27

    2.1     Revolving Loan and Letter of Credit Facilities. ...........................27
    2.2     Term Loan Facilities. ..........................................................28
    2.3     Mandatory Payments; Prepayments. .........................................29
    2.4     Borrowers' Loan Account. ....................................................31
    2.5     Statements. ......................................................................32
    2.6     Interest and Fees. ..............................................................32
    2.7     Method for Making Payments. ...............................................34
    2.8     Termination of Revolving Commitment. ....................................34
    2.9     Advance Types. ................................................................34
    2.10    New LIBOR Rate Advances; Continuation of LIBOR Rate Advances; Conversion of Advance Types. ...................................................................35
    2.11    Determination of Interest Period. ............................................35
    2.12    Additional Costs, Etc. With Respect to LIBOR Rate Advances and Index Rate Advances. ......................................................................................36
    2.13    Indemnification for Losses. ...................................................37
    2.14    Payments to be Free of Deductions. .........................................38
    2.15    Capital Adequacy. .............................................................38
    2.16    Certificate. ......................................................................39

3.    CONDITIONS OF ADVANCES. .............................................................39

    3.1     Any Borrower's Written Request - Revolving Loan and Letters of Credit. ............39
    3.2     Financial Condition. ...........................................................40
    3.3     No Event of Default. ...........................................................40
    3.4     Representations and Warranties True and Correct. .........................40
    3.5     Conditions to Initial Extension of Credit. ...................................40
    3.6     [Reserved] .......................................................................40
    3.7     Other Requirements. ...........................................................40

4.    REPRESENTATIONS AND WARRANTIES. .................................................40

    4.1     Existence and Power. ..........................................................41
    4.2     Corporate Authorization; No Contravention. ...............................41
    4.3     Governmental Authorization; Compliance. ..................................41
    4.4     Binding Effect. .................................................................42

4.5     Litigation. ................................................................................................................42
4.6     No Default. ...............................................................................................................42
4.7     ERISA Compliance. ..................................................................................................42
4.8     Use of Proceeds; Margin Regulations. ....................................................................43
4.9     Title to Properties. ...................................................................................................43
4.10    Taxes. .......................................................................................................................43
4.11    Financial Condition. .................................................................................................43
4.12    Environmental Matters. ............................................................................................44
4.13    Collateral Documents. ..............................................................................................44
4.14    Regulated Entities. ...................................................................................................45
4.15    Labor Relations. .......................................................................................................45
4.16    Copyrights, Patents, Trademarks and Licenses, Etc. ...............................................45
4.17    Subsidiaries and Parent. ...........................................................................................45
4.18    Brokers' Fees; Transaction Fees. .............................................................................46
4.19    Insurance. .................................................................................................................46
4.20    Full Disclosure. ........................................................................................................46
4.21    Collateral. .................................................................................................................47
4.22    Solvency. ..................................................................................................................47
4.23    Legal Status. .............................................................................................................47
4.24    Other Names. ............................................................................................................48
4.25    [Reserved] ................................................................................................................48
4.26    [Reserved] ................................................................................................................48
4.27    [Reserved] ................................................................................................................48
4.28    Anti-Terrorism Laws. ...............................................................................................48
4.29    Survival of Warranties. ............................................................................................49

5.      AFFIRMATIVE COVENANTS. ...............................................................................49

5.1     Financial Statements. ...............................................................................................49
5.2     Borrowing Base Certificates; Reporting. .................................................................50
5.3     Certificates; Other Information. ...............................................................................51
5.4     Notices. ....................................................................................................................52
5.5     Preservation of Existence, Etc. ................................................................................53
5.6     Maintenance of Property. .........................................................................................53
5.7     Borrowers' Property Insurance and Business Interruption Insurance. ......................53
5.8     Payment of Liabilities. .............................................................................................58
5.9     Compliance with Laws. ............................................................................................58
5.10    Inspection of Property and Books and Records. .......................................................59
5.11    Use of Proceeds. ......................................................................................................59
5.12    Further Assurances. ..................................................................................................59
5.13    Amendment to Schedules and Representations and Warranties. ...............................59
5.14    Locations of Collateral. ............................................................................................60
5.15    Bank's Costs and Expenses as Additional Liabilities. ..............................................60
5.16    Yield Protection. ......................................................................................................60
5.17    Landlord Consents and Waivers. ..............................................................................61
5.18    Primary Depository. .................................................................................................61
5.19    Remittance and Lock Box Accounts. ........................................................................62

{Z0014373/12 }

| 5.20 | Anti-Terrorism Laws. | 63 |
| 5.21 | Rate Management Agreements. | 63 |
| 5.22 | Post-Closing Matters. | 63 |
| 5.23 | Management Fees. | 63 |
| 5.24 | Permitted Subsidiaries. | 63 |

6.     NEGATIVE COVENANTS. ........................................................................ 64

| 6.1 | Encumbrances. | 64 |
| 6.2 | Indebtedness. | 65 |
| 6.3 | Disposition of Assets. | 65 |
| 6.4 | Consolidations and Mergers. | 66 |
| 6.5 | Loans and Investments. | 67 |
| 6.6 | Transactions with Affiliates. | 67 |
| 6.7 | Margin Stock. | 67 |
| 6.8 | Contingent Obligations. | 68 |
| 6.9 | Compliance with ERISA. | 68 |
| 6.10 | Collective Bargaining Agreements. | 68 |
| 6.11 | Restricted Payments. | 68 |
| 6.12 | Change in Business; Ordinary Course of Business. | 69 |
| 6.13 | Change in Structure. | 69 |
| 6.14 | Accounting Changes. | 69 |
| 6.15 | [Reserved] | 69 |
| 6.16 | Legal Status. | 70 |
| 6.17 | Fiscal Periods. | 70 |
| 6.18 | Subsidiaries. | 70 |
| 6.19 | Identified Employees Compensation. | 70 |

7.     FINANCIAL COVENANTS. ...................................................................... 70

| 7.1 | Minimum Fixed Charge Coverage Ratio. | 70 |
| 7.2 | Maximum Total Leverage Ratio. | 71 |
| 7.3 | Unfinanced Capital Expenditures. | 71 |
| 7.4 | Minimum Adjusted EBITDA. | 71 |

8.     COLLATERAL. ........................................................................................ 71

| 8.1 | Security Interest. | 71 |
| 8.2 | Perfection of Security Interests in Collateral. | 72 |
| 8.3 | Loss of Value of Collateral. | 72 |
| 8.4 | Setoff. | 72 |
| 8.5 | Cash Collateral. | 73 |
| 8.6 | Verification of Accounts. | 73 |
| 8.7 | Notification to Account Debtors and Others. | 73 |
| 8.8 | Inventory Records. | 74 |
| 8.9 | Equipment Records. | 74 |
| 8.10 | Risk of Loss and Damage. | 74 |
| 8.11 | Other Actions. | 74 |

| | | |
|---|---|---|
| 8.12 | Real Property. | 77 |
| 8.13 | Inventory Covenants. | 78 |
| 8.14 | [Reserved] | 79 |
| 8.15 | Collection of Accounts and Payments. | 79 |
| 8.16 | Collateral Protection Expenses. | 79 |

**9. DEFAULT, RIGHTS AND REMEDIES OF BANK. ...... 80**

| | | |
|---|---|---|
| 9.1 | Defaults. | 80 |
| 9.2 | Rights and Remedies Generally. | 84 |
| 9.3 | Entry Upon Premises and Access to Information. | 86 |
| 9.4 | Sale or Other Disposition of Collateral by Bank. | 86 |
| 9.5 | Waiver of Demand. | 87 |
| 9.6 | Appointment of Bank as Borrowers' Attorney-in-Fact. | 87 |
| 9.7 | Standards for Exercising Rights and Remedies. | 87 |
| 9.8 | WAIVER OF NOTICE. | 88 |

**10. MISCELLANEOUS. ...... 88**

| | | |
|---|---|---|
| 10.1 | Waiver. | 88 |
| 10.2 | Costs and Attorneys' Fees. | 89 |
| 10.3 | Expenditures by Bank. | 89 |
| 10.4 | Custody and Preservation of Collateral. | 90 |
| 10.5 | Reliance by Bank. | 90 |
| 10.6 | Parties. | 90 |
| 10.7 | CHOICE OF LAW. | 90 |
| 10.8 | CONSENT TO JURISDICTION. | 91 |
| 10.9 | SERVICE OF PROCESS. | 91 |
| 10.10 | Advice of Counsel. | 92 |
| 10.11 | Severability. | 92 |
| 10.12 | Application of Payments. | 92 |
| 10.13 | Marshaling; Payments Set Aside. | 92 |
| 10.14 | Section Titles. | 93 |
| 10.15 | Continuing Effect. | 93 |
| 10.16 | Notices. | 93 |
| 10.17 | Equitable Relief. | 94 |
| 10.18 | Indemnification. | 94 |
| 10.19 | Counterparts. | 95 |
| 10.20 | Entire Agreement. | 95 |
| 10.21 | Patriot Act Notice. | 95 |
| 10.22 | WAIVER OF JURY TRIAL AND BOND. | 96 |
| 10.23 | Joint and Several Liability. | 96 |

## EXHIBITS AND SCHEDULES

### EXHIBITS

Exhibit 2.1(a)      Form of Revolving Note
Exhibit 2.2(a)      Form of Term Note A
Exhibit 2.2(b)      Form of Term Note B
Exhibit 2.10        Form of Notice of LIBOR Rate Continuation/Conversion
Exhibit 3.5         Closing Conditions
Exhibit 5.3(b)      Form of Compliance Certificate
Exhibit 5.17        Form of Landlord Waiver and Consent
Exhibit 5.24        Form of Joinder Agreement

### SCHEDULES

Schedule 4.2        Equity Ownership; Breaches or Liens Created by Loan and Security
                    Agreement and Other Financing Agreements
Schedule 4.5        Litigation
Schedule 4.7        Qualified Plans
Schedule 4.12       Hazardous Materials
Schedule 4.16       Patents, Trademarks, Service Marks, Copyrights and Licensed Intellectual
                    Property
Schedule 4.17       Subsidiaries
Schedule 4.21       Collateral Locations
Schedule 4.23       Legal Status
Schedule 4.24       Corporate and Fictitious Names
Schedule 5.22       Post-Closing Matters
Schedule 6.1        Liens
Schedule 6.2        Indebtedness
Schedule 6.5        Loans and Investments
Schedule 6.6        Affiliate Transactions
Schedule 8.11       Commercial Tort Claims

## LOAN AND SECURITY AGREEMENT

THIS LOAN AND SECURITY AGREEMENT, together with all exhibits and schedules attached hereto and hereby made a part hereof (this "Agreement"), is made as of July 19, 2013 by and among SPRING COMMUNICATIONS HOLDING, INC., a Delaware corporation ("SCH"), SPRING COMMUNICATIONS - BLUE WIRE, INC., a Utah corporation ("SCBW"), SPRING COMMUNICATIONS DSW, INC., a Delaware corporation ("SCDSW"), SPRING COMMUNICATIONS IDAHO, INC., a Utah corporation ("SCID"), SPRING COMMUNICATIONS - ILLINOIS, INC., a Utah corporation ("SCILL"), SPRING COMMUNICATIONS MNP, INC., a Utah corporation ("SCMNP"), SPRING COMMUNICATIONS NEVADA, INC., a Utah corporation ("SCN"), SPRING COMMUNICATIONS, INC., a Utah corporation ("SCI"), and SPRING COMMUNICATIONS - TEXAS, INC., a Utah corporation ("SCT", and together with SCH, SCBW, SCDSW, SCID, SCILL, SCMNP, SCN, SCI and each other Person who becomes a party to this Agreement pursuant to a Joinder Agreement, "Borrowers", and each a "Borrower"), and FIFTH THIRD BANK, an Ohio banking corporation ("Bank").

## W I T N E S S E T H :

**WHEREAS,** Borrowers desire to borrow monies and obtain other financial accommodations from Bank, and, pursuant to Borrowers' request, Bank is willing to make certain loans and to extend credit to Borrowers of up to such amount upon the terms and conditions set forth herein;

**NOW, THEREFORE,** in consideration of the terms and conditions contained herein, and of any loans or extensions of credit heretofore, now or hereafter made to or for the benefit of Borrowers by Bank, and for other consideration, the receipt and adequacy of which are hereby acknowledged, each Borrower and Bank hereby agree as follows:

1. **DEFINITIONS.**

    1.1   General Terms.

    When used herein, the following terms shall have the following meanings:

    "Account Debtor" means any Person who is obligated on or under an Account.

    "Accounts" means, whether now owned or existing or hereafter acquired or arising, all accounts (as defined in the Code) and all other present and future rights of a Borrower to payment for goods sold or leased or for services rendered, and whether or not they have been earned by performance.

    "ACH Direction Letter" shall have the meaning given such term in Section 5.19.

    "Acquisition" means any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the Property of a Person, or of any business or division of a Person, (b) the acquisition of in excess of fifty percent (50%) of the Equity Interests of any Person or otherwise causing any Person to become a

2.6(a), shall be part of the Liabilities, payable upon demand or upon the automatic acceleration of the Liabilities, and secured by the Collateral.

     10.4   Custody and Preservation of Collateral.

     Without limiting Bank's duties set forth in Section 8.16, Bank shall be deemed to have exercised reasonable care in the custody and preservation of any of the Collateral in its possession if it takes such action for that purpose as a Borrower shall request in writing, but failure by Bank to comply with any such request shall not of itself be deemed a failure to exercise reasonable care, and no failure by Bank to preserve or protect any right with respect to such Collateral against prior parties, or to do any act with respect to the preservation of such Collateral not so requested by a Borrower, shall of itself be deemed a failure to exercise reasonable care in the custody or preservation of such Collateral.

     10.5   Reliance by Bank.

     All covenants, agreements, representations and warranties made herein by a Borrower shall, notwithstanding any investigation by Bank, be deemed to be material to and to have been relied upon by Bank.

     10.6   Parties.

     Whenever in this Agreement there is reference made to any of the parties hereto, such reference shall be deemed to include, wherever applicable, a reference to the successors and permitted assigns of Borrowers and the participants, successors and assigns of Bank, and the provisions of this Agreement shall be binding upon and shall inure to the benefit of said participants, successors and assigns. Notwithstanding anything herein to the contrary, no Borrower may assign or otherwise transfer its rights or obligations under this Agreement or any other Financing Agreement without the prior written consent of Bank. Without in any way limiting Bank's rights, Bank may sell participations in the Liabilities or sell or assign its rights hereunder and under the other Financing Agreements, in whole or in part, on such terms as Bank may determine. In connection with any such proposed participations or assignments, Bank may disclose information required to be kept confidential hereunder; provided such disclosure shall not be made unless the party to whom it is disclosed shall have agreed to keep such information confidential as set forth herein.

     10.7   CHOICE OF LAW.

     THIS AGREEMENT SHALL BE DEEMED TO BE EXECUTED AND HAS BEEN DELIVERED AND ACCEPTED IN DENVER, COLORADO. ANY DISPUTE BETWEEN OR AMONG THE PARTIES HERETO ARISING OUT OF, CONNECTED WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN OR AMONG THEM IN CONNECTION WITH THIS AGREEMENT, AND WHETHER ARISING IN CONTRACT, TORT, EQUITY, OR OTHERWISE, SHALL BE RESOLVED IN ACCORDANCE WITH THE INTERNAL LAWS AND NOT THE CONFLICTS OF LAW PROVISIONS OF THE STATE OF COLORADO.

{Z0014373/12 }

10.8   CONSENT TO JURISDICTION.

(a)   EXCLUSIVE JURISDICTION.  EXCEPT AS PROVIDED IN SECTION 10.8(b), BANK AND EACH BORROWER AGREE THAT ALL DISPUTES BETWEEN OR AMONG THEM ARISING OUT OF, CONNECTED WITH, RELATED TO OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN OR AMONG THEM IN CONNECTION WITH THIS AGREEMENT, AND WHETHER ARISING IN CONTRACT, TORT, EQUITY OR OTHERWISE, SHALL BE RESOLVED ONLY BY STATE OR FEDERAL COURTS LOCATED IN THE CITY AND COUNTY OF DENVER, COLORADO, AND EACH BORROWER AND BANK WAIVE ANY OBJECTION BASED ON VENUE OR FORUM NON CONVENIENS WITH RESPECT TO ANY ACTION INSTITUTED THEREIN, BUT BANK AND EACH BORROWER ACKNOWLEDGE THAT ANY APPEALS FROM THOSE COURTS MAY HAVE TO BE HEARD BY A COURT LOCATED OUTSIDE OF THE CITY AND COUNTY OF DENVER, COLORADO.  EACH BORROWER WAIVES IN ALL DISPUTES ANY OBJECTION THAT IT MAY HAVE TO THE LOCATION OF THE COURT CONSIDERING THE DISPUTE.

(b)   OTHER JURISDICTIONS.  EACH BORROWER AGREES THAT BANK SHALL HAVE THE RIGHT TO PROCEED AGAINST SUCH BORROWER OR ITS PROPERTY IN A COURT IN ANY LOCATION WHERE SUCH BORROWER OR ITS PROPERTY IS LOCATED WITH RESPECT TO ALL DISPUTES BETWEEN THEM ARISING OUT OF, CONNECTED WITH, RELATED TO OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT, AND WHETHER ARISING IN CONTRACT, TORT, EQUITY OR OTHERWISE, AND TO ENABLE BANK TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE LIABILITIES, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER ENTERED IN FAVOR OF BANK.  EACH BORROWER WAIVES ANY OBJECTION THAT IT MAY HAVE TO THE LOCATION OF THE COURT IN WHICH BANK HAS COMMENCED A PROCEEDING DESCRIBED IN THIS SECTION 10.8(b).

10.9   SERVICE OF PROCESS.

EACH BORROWER HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON IT AND IRREVOCABLY APPOINTS CT CORPORATION, AS SUCH BORROWER'S AGENT FOR THE PURPOSE OF ACCEPTING SERVICE OF PROCESS WITHIN THE STATE OF COLORADO.  BANK AGREES TO PROMPTLY FORWARD BY CERTIFIED MAIL (NO RETURN RECEIPT REQUIRED) A COPY OF ANY PROCESS SO SERVED UPON SAID AGENT TO SUCH BORROWER AT ITS ADDRESS SET FORTH IN SECTION 10.16.  EACH BORROWER HEREBY CONSENTS TO SERVICE OF PROCESS AS AFORESAID.  EACH BORROWER FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF THE COURTS REFERRED TO IN SECTION 10.8 IN ANY SUCH ACTION OR PROCEEDING BY MAILING COPIES OF SUCH SERVICE BY CERTIFIED MAIL, POSTAGE PREPAID TO SUCH BORROWER AT SAID ADDRESS.  NOTHING IN THIS AGREEMENT SHALL AFFECT THE RIGHT OF BANK TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW BUT ANY FAILURE TO

91

10.14   Section Titles.

Article, Section and subsection titles contained in this Agreement shall be without substantive meaning or content of any kind whatsoever and are not a part of the agreement among the parties.  References to Articles, Sections, subsections, Exhibits, Schedules and the like, are to Articles, Sections and subsections of, or Exhibits or Schedules attached to, this Agreement unless otherwise expressly provided.

10.15   Continuing Effect.

This Agreement, the other Financing Agreements and Bank's security interest in and Lien on the Collateral shall continue in full force and effect so long as any Liabilities shall be owed to Bank, and (even if there shall be no Liabilities outstanding) so long as this Agreement has not been terminated as provided in Section 2.8.

10.16   Notices.

Except as otherwise expressly provided herein, any notice required or desired to be served, given or delivered hereunder shall be in writing, and shall be deemed to have been validly served, given or delivered (a) three (3) days after deposit in the United States mails, with proper postage prepaid, (b) when sent after receipt of confirmation or answerback if sent by telecopy, or other similar facsimile transmission, (c) one (1) Business Day after deposited with a reputable overnight courier with all charges prepaid, or (d) when delivered, if hand-delivered by messenger, all of which shall be properly addressed to the party to be notified and sent to the address or number indicated as follows:

| | |
|---|---|
| If to Bank at: | Fifth Third Bank<br>Structured Finance Group<br>1225 17th Street, Suite 2850<br>Denver, Colorado 80202<br>Attention:  John D. Lundberg<br>Telecopy:  (866) 359-5353<br>Confirmation:  (303) 524-3513 |
| with courtesy copies to (which shall not constitute Notice for purposes of this Section 10.16): | Markus Williams Young & Zimmermann LLC<br>2750 Rasmussen Rd., Suite H-104<br>Park City, Utah  84098<br>Attn:  Linda Zimmermann<br>Telecopy:  (435) 214-3811<br>Confirmation:  (435) 214-3806 |

93

{Z0014373/12 }

If to a Borrower at:    c/o Spring Communications Holding, Inc.
           3939 South Wasatch Blvd., Suite 1
           Salt Lake City, Utah 84124
           Attention: Jason S. Ellis
           Telecopy: (801) 278-7322
           Confirmation: (801) 277-7777

with courtesy copies to   Holland & Hart LLP
(which shall not constitute  222 South Main, Suite 2200
Notice for purposes of this  Salt Lake City, Utah 84101
Section 10.16):      Attention: Carl W. Barton
           Telecopy: (801) 799-5700
           Confirmation: (801) 799-5831

or to such other address or number as each party designates to the other in the manner herein prescribed. Any request for an accounting under Section 9-210 of the Code will not be deemed to have been received until actual receipt by Bank on a Business Day by an authorized employee of Bank.

### 10.17  Equitable Relief.

Each Borrower recognizes that, in the event any Borrower fails to perform, observe or discharge any of its obligations or liabilities under this Agreement or any other Financing Agreement (including the Liabilities), any remedy at law may prove to be inadequate relief to Bank; therefore, each Borrower agrees that Bank, if Bank so requests, shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages and the granting of any such relief shall not preclude Bank from pursuing any other relief or remedies for such breach.

### 10.18  Indemnification.

Each Borrower agrees, jointly and severally, to defend, protect, indemnify and hold harmless Bank and each of its Affiliates, officers, directors, managers, employees, attorneys, consultants and agents (collectively, the "Indemnitees") from and against any and all liabilities, obligations, losses, damages, penalties, actions, suits, proceedings, claims, disputes, judgments, costs, expenses and disbursements of any kind or nature whatsoever (including the fees, costs and disbursements of counsel (including reasonable attorneys' fees) for, and consultants of, such Indemnitees in connection with any investigative, administrative or judicial proceeding, whether or not such Indemnitees shall be designated a party thereto), which may be imposed on, incurred by, or asserted against such Indemnitees (whether direct, indirect, or consequential and whether based on any federal or state laws or other statutory regulations, including securities, environmental and commercial laws and regulations, under common law or at equitable cause or on contract or otherwise) in any manner relating to or arising out of this Agreement or any other Financing Agreement, or any act, event or transaction related or attendant thereto, the agreements of Bank contained herein or in any other Financing Agreement, the making of any Advance, the issuance of any Letter of Credit hereunder, the management of the Loans or the

94

{Z0014373/12 }

**IN WITNESS WHEREOF**, this Loan and Security Agreement has been duly executed as of the day and year first above written.

FIFTH THIRD BANK

By: _____
Name:  John D. Lundberg
Its:  Vice President

SPRING COMMUNICATIONS
HOLDING, INC.

By: _____
Name:  Jason S. Ellis
Its:  President

SPRING COMMUNICATIONS -
BLUE WIRE, INC.

By: _____
Name:  Jason S. Ellis
Its:  President

SPRING COMMUNICATIONS DSW, INC.

By: _____
Name:  Jason S. Ellis
Its:  President

SPRING COMMUNICATIONS -
ILLINOIS, INC.

By: _____
Name:  Jason S. Ellis
Its:  President

SPRING COMMUNICATIONS MNP, INC.

By: _____
Name:  Jason S. Ellis
Its:  President

SPRING COMMUNICATIONS
NEVADA, INC.

By: _____
Name:  Jason S. Ellis
Its:  President

SPRING COMMUNICATIONS, INC.

By: _____
Name:  Jason S. Ellis
Its:  President

SPRING COMMUNICATIONS -
TEXAS, INC.

By: _____
Name:  Jason S. Ellis
Its:  President

SPRING COMMUNICATIONS
IDAHO, INC.

By: _____
Name:  Jason S. Ellis
Its:  President

Signature Page to Loan and Security Agreement

EXHIBIT E

STOCK PURCHASE AGREEMENT

among

SPRING COMMUNICATIONS HOLDING, INC.,

MERGENCE CORPORATION

and

GAMESTOP CORP.

dated as of

October 17, 2013

# TABLE OF CONTENTS

**ARTICLE I** DEFINITIONS ........................................................................................................1

**ARTICLE II** PURCHASE AND SALE...........................................................................................6

Section 2.01 Purchase and Sale. ..................................................................................................6

Section 2.02 Purchase Price. ........................................................................................................6

Section 2.03 Closing. ...................................................................................................................7

Section 2.04 Working Capital Adjustment. ..................................................................................7

Section 2.05 EBITDA Adjustment. ..............................................................................................8

**ARTICLE III** REPRESENTATIONS AND WARRANTIES OF SELLER ...............................8

Section 3.01 Authority of Seller. .................................................................................................8

Section 3.02 Organization, Authority and Qualification of the Company. ...................................9

Section 3.03 Capitalization. .........................................................................................................9

Section 3.04 Subsidiaries. ..........................................................................................................10

Section 3.05 No Conflicts; Consents. .........................................................................................10

Section 3.06 Financial Statements. .............................................................................................11

Section 3.07 Absence of Certain Changes, Events and Conditions..............................................12

Section 3.08 Material Contracts..................................................................................................13

Section 3.09 Title to Assets; Real Property. ...............................................................................15

Section 3.10 Intellectual Property...............................................................................................15

Section 3.11 Insurance. ...............................................................................................................16

Section 3.12 Legal Proceedings; Governmental Orders. .............................................................16

Section 3.13 Compliance With Laws; Permits. ...........................................................................16

Section 3.14 Employee Benefit Matters. .....................................................................................17

Section 3.15 Employment Matters...............................................................................................18

Section 3.16 Taxes. .....................................................................................................................19

Section 3.17 Environmental Matters............................................................................................20

Section 3.18 Telecommunications Matters ..................................................................................21

Section 3.19 Acquired Retail Stores ...........................................................................................21

Section 3.20 Affiliate Transactions.............................................................................................22

Section 3.21 Indebtedness.................................................................................................22

Section 3.22 Brokers........................................................................................................23

Section 3.23 No Other Representations and Warranties.................................................23

**ARTICLE IV** REPRESENTATIONS AND WARRANTIES OF BUYER ..............................23

Section 4.01 Organization and Authority of Buyer. .......................................................23

Section 4.02 No Conflicts; Consents. ..............................................................................23

Section 4.03 Investment Purpose.....................................................................................24

Section 4.04 Brokers........................................................................................................24

Section 4.05 Sufficiency of Funds. ..................................................................................24

Section 4.06 Legal Proceedings.......................................................................................24

Section 4.07 Independent Investigation. ..........................................................................24

Section 4.08 No Other Representations and Warranties..................................................25

**ARTICLE V** COVENANTS .................................................................................................25

Section 5.01 Conduct of Business Prior to the Closing...................................................25

Section 5.02 Access to Information..................................................................................25

Section 5.03 Resignations................................................................................................26

Section 5.04 Exclusivity. .................................................................................................26

Section 5.05 Non-Competition; Non-Solicitation; Non-Interference. ...........................26

Section 5.06 Confidentiality. ...........................................................................................27

Section 5.07 Governmental Approvals and Other Third-Party Consents........................27

Section 5.08 Books and Records. ....................................................................................28

Section 5.09 Closing Conditions......................................................................................28

Section 5.10 Public Announcements. ..............................................................................29

Section 5.11 Further Assurances......................................................................................29

Section 5.12 Loss Shares. ................................................................................................29

Section 5.13 Tax Sharing Agreements.............................................................................29

Section 5.14 Straddle Period............................................................................................29

Section 5.15 Tax Periods Ending on or before Closing Date .........................................29

Section 5.16 Cooperation on Tax Matters .......................................................................30

Section 5.17 Transfer Taxes. ..............................................................................30

Section 5.18 Refunds; Carrybacks. ......................................................................30

**ARTICLE VI** CONDITIONS TO CLOSING ........................................................30

Section 6.01 Conditions to Obligations of Buyer. ...............................................30

Section 6.02 Conditions to Obligations of Seller. ...............................................32

**ARTICLE VII** INDEMNIFICATION ...................................................................32

Section 7.01 Survival. ..........................................................................................32

Section 7.02 Indemnification by Seller. ..............................................................33

Section 7.03 Recovery from Escrow Fund. .........................................................33

Section 7.04 Exclusive Remedy; Limitations on Recovery. ................................34

Section 7.05 Distribution of Escrow Fund. .........................................................35

Section 7.06 Indemnification Procedures. ...........................................................35

Section 7.07 Tax Treatment of Indemnification Payments. .................................36

**ARTICLE VIII** TERMINATION ..........................................................................37

Section 8.01 Termination. ....................................................................................37

Section 8.02 Effect of Termination. ....................................................................37

**ARTICLE IX** MISCELLANEOUS ......................................................................38

Section 9.01 Expenses. ........................................................................................38

Section 9.02 Notices. ...........................................................................................38

Section 9.03 Interpretation. .................................................................................39

Section 9.04 Headings. .........................................................................................39

Section 9.05 Severability. ....................................................................................39

Section 9.06 Entire Agreement. ...........................................................................40

Section 9.07 Successors and Assigns. ..................................................................40

Section 9.08 No Third-Party Beneficiaries. .........................................................40

Section 9.09 Amendment and Modification; Waiver. ..........................................40

Section 9.10 Governing Law; Waiver of Jury Trial. ............................................40

Section 9.11 Counterparts; Facsimile. .................................................................41

Section 9.12 Legal Representation. ......................................................................41

iii

## STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement (this **"Agreement"**), dated as of October 17, 2013, is entered into among Spring Communications Holding, Inc., a Delaware corporation (the **"Company"**), Mergence Corporation, a Delaware corporation (**"Seller"**), and GameStop Corp., a Delaware corporation (the **"Buyer"**).

## RECITALS

WHEREAS, Seller owns all of the issued and outstanding shares of common stock, \$0.001 par value per share (the **"Shares"**), of the Company; and

WHEREAS, Seller wishes to sell to Buyer, and Buyer wishes to purchase from Seller, the Shares, subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
### DEFINITIONS

The following terms have the meanings specified or referred to in this **Article I**:

**"2014 Audited Financial Statements"** has the meaning set forth in **Section 2.05**.

**"2014 Adjusted EBITDA"** has the meaning set forth in **Section 2.05**.

**"2014 Adjusted EBITDA Statement"** has the meaning set forth in **Section 2.05**.

**"Acquired Business"** means any business or operations Company or any of its Subsidiaries acquires (whether in the form of a purchase of assets, stock, merger or otherwise).

**"Acquired Retail Stores"** means all retail facilities acquired by the Company or any of its Subsidiaries during the three (3) year period prior to the date of this Agreement, or hereafter acquired prior to the Closing by the Company or any of its Subsidiaries, whether owned or leased, including all leases relating to such retail facilities, any rights under any contract relating to the lease, occupancy, use or maintenance of any retail stores or facilities, and all inventory used or useable in the Company's or any of its Subsidiaries' retail business (wherever located). For the avoidance of doubt, "Acquired Retail Stores" shall include all retail facilities acquired by the Company or any of its Subsidiaries from (i) Affordable Portables, Inc. and (ii) Cartronix, Inc. to the extent hereafter acquired (whether by merger, consolidation, stock or asset purchase or any other manner) by the Company pursuant to an acquisition agreement entered into prior to the Closing or pursuant to an acquisition consummated within 10 days following the Closing.

**"Adjusted EBITDA"** means earnings before interest, income taxes, depreciation, and amortization, and after the "Mergence Allocation" (as described in the Financial Statements), as determined in accordance with GAAP consistently applied and applied in accordance with the Company's historical practice excluding (i) all extraordinary, unusual, infrequent or nonrecurring items of gain or loss; (ii) revenues and other financial results from the acquisition of an Acquired Business prior to its acquisition by the Company or any of its Subsidiaries; and (iii) any prepayment penalties and similar fees incurred by Buyer, the Company or its Subsidiaries at or following the Closing. For the avoidance of doubt, all costs and expenses associated with the acquisition of an Acquired Business, including all fees and accrued interest on funds used to

acquire any such Acquired Business at the Company's borrowing rate, shall be a reduction to Adjusted EBITDA.

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agency Agreements**" has the meaning set forth in **Section 3.08(a)(ii)**.

"**Agreement**" has the meaning set forth in the preamble.

"**Ancillary Agreements**" mean, collectively, the Escrow Agreement, the Employment Arrangements, the Services Agreement Assignment and all other agreements, certificates, instruments, documents and writings delivered in connection with this Agreement.

"**Audited Financial Statements**" has the meaning set forth in **Section 3.06**.

"**Balance Sheet**" has the meaning set forth in **Section 3.06**.

"**Balance Sheet Date**" has the meaning set forth in **Section 3.06**.

"**Benefit Plan**" has the meaning set forth in **Section 3.14(a)**.

"**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in Salt Lake City, Utah are authorized or required by Law to be closed for business.

"**Buyer**" has the meaning set forth in the preamble.

"**Claim**" has the meaning set forth in **Section 7.03(c)**.

"**Closing**" has the meaning set forth in **Section 2.03**.

"**Closing Date**" has the meaning set forth in **Section 2.03**.

"**Closing Date Working Capital Amount**" has the meaning set forth in **Section 2.04**.

"**Closing Date Working Capital Statement**" has the meaning set forth in **Section 2.04**.

"**Code**" means the Internal Revenue Code of 1986, as amended, and the rules and regulations thereunder.

"**Commission Statement**" has the meaning set forth in **Section 3.18(a)**.

"**Common Stock**" has the meaning set forth in **Section 3.03(a)**.

"**Company**" has the meaning set forth in the preamble.

"**Company Intellectual Property**" has the meaning set forth in **Section 3.10(b)**.

"**Confidentiality Agreement**" means the Mutual Nondisclosure Agreement, dated as of September 20, 2013, between Buyer and the Company.

"**Direct Claim**" has the meaning set forth in **Section 7.06(c)**.

2

## ARTICLE IX
### MISCELLANEOUS

**Section 9.01 Expenses.** Whether or not the Closing takes place, and except as otherwise expressly provided herein (including **Section 5.17** hereof), all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses; *provided, however*, that any expenses of the Company or any of its Subsidiaries incurred in connection with this Agreement and the transactions contemplated hereby shall be the sole responsibility of Seller.

**Section 9.02 Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand; (b) on the first Business Day after mailed if sent for overnight delivery by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third Business Day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this **Section 9.02**):

| | |
|---|---|
| If to the Company: | Spring Communications Holding, Inc. |
| | 3939 Wasatch Boulevard, Suite 1 |
| | Salt Lake City, Utah 84124 |
| | Facsimile: (801) 278-7322 |
| | E-mail: jellis@springmobile.com |
| | |
| If to Seller: | Mergence Corporation |
| | 3939 Wasatch Boulevard, Suite 1 |
| | Salt Lake City, Utah 84124 |
| | Facsimile: (801) 278-7322 |
| | E-mail: jellis@springmobile.com |
| | |
| with a copy (which shall not constitute notice) to: | Holland & Hart LLP |
| | 222 South Main Street, Suite 2200 |
| | Salt Lake City, UT 84101 |
| | Facsimile: 801-799-5700 |
| | E-mail: glindley@hollandhart.com |
| | Attention: Gregory E. Lindley |
| | |
| If to Buyer: | GameStop Corp. |
| | 625 Westport Parkway |
| | Grapevine, TX 76051 |
| | Facsimile: 817-424-2820 |
| | E-mail: RobLloyd@gamestop.com |
| | Attention: Rob Lloyd |
| | Chief Financial Officer |

38

with a copy (which shall not
constitute notice) to:

Bryan Cave LLP
1290 Avenue of the Americas
New York, NY 10104
Facsimile: (212) 541-1418
E-mail: jmdorman@bryancave.com
Attention: Jay M. Dorman

and

GameStop Corp.
600 Willowbrook Lane, Suite 622
West Chester, PA 19382
Facsimile: 484-991-1944
E-mail: DanKaufman@gamestop.com
Attention: Daniel J. Kaufman
  Senior Vice President, General
  Counsel and Secretary

**Section 9.03   Interpretation.** For purposes of this Agreement: (a) the words "include,"
"includes" and "including" shall be deemed to be followed by the words "without limitation"; (b)
the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and
"hereunder" refer to this Agreement as a whole. Unless the context otherwise requires,
references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles
and Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an
agreement, instrument or other document means such agreement, instrument or other document
as amended, supplemented and modified from time to time to the extent permitted by the
provisions thereof; and (z) to a statute means such statute as amended from time to time and
includes any successor legislation thereto and any regulations promulgated thereunder. The
definitions contained in this Agreement are applicable to the singular as well as the plural forms
of such terms. References to a Person are also to its permitted successors and assigns. This
Agreement shall be construed without regard to any presumption or rule requiring construction
or interpretation against the party drafting an instrument or causing any instrument to be drafted.
The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an
integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

**Section 9.04   Headings.** The headings in this Agreement are for reference only and shall
not affect the interpretation of this Agreement.

**Section 9.05   Severability.** If any term or provision of this Agreement is held by a court
of competent jurisdiction to be invalid, illegal or unenforceable in any jurisdiction, such
invalidity, illegality or unenforceability shall not affect any other term or provision of this
Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.
Upon such determination that any term or other provision is invalid, illegal or unenforceable, the
parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original
intent of the parties as closely as possible in a mutually acceptable manner in order that the

39

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above individually or by their respective officers thereunto duly authorized.

SIMPLY MAC, INC.

By: _____
Name: Steven B. Bain
Title: president

MERGENCE CORPORATION

By: _____
Name: Jason S. Ellis
Title: Director

STEVE BAIN

_____

TYLER DICKMAN

_____

KENT FORSGREN

_____

KENT THOMAS

_____

[Signature Page to Stock Purchase Agreement]

EXHIBIT 1



FINRA

## BrokerCheck Report

# Q ADVISORS LLC

CRD# 127232

Report #71113-96466, data current as of Tuesday, May 19, 2015.

| Section Title | Page(s) |
|---|---|
| Report Summary | 1 |
| Firm Profile | 2 – 6 |
| Firm History | 7 |
| Firm Operations | 8 – 13 |



**About BrokerCheck®**

BrokerCheck offers information on all current, and many former, registered securities brokers, and all current and former registered securities firms. FINRA strongly encourages investors to use BrokerCheck to check the background of securities brokers and brokerage firms before deciding to conduct, or continue to conduct, business with them.

- **What is included in a BrokerCheck report?**

  BrokerCheck reports for individual brokers include information such as employment history, professional qualifications, disciplinary actions, criminal convictions, civil judgments and arbitration awards. BrokerCheck reports for brokerage firms include information on a firm's profile, history, and operations, as well as many of the same disclosure events mentioned above.

  Please note that the information contained in a BrokerCheck report may include pending actions or allegations that may be contested, unresolved or unproven. In the end, these actions or allegations may be resolved in favor of the broker or brokerage firm, or concluded through a negotiated settlement with no admission or finding of wrongdoing.

- **Where did this information come from?**

  The information contained in BrokerCheck comes from FINRA's Central Registration Depository, or CRD® and is a combination of:

  - o information FINRA and/or the Securities and Exchange Commission (SEC) require brokers and brokerage firms to submit as part of the registration and licensing process, and
  - o information that regulators report regarding disciplinary actions or allegations against firms or brokers.

- **How current is this information?**

  Generally, active brokerage firms and brokers are required to update their professional and disciplinary information in CRD within 30 days. Under most circumstances, information reported by brokerage firms, brokers and regulators is available in BrokerCheck the next business day.

- **What if I want to check the background of an investment adviser firm or investment adviser representative?**

  To check the background of an investment adviser firm or representative, you can search for the firm or individual in BrokerCheck. If your search is successful, click on the link provided to view the available licensing and registration information in the SEC's Investment Adviser Public Disclosure (IAPD) website at http://www.adviserinfo.sec.gov. In the alternative, you may search the IAPD website directly or contact your state securities regulator at http://www.finra.org/Investors/ToolsCalculators/BrokerCheck/P455414.

- **Are there other resources I can use to check the background of investment professionals?**

  FINRA recommends that you learn as much as possible about an investment professional before deciding to work with them. Your state securities regulator can help you research brokers and investment adviser representatives doing business in your state.

**Thank you for using FINRA BrokerCheck.**



Using this site/information means that you accept the FINRA BrokerCheck Terms and Conditions. A complete list of Terms and Conditions can be found at

brokercheck.finra.org



For additional information about the contents of this report, please refer to the User Guidance or www.finra.org/brokercheck. It provides a glossary of terms and a list of frequently asked questions, as well as additional resources. For more information about FINRA, visit www.finra.org.

# FINra

**Q ADVISORS LLC**
CRD# 127232
SEC# 8-65975

## Main Office Location

1899 WYNKOOP STREET
SUITE 200
DENVER, CO 80202
Regulated by FINRA Denver Office

## Mailing Address

1899 WYNKOOP STREET
SUITE 200
DENVER, CO 80202

## Business Telephone Number

303-996-9660

# Report Summary for this Firm

This report summary provides an overview of the brokerage firm. Additional information for this firm can be found in the detailed report.

## Firm Profile

This firm is classified as a limited liability company.

This firm was formed in Colorado on 07/26/2002.

Its fiscal year ends in December.

## Firm History

Information relating to the brokerage firm's history such as other business names and successions (e.g., mergers, acquisitions) can be found in the detailed report.

## Firm Operations

This firm is registered with:

- the SEC
- 1 Self-Regulatory Organization
- 2 U.S. states and territories

Is this brokerage firm currently suspended with any regulator?  **No**

This firm conducts 2 types of businesses.

This firm is not affiliated with any financial or investment institutions.

This firm does not have referral or financial arrangements with other brokers or dealers.

## Disclosure Events

Brokerage firms are required to disclose certain criminal matters, regulatory actions, civil judicial proceedings and financial matters in which the firm or one of its control affiliates has been involved.

Are there events disclosed about this firm?    **No**



## Firm Profile

This firm is classified as a limited liability company.

This firm was formed in Colorado on 07/26/2002.

Its fiscal year ends in December.

## Firm Names and Locations

This section provides the brokerage firm's full legal name, "Doing Business As" name, business and mailing addresses, telephone number, and any alternate name by which the firm conducts business and where such name is used.

**Q ADVISORS LLC**

**Doing business as Q ADVISORS LLC**

**CRD#** 127232

**SEC#** 8-65975

**Main Office Location**

1899 WYNKOOP STREET
SUITE 200
DENVER, CO  80202

**Regulated by FINRA Denver Office**

**Mailing Address**

1899 WYNKOOP STREET
SUITE 200
DENVER, CO  80202

**Business Telephone Number**

303-996-9660

©2015 FINRA. All rights reserved.   Report# 71447-95466 about Q ADVISORS LLC. Data current as of Tuesday, May 19, 2015.



# Firm Profile

This section provides information relating to all direct owners and executive officers of the brokerage firm.

## Direct Owners and Executive Officers

| | |
|---|---|
| **Legal Name & CRD# (if any):** | Q CONSULTING LLC |
| **Is this a domestic or foreign entity or an individual?** | Domestic Entity |
| **Position** | MEMBER AND MANAGER |
| **Position Start Date** | 12/2002 |
| **Percentage of Ownership** | 50% but less than 75% |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | SCOTT, PATRICK ADAM KENNEDY |
| | 3045772 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | MEMBER |
| **Position Start Date** | 01/2006 |
| **Percentage of Ownership** | 25% but less than 50% |
| **Does this owner direct the management or policies of the firm?** | No |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | BROWN TROUT EQUITY MANAGEMENT LLC |
| **Is this a domestic or foreign entity or an individual?** | Domestic Entity |
| **Position** | MEMBER |
| **Position Start Date** | 01/2007 |
| **Percentage of Ownership** | 10% but less than 25% |

©2015 FINRA. All rights reserved.   Report about ADVISORS LLC. Date generated on ____day, May 19, 2015



FINra

# Firm Profile

## Direct Owners and Executive Officers (continued)

**Does this owner direct the management or policies of the firm?**
No

**Is this a public reporting company?**
No

**Legal Name & CRD# (if any):**
DEHAVEN, RICHARD GERARD

5463464

**Is this a domestic or foreign entity or an individual?**
Individual

**Position**
MEMBER

**Position Start Date**
10/2012

**Percentage of Ownership**
5% but less than 10%

**Does this owner direct the management or policies of the firm?**
No

**Is this a public reporting company?**
No

**Legal Name & CRD# (if any):**
COLLINS, ELIZABETH SARAH

4714831

**Is this a domestic or foreign entity or an individual?**
Individual

**Position**
FINOP

**Position Start Date**
08/2014

**Percentage of Ownership**
Less than 5%

**Does this owner direct the management or policies of the firm?**
No

**Is this a public reporting company?**
No

**Legal Name & CRD# (if any):**
QUINN, MICHAEL SCOTT

4666153

©2015 FINRA. All rights reserved. Report# 71112-25466 about O ADVISORS LLC. Data current as of Tuesday, May 19, 2015.



# Firm Profile

## Direct Owners and Executive Officers (continued)

| | |
|---|---|
| Is this a domestic or foreign entity or an individual? | Individual |
| Position | CHIEF COMPLIANCE OFFICER |
| Position Start Date | 09/2006 |
| Percentage of Ownership | Less than 5% |
| Does this owner direct the management or policies of the firm? | Yes |
| Is this a public reporting company? | No |

©2015 FINRA. All rights reserved. Report 714445-96458 about O ADVISORS LLC. Data current as of Tuesday, May 19, 2015.



# Firm Profile

This section provides information relating to any indirect owners of the brokerage firm.

## Indirect Owners

| | |
|---|---|
| **Legal Name & CRD# (if any):** | CRAWFORD, FRANK MICHAEL |
| | 1569486 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Company through which indirect ownership is established** | BROWN TROUT EQUITY MANAGEMENT LLC |
| **Relationship to Direct Owner** | MEMBER |
| **Relationship Established** | 01/2005 |
| **Percentage of Ownership** | 75% or more |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | QUINN, MICHAEL SCOTT |
| | 4666153 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Company through which indirect ownership is established** | Q CONSULTING LLC |
| **Relationship to Direct Owner** | PRESIDENT |
| **Relationship Established** | 03/2000 |
| **Percentage of Ownership** | 75% or more |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |

©2015 FINRA. All rights reserved. Report #44442-95456 about Q ADVISORS LLC. Data current as of Tuesday, May 19, 2015.



## Firm History

This section provides information relating to any successions (e.g., mergers, acquisitions) involving the firm.

No information reported.

©2015 FINRA. All rights reserved. Report# 71113-05455 about O ADVISORS LLC. Data current as of Tuesday, May 12, 2015.



# Firm Operations

## Registrations

This section provides information about the regulators (Securities and Exchange Commission (SEC), self-regulatory organizations (SROs), and U.S. states and territories) with which the brokerage firm is currently registered and licensed, the date the license became effective, and certain information about the firm's SEC registration.

**This firm is currently registered with the SEC, 1 SRO and 2 U.S. states and territories.**

| Federal Regulator | Status | Date Effective |
|---|---|---|
| SEC | Approved | 11/17/2003 |

## SEC Registration Questions

This firm is registered with the SEC as:

A broker-dealer:   Yes

A broker-dealer and government securities broker or dealer:   No

A government securities broker or dealer only:   No

This firm has ceased activity as a government securities broker or dealer:   No

| Self-Regulatory Organization | Status | Date Effective |
|---|---|---|
| FINRA | Approved | 11/17/2003 |

©2015 FINRA. All rights reserved. Report #11412-05455 about about ADVISORS LLC. Data current as of Tuesday, May 19, 2015.



**Firm Operations**

## Registrations (continued)

| U.S. States & Territories | Status | Date Effective |
|---|---|---|
| California | Approved | 11/18/2003 |
| Colorado | Approved | 12/12/2003 |

©2015 FINRA. All rights reserved. Report #41442-05492 about O ATKINSON ROGERS LLC. Data current as of Tuesday, May 19, 2015



# Firm Operations

## Types of Business

This section provides the types of business, including non-securities business, the brokerage firm is engaged in or expects to be engaged in.

**This firm currently conducts 2 types of businesses.**

### Types of Business

Private placements of securities

Other – MERGERS AND ACQUISITIONS AND RESTRUCTURING

### Other Types of Business

This firm does not effect transactions in commodities, commodity futures, or commodity options.

This firm does not engage in other non-securities business.

Non-Securities Business Description:



# Firm Operations

## Clearing Arrangements

This firm does not hold or maintain funds or securities or provide clearing services for other broker-dealer(s).

## Introducing Arrangements

This firm does not refer or introduce customers to other brokers and dealers.

©2015 FINRA. All rights reserved.    Report# 71112-06/65 about C ADVISORS LLC. Data current as of Tuesday, May 19, 2015.



# Firm Operations

## Industry Arrangements

**This firm does not have books or records maintained by a third party.**

**This firm does not have accounts, funds, or securities maintained by a third party.**

**This firm does not have customer accounts, funds, or securities maintained by a third party.**

**Control Persons/Financing**

**This firm does not have individuals who control its management or policies through agreement.**

**This firm does not have individuals who wholly or partly finance the firm's business.**

©2015 FINRA. All rights reserved. Report# 71443-95486 about CAPHSCORE LLC. Data current as of Tuesday, May 19, 2015.



## Firm Operations

### Organization Affiliates

This section provides information on control relationships the firm has with other firms in the securities, investment advisory, or banking business.

**This firm is not, directly or indirectly:**
- in control of
- controlled by
- or under common control with

**the following partnerships, corporations, or other organizations engaged in the securities or investment advisory business.**

**This firm is not directly or indirectly, controlled by the following:**
- bank holding company
- national bank
- state member bank of the Federal Reserve System
- state non-member bank
- savings bank or association
- credit union
- or foreign bank



FINC2

End of Report

This page is intentionally left blank.

EXHIBIT 2

| | |
|---|---|
| DISTRICT COURT<br>CITY AND COUNTY OF DENVER, COLORADO<br><br>Denver City & County Building<br>Clerk of the Court, Civil Division<br>1437 Bannock St., Room 256<br>Denver, CO  80202 | |
| Plaintiff:     Q ADVISORS LLC<br><br>v.<br><br>Defendants:     MERGENCE CORPORATION and<br>JASON S. ELLIS | ▲ COURT USE ONLY ▲ |
| John S. Phillips #24884<br>Sean C. Grimsley #36422<br><br>BARTLIT BECK HERMAN PALENCHAR &<br>    SCOTT LLP<br>1899 Wynkoop Street, 8th Floor<br>Denver, CO  80202<br><br>Telephone Number:   (303) 592-3100<br>Facsimile Number:   (303) 592-3140<br>Email:   john.phillips@bartlit-beck.com<br>             sean.grimsley@bartlit-beck.com | Case Number:<br><br>Div.:      Ctrm: |
| **COMPLAINT** | |

Plaintiff Q Advisors LLC ("Q Advisors"), for its Complaint against Mergence

Corporation ("Mergence") and Jason S. Ellis ("Ellis"), states as follows:

### Parties

1.     Q Advisors is a Colorado limited liability company headquartered in the City and

County of Denver, Colorado.  Q Advisors is an investment bank that specializes in assisting

companies with business transactions such as mergers and acquisitions, debt and equity

financings, and recapitalizations.

2.      Mergence is a Nevada corporation headquartered in Salt Lake City, Utah at 3939 South Wasatch Boulevard. Mergence was formed on August 2, 2005 to provide "technical products and services offered in both retail and wholesale markets." Until November 2013, Mergence directly or indirectly owned Spring Communications, Inc., which was known and did business variously as "Spring," "Spring Mobile," "Spring Retail Group," and "Spring Communications Holding." Mergence referred to these Spring entities and its Spring Mobile business "Spring Retail Group." Mergence also itself did business as "Spring Retail Group" at the same business address as the Spring entities at 3939 South Wasatch Boulevard in Salt Lake City.

3.      Jason S. Ellis is an individual whose principal residence is in Utah. He is and has at all relevant times been President and Chief Executive Officer of Spring Mobile and numerous other Spring entities (such as Chief Executive Officer of Spring Retail Group, President of Spring Communications, Inc., President of Spring Communications Holding, Inc., and the like) and also President and Treasurer of Mergence. According to sworn Nevada Secretary of State filings, Ellis is and always has been a member of the Board of Directors of Mergence since Mergence was incorporated on August 2, 2005. Ellis is currently President and Chief Executive Officer of Spring Mobile, which (like Mergence) is located at 3939 South Wasatch Boulevard in Salt Lake City.

4.      Though not currently named as defendants, other individuals who are important to this action are Brett M. Bradshaw ("Bradshaw") and Vernon G. Dickman ("Dickman"). Both Bradshaw and Dickman have been members of the Board of Directors of Mergence since Mergence was incorporated on August 2, 2005. Bradshaw is and has always served as Mergence's Secretary. Bradshaw is also currently Senior Vice President of Sales and Operations

2

of Spring Mobile, which (like Mergence) is located at 3939 South Wasatch Boulevard in Salt Lake City. Dickman is the Founder of Spring Mobile and was, as of at least 2013, a Member of the Board of Directors and Chairman of the Board of Spring Mobile and numerous other Spring entities.

5.     On information and belief, each of Ellis, Bradshaw, and Dickman were and are shareholders or beneficial owners of Mergence – Ellis (23.5%), Bradshaw (7.5%), and Dickman (69%) – and each personally benefited from the sale of Spring in November 2013 and from the breaches described below.

### Jurisdiction and Venue

6.     Plaintiff's claims arise under the contract attached to this Complaint as Exhibit A (the "Contract") and common law.

7.     This Court has subject matter jurisdiction over this action pursuant to Article 6, Section 9, of the Colorado Constitution.

8.     This Court has personal jurisdiction over the Defendants because Mergence, Spring, and Ellis have had numerous, substantial contacts with the State of Colorado and the City and County of Denver. For example, between December 2012 and July 2013, Mergence, Spring, and Ellis placed dozens of telephone calls and sent dozens of e-mails to Q Advisors at Q Advisors' offices in the City and County of Denver. These contacts related to the negotiation of the Contract, the signing of the Contract, representations about Mergence's and Spring's business activities, financial condition, and financing needs, communications with Fifth Third bank representatives located in Denver, requests for services by Q Advisors to be provided in Denver, and the actual provision of services in Denver by Q Advisors to Mergence and Spring

3

under the Contract. Spring also substantial ongoing business operations through at least two retail locations located in the City of County of Denver today.

9.    Venue is proper in the City and County of Denver pursuant to C.R.C.P. 98(c) because, among other things, Mergence, Spring, and Ellis requested that Q Advisors perform the services in the City and County of Denver, the Contract was in fact performed and the services were in fact provided by Q Advisors at Q Advisors' offices in the City and County of Denver, the damages have been felt and incurred by Q Advisors in the City and County of Denver, and Q Advisors is a resident of the City and County of Denver. The financing transaction in which Q Advisors assisted Mergence and Spring was done by the lending team of Fifth Third Bank located in the City and County of Denver. Spring currently transacts business in the City and County of Denver.

### Statement of Facts

10.    In late 2012, Ellis and Spring's Chief Financial Officer Kent Forsgren asked Q Advisors to provide financial investment banking services to Mergence and Spring, including exploring possible financing transactions for Spring.

11.    In order to convince Q Advisors to enter into the Contract, Ellis informed Q Advisors that Mergence and Spring envisioned "a larger deal with Spring all in," meaning that Spring would likely be sold in the future. Mergence and Spring also informed Q Advisors that Mergence's largest shareholder (Dickman) intended to sell Spring "within twenty-four to thirty-six months."

12.    The parties negotiated the Contract between December 20, 2012 and January 18, 2013. Ellis, who was the President of both Mergence and Spring, and Spring's Chief Financial

4

Officer Kent Forsgren, negotiated the terms on behalf of Spring and "Mergence dba Sprint Retail Group." Q Advisors' Michael Crawford ("Crawford") negotiated on behalf of Q Advisors.

13.    Ellis and Crawford each signed the Contract on or about January 18, 2013.

14.    At the time Ellis signed the Contract, Ellis held himself out as an officer and agent of Mergence Corporation and an officer and agent of Spring.

15.    Ellis signed the Contract as "President."

16.    At the time Ellis signed the Contract, Mergence, Ellis, and Mergence's other officers and directors all knew or should have known that Mergence was not legally permitted to transact business under the law of it's state of incorporation.

17.    Unbeknownst to Q Advisors, Mergence was a Nevada corporation and Mergence's directors and officers had failed to follow Nevada corporate legal requirements since at least August 2009.

18.    Under Nevada law, Mergence was not permitted to transact business at the time Ellis signed the Contract in January 2013.

19.    In 2012 and 2013, Mergence held itself out as a Delaware corporation, which it never was.

20.    The Contract provides that "Mergence Corporation (dba Spring Retail Group) ("Mergence" or the "Company")" engaged Q Advisors "to provide financial advisory services on an exclusive basis (the "Services"), to the Company in connection with the private placement to qualified institutional buyers" of debt.

21.    The Contract provides that Mergence would compensate Q Advisors for Q Advisors' work.

5

22. Section 15 of the Contract provides that "In the event Mergence elects to pursue a sale or recapitalization of the Company, whether this letter is in effect or within thirty-six (36) months of its termination, Q Advisors and Mergence **shall negotiate in good faith a new engagement letter** under which Q Advisors would be the Company's exclusive financial advisor for that assignment/transaction." (Emphasis added in bold.)

23. Section 15 also reflects the parties' intent and agreement to "terms of an engagement that are commercially reasonable and that, when taken as a whole, are not materially inconsistent with those available at the time from investment banks or other organizations with experience and qualifications substantially similar to those of Q Advisors." The terms of such engagements are well-known, and the parties themselves had a history of two other engagements.

24. With Q Advisors' assistance, Spring completed a debt transaction with Fifth Third Bank in July 2013.

25. Between December 2012 and July 2013, Mergence and Spring officers and agents sent numerous e-mails to Q Advisors in Denver, Colorado in connection with the services Q Advisors provided under the Contract. Mergence and Spring officers and agents placed numerous telephone calls to Q Advisors in Denver, Colorado in connection with the services Q Advisors provided under the Contract. Q Advisors performed substantially all the services under the Contract at Q Advisors offices in Denver, Colorado.

26. Without telling Q Advisors, the officers and directors of Mergence and Spring discussed the possible sale of Spring at various times between August 2013 and November 2013.

27. Without telling Q Advisors, Mergence and Spring agreed that Spring would be sold.

6

28.     Without telling Q Advisors, Mergence sold Spring to a public company named Gamestop Corp. in November 2013 in a transaction with a total enterprise value of approximately $97 million.  Q Advisors had originally introduced Gamestop to Mergence and Spring Retail Group in connection with an earlier transaction for Mergence and Spring in 2012.

29.     Mergence and Spring never told Q Advisors that Spring was being sold at any time before Spring was sold to Gamestop in November 2013.

30.     Mergence and Spring never negotiated a new engagement letter with Q Advisors in connection with the November 2013 sale of Spring, as the Contract required.

31.     Defendants have never paid Q Advisors any fees in connection with the November 2013 sale of Spring.

32.     Defendants have failed and refused to pay Q Advisors any fees in connection with the November 2013 sale of Spring.

33.     Ellis knew or had reason to know that Mergence lacked capacity to do business as of 2012 and 2013.

34.     Ellis is personally liable for the debts of Mergence under the Contract.

35.     Ellis is a party to the Contract as a matter of agency and common law.

36.     Mergence and Ellis have failed to pay Q Advisors what they owe under the Contract.

### First Claim for Relief
### (Breach of Contract – Mergence)

37.     Plaintiff incorporates by reference all of the foregoing paragraphs.

38.     The Contract between Q Advisors and Mergence is valid and enforceable.

39.     Q Advisors performed its obligations under the Contract.

40.    Mergence breached its obligation to engage and pay Q Advisors for the sale of

Spring according to the terms of the Contract.

41.    Q Advisors has suffered damage because of Mergence's breach of the Contract.

### Second Claim for Relief
(Breach of Contract – Ellis)

42.    Plaintiff incorporates by reference all of the foregoing paragraphs.

43.    The Contract is valid and enforceable.

44.    Q Advisors performed its obligations under the Contract.

45.    Ellis held himself out as an agent for Mergence and Spring at the time he signed

the Contract.

46.    At the time he signed the Contract and thereafter, Ellis knew or should have

known that Mergence lacked capacity to be a party to a contract.

47.    Ellis is therefore personally liable under the Contract.

48.    Ellis breached his obligation to engage and pay Q Advisors for the sale of Spring

according to the terms of the Contract.

49.    Q Advisors has suffered damage because of Ellis' breach of the Contract.

### Third Claim for Relief
(Breach of Covenant of Good Faith and Fair Dealing – Mergence)

50.    Plaintiff incorporates by reference all of the foregoing paragraphs.

51.    The Contract included an implied covenant of good faith and fair dealing.

52.    Mergence breached the covenant of good faith and fair dealing by failing to

inform Q Advisors that Mergence and Spring were pursuing a sale of Spring, by failing to inform

Q Advisors that it had agreed to sell Spring, by failing to engage Q Advisors in connection with

the sale, by hiding its intentions for Spring and the implications of that sale for Q Advisors under

8

the Contract, and by its bad faith failure and refusal to pay Q Advisors what it owes under the Contract.

### Fourth Claim for Relief
**(Breach of Covenant Good Faith and Fair Dealing – Ellis)**

53.     Plaintiff incorporates by reference all of the foregoing paragraphs.

54.     The Contract included an implied covenant of good faith and fair dealing.

55.     Ellis breached the covenant of good faith and fair dealing by failing to inform Q Advisors that Mergence and Spring were pursuing a sale of Spring, by failing to inform Q Advisors he and others were involved in negotiating and selling Spring, by failing to engage Q Advisors in connection with the sale, by hiding his, Mergence's and Spring's intentions for Spring and the implications of that sale for Q Advisors under the Contract, and by his bad faith failure and refusal to pay Q Advisors what he owes under the Contract.

### Prayer for Relief

WHEREFORE, Plaintiff requests a judgment in his favor and against Defendant, including the following:

A.     Compensatory damages;

B.     Costs, as provided by applicable law; and

C.     Such further and additional relief as the Court may deem just and equitable.

### Jury Demand

Plaintiff demands trial by jury of all issues so triable.

9

Dated: March 17, 2015                    Respectfully submitted,

                                         John S. Phillips #24884
                                         Sean C. Grimsley #36422
                                         BARTLIT BECK HERMAN PALENCHAR
                                            & SCOTT LLP

                                         Attorneys for Plaintiff

<u>Address of Plaintiff Q Advisors</u>:

Q Advisors LLC
1899 Wynkoop Street, Suite 200
Denver, Colorado 80202

*Document filed electronically. See C.R.C.P. 121, § 1-26. Original on file.*

10

EXHIBIT 3

| | |
|---|---|
| DENVER DISTRICT COURT, COLORADO<br>1437 Bannock St., Room 256<br>Denver, CO 80202 | |
| Plaintiff:<br><br>Q ADVISORS, LLC<br><br>v.<br><br>Defendants:<br><br>MERGENCE CORPORATION and JASON S. ELLIS | ▲ COURT USE ONLY ▲ |
| *Attorneys for Defendants*<br>Steven G. Loosle (*pro hac vice pending*)<br>Platte S. Nielson (*pro hac vice pending*)<br>KRUSE LANDA MAYCOCK & RICKS, LLC<br>136 East South Temple, Suite 2100<br>P. O. Box 45561<br>Salt Lake City, Utah 84145-0561<br>Telephone: (801) 531-7090<br>Facsimile: (801) 531-7091<br>sloosle@klmrlaw.com<br>pnielson@klmrlaw.com<br><br>Thomas P. McMahon<br>Aaron D. Goldhamer<br>JONES & KELLER, P.C.<br>1999 Broadway, Suite 3150<br>Denver, CO 80202<br>Telephone: (303) 573-1600<br>Facsimile: (303) 573-8133<br>tmcmahon@joneskeller.com<br>agoldhamer@joneskeller.com | Case Number: 15CV30955<br><br>Div.:            Ctrm: |
| **AFFIDAVIT OF JASON ELLIS** | |

{00290101/1 }

STATE OF UTAH        )
                         :ss

COUNTY OF SALT LAKE    )

    Jason Ellis, being first duly sworn, deposes and states as follows:

    1.    I am over 18 years of age and have personal knowledge of the matters set forth in this affidavit.

    2.    I am submitting this affidavit with respect to the Complaint filed by Plaintiff Q Advisors LLC against me personally and Mergence Corporation, a Nevada corporation ("Mergence-Nevada"). As I understand the Complaint, Q Advisors asserts claims against me based on its contention that Q Advisors entered into a contract with Mergence-Nevada but Mergence-Nevada "was not legally permitted to transact business under the law of it's state of incorporation." (Complaint, ¶ 16.)

    3.    Mergence-Nevada was formed in August 2005. I was one of the founding shareholders. Attached as Exhibit A is the corporate charter and articles of incorporation for Mergence-Nevada.

    4.    Mergence-Nevada has never conducted any business in Colorado or elsewhere. Mergence-Nevada has never owned property nor engaged in any business operations in any state, including Colorado.

    5.    The officers of Mergence-Nevada allowed the company's charter to expire because the company was not engaging in any business.

    6.    Mergence-Nevada has never had any employees, officers, agents, offices, bank accounts, or phone listings in Colorado. Mergence-Nevada has never advertised or registered to

do business in Colorado, nor has it solicited business or sold any products or services in Colorado or any other state.

7.      Mergence-Nevada has never entered into any contract with Q Advisors. Mergence-Nevada has never contacted Q Advisors directly or through an agent to transact business with Q Advisors.

8.      I personally do not own or lease any property in Colorado, nor do I conduct any business in Colorado. I do not have an office in Colorado, nor do I have a bank account or phone listing in Colorado. I have never lived in Colorado, filed taxes in Colorado, or held any professional or other license in Colorado.

9.      I have never conducted business with Q Advisors or entered into any contract with Q Advisors in a personal capacity.

DATED this 25th day of March, 2015.

_____
JASON ELLIS

SUBSCRIBED AND SWORN TO before me this 25th day of March, 2015.

_____
NOTARY PUBLIC

HEATHER BAILEY
NOTARY PUBLIC · STATE OF UTAH
COMMISSION# 653777
COMM. EXP. 04-15-2016

## CERTIFICATE OF SERVICE

I hereby certify that on March 30, 2015, I electronically filed the foregoing Affidavit of Jason Ellis via ICCES which will send a notice of electronic filing to the following:

> John S. Phillips
> Sean C. Grimsley
> BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
> 1899 Wynkoop Street, 8th Floor
> Denver, CO 80202
> john.phillips@bartlit-beck.com
> sean.grimsley@bartlit-beck.com

/s/ Renae Mesch

EXHIBIT A





## CORPORATE CHARTER

I, DEAN HELLER, the duly elected and qualified Nevada Secretary of State, do hereby certify that **MERGENCE CORPORATION**, did on August 2, 2005, file in this office the original Articles of Incorporation; that said Articles of Incorporation are now on file and of record in the office of the Secretary of State of the State of Nevada, and further, that said Articles contain all the provisions required by the law of said State of Nevada.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the Great Seal of State, at my office on August 16, 2005.

DEAN HELLER
Secretary of State

By

Certification Clerk



**DEAN HELLER**
Secretary of State
206 North Carson Street
Carson City, Nevada 89701-4299
(775) 684-5708
Website: secretaryofstate.biz

Entity #
E0534532005-7
Document Number:
20050305728-72

Date Filed:
8/2/2005 11:31:40 AM
In the office of

Dean Heller
Secretary of State

## Articles of Incorporation

(PURSUANT TO NRS 78)

ABOVE SPACE IS FOR OFFICE USE ONLY

Important: Read attached instructions before completing form.

| | |
|---|---|
| 1. Name of Corporation: | MEBGENCE CORPORATION |
| 2. Resident Agent Name and Street Address: (must be a Nevada address where process may be served) | The Corporation Trust Company of Nevada Name<br>One East First Street   Room   NEVADA 89501<br>Street Address   City   Zip Code<br>Optional Mailing Address   City   State   Zip Code |
| 3. Shares: (number of shares corporation authorized to issue) | Number of shares with par value: 20,000   Par value: $ 0.001   Number of shares without par value: |
| 4. Names & Addresses of Board of Directors/Trustees: (each director/trustee must be a natural person at least 18 years of age; attach additional page if more than 3 directors/trustees) | 1. Jason S. Ellis<br>Name<br>3939 South Wasatch Blvd., Suite 1   Salt Lake City   UT   84124<br>Street Address   City   State   Zip Code<br>2. Brett Bradshaw<br>Name<br>3939 South Wasatch Blvd., Suite 1   Salt Lake City   UT   84124<br>Street Address   City   State   Zip Code<br>3. Vernon G. Dickman<br>Name<br>3939 South Wasatch Blvd., Suite 1   Salt Lake City   UT   84124<br>Street Address   City   State   Zip Code |
| 5. Purpose: (optional; see instructions) | The purpose of this Corporation shall be:<br>wireless services |
| 6. Names, Address and Signature of Incorporator: (attach additional page if more than one incorporator) | Jason S. Ellis   [signature]<br>Name   Signature<br>3939 South Wasatch Blvd., Suite 1   Salt Lake City   UT   84124<br>Address   City   State   Zip Code |
| 7. Certificate of Acceptance of Appointment of Resident Agent: | I hereby accept appointment as Resident Agent for the above named corporation.<br>[signature] Hildi M. Leach   7-28-05<br>Authorized Signature of R. A. or On behalf of R. A. Company   Date<br>Hildi M. Leach, Asst. Secretary |

This form must be accompanied by appropriate fees. See attached fee schedule.

Nevada Secretary of State Form 78 ARTICLES 2005
Revised on 03/09/05

## ARTICLES OF INCORPORATION
## OF
## MERGENCE CORPORATION

The undersigned incorporator, being a natural person over 18 years of age acting as the incorporator of the above-named corporation (hereinafter referred to as the "Corporation"), hereby adopts the following Articles of Incorporation for the Corporation:

### ARTICLE I
### NAME

The name of the Corporation shall be: Mergence Corporation

### ARTICLE II
### PERIOD OF DURATION

The Corporation shall continue in existence perpetually unless sooner dissolved according to law.

### ARTICLE III
### PURPOSES AND POWERS

The purposes for which the Corporation is organized and its powers are:

(a)    providing technical products and services offered in both retail and wholesale markets;

(b)    to do all and everything necessary, suitable, convenient, or proper for the accomplishment of any of the purposes or the attainment of any one or more of the objectives herein enumerated or incidental to the powers herein named or which shall at any time appear conducive or expedient for the protection or benefit of the Corporation, with all the powers hereafter conferred by the laws under which this Corporation is organized; and

(c)    to engage in any and all other lawful purposes, activities, and pursuits, whether similar or dissimilar to the foregoing, for which corporations may be organized under laws of the state of Nevada and to exercise all powers allowed or permitted thereunder.

### ARTICLE IV
### AUTHORIZED SHARES

The Corporation shall have the authority to issue 20,000 shares, of which 15,000 shares shall be common stock, $0.001 par value ("Common Stock"), and 2,000 shares shall be preferred stock $0.001 par value ("Preferred Stock"). Shares of any class of stock may be issued, without stockholder action, from time to time in one or more series as may from time to time be determined by the board of directors. The board of directors of this Corporation is hereby expressly granted authority, without stockholder action, and within the limits set forth in the Nevada Revised Statutes, to:

(a) designate, in whole or in part, the voting powers, designation, preferences, limitations, restrictions, and relative rights of each class of shares before the issuance of any shares of that class;

(b) create one or more series within a class of shares, fix the number of shares of each such series, and designate (in whole or part) the voting powers, designation, preferences, limitations, restrictions, and relative rights of the series, all before the issuance of any shares of that series; or

(c) alter or revoke the preferences, limitations, and relative rights granted to or imposed upon any wholly unissued class of shares or any wholly unissued series of any class of shares.

The allocation between the classes or among the series of each class of unlimited voting rights and the right to receive the net assets of the Corporation upon dissolution, shall be as designated by the board of directors. All rights accruing to the outstanding shares of the Corporation not expressly provided for to the contrary herein or in the Corporation's bylaws or in any amendment hereto or thereto shall be vested in the Common Stock. Accordingly, unless and until otherwise designated by the board of directors of the Corporation, and subject to any superior rights as so designated, the Common Stock shall have unlimited voting rights and be entitled to receive the net assets of the Corporation upon dissolution.

## ARTICLE V
## TRANSACTIONS WITH OFFICERS AND DIRECTORS

No contract or other transaction between the Corporation and one or more of its directors or officers, or between the Corporation and any corporation, firm, or association in which one or more of its directors or officers are directors or officers or are financial interested, is either void or voidable solely for this reason or solely because any such director or officer is present at the meeting of the board of directors or a committee thereof which authorizes or approves the contract or transaction, or because the vote or votes of common or interested directors are counted for such purpose, if the circumstances specified in any of the following paragraphs exist:

(a) the fact of the common directorship or financial interest is disclosed or known to the board of directors or committee; and noted in the minutes, and the board or committee authorizes, approves, or ratifies the contract or transaction in good faith by a vote sufficient for the purpose without counting the vote or votes of such common or interested director or directors;

(b) the fact of the common directorship or financial interest is disclosed or known to the stockholders, and they approve or ratify the contract or transaction in good faith by a majority vote or written consent of stockholders holding a majority of the shares entitled to vote; the votes of the common or interested directors or officers shall be counted in any such vote of stockholders; or

(c) the contract or transaction is fair as to the Corporation at the time it is authorized or approved.

## ARTICLE VI
## INDEMNIFICATION OF OFFICERS, DIRECTORS, AND OTHERS

(a) The Corporation shall indemnify each director and officer of the Corporation and his or her respective heirs, administrators, and executors against all liabilities and expenses

2

reasonably incurred in connection with any action, suit, or proceeding to which he or she may be made a party by reason of the fact that he or she is or was a director or officer of the Corporation, to the full extent permitted by the laws of the state of Nevada now existing or as such laws may hereafter be amended. The expenses of officers and directors incurred in defending a civil or criminal action, suit, or proceeding shall be paid by the Corporation as they are incurred and in advance of the final disposition of the action, suit, or proceeding, upon receipt of an undertaking by or on behalf of the director or officer to repay the amount if it is ultimately determined by a court of competent jurisdiction that he or she is not entitled to be indemnified by the Corporation.

(b)     The Corporation may, at the discretion of the board of directors, indemnify any person who is or was a party or is threatened to be made a party to any threatened, pending, or completed action or suit by or in the right of the Corporation to procure a judgment in its favor by reason of the fact that he or she is or was a director, officer, employee, or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee, or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses, including attorneys' fees, actually and reasonably incurred by him or her in connection with the defense or settlement of the action or suit, if he or she acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Corporation, except that no indemnification shall be made in respect of any claim, issue, or matter as to which such a person shall have been adjudged to be liable to the Corporation, unless and only to the extent that the court in which the action or suit was brought shall determine on application that, despite the adjudication of liability but in view of all circumstances of the case, the person is fairly and reasonably entitled to indemnify for such expenses as the court deems proper.

## ARTICLE VII
## MEETINGS OF STOCKHOLDERS

Subject to the rights of the holders of any series of Common Stock, special meetings of stockholders of the Corporation may be called only by the board of directors pursuant to a resolution duly adopted by a majority of the total number of directors which the Corporation would have if there were no vacancies. At any annual meeting or special meeting of stockholders of the Corporation, only such business shall be conducted as shall have been brought before such meeting in the manner provided by the bylaws of the Corporation.

## ARTICLE VIII
## BOARD OF DIRECTORS

The business and affairs of the Corporation shall be managed and controlled by or under the direction of a board of directors, which may exercise all such powers of the Corporation and do all such lawful acts and things as are not by law or by these Articles of Incorporation directed or required to be exercised or done by the stockholders of the Corporation.

(a)     Number.     Until such time, if ever, as the Corporation has three or more stockholders, the number of directors shall not be less than the number of stockholders. At such time as the Corporation has three or more stockholders, the number of directors shall not be less than three nor more than nine, the exact number of directors to be fixed from time to time by the vote of a majority of the entire board of directors. No decrease in the number of directors shall shorten the term of any incumbent director.

3.

Notwithstanding the provisions of the foregoing paragraph, whenever the holders of any class or series of Common Stock shall have the right, voting as a class or series or otherwise, to elect directors, the then-authorized number of directors of the Corporation shall be increased by the number of the additional directors to be elected, and the holders of such Common Stock shall be entitled, as a class or series or otherwise, to elect such additional directors. Any directors so elected shall hold office until their rights to hold such office terminate pursuant to the provisions of such Common Stock. The provisions of this paragraph shall apply notwithstanding the maximum number of directors hereinabove set forth.

(b)     Qualification. The board of directors may, by the vote of a majority of the entire board, prescribe qualifications of candidates for the office of director of the Corporation, but no director then in office shall be disqualified from office as a result of the adoption of such qualification.

(c)     Tenure. The term of office of each director shall expire at the annual meeting of the stockholders in the first succeeding year following the year of incorporation or thereafter when his or her respective successor is elected and has qualified. At each annual election, the directors chosen to succeed those whose terms then expire shall be elected for a term expiring at the next succeeding annual meeting or thereafter when their respective successors are elected and have qualified.

(d)     Removal. At a meeting of stockholders called expressly for that purpose, one or more members of the board (including the entire board) may be removed, with or without cause, by the holders of two-thirds of the shares then entitled to vote at an election of directors.

(e)     Vacancies. Vacancies and newly-created directorships resulting from any increase in the number of directors may be filled by a majority of the directors then in office though less than a quorum, and each director so chosen shall hold office for the unexpired term to which elected and until his or her successor is elected and qualified or until his or her earlier resignation or removal. If there are no directors in office, then an election of directors may be held in the manner provided by law.

(f)     Limitation on Liability. A director or officer of the Corporation shall have no personal liability to the Corporation or its stockholders for damages for breach of fiduciary duty as a director or officer, except for damages resulting from (i) acts or omissions which involve intentional misconduct, fraud, or a knowing violation of law, or (ii) the payment of dividends in violation of the provisions of section 78.300 of the Nevada Revised Statutes, as it may be amended from time to time, or any successor statute thereto.

ARTICLE IX
NO LIMITATIONS ON VOTING RIGHTS

To the extent permissible under the applicable law of any jurisdiction to which the Corporation may become subject by reason of the conduct of business, the ownership of assets, the residence of stockholders, the location of offices or facilities, or any other item, the Corporation elects not be governed by the provisions of any statute that (a) limits, restricts, modifies, suspends, terminates, or otherwise affects the rights of any stockholder to cast one vote for each share of stock registered in the name of such stockholder on the books of the Corporation, without regard to whether such shares were acquired directly from the Corporation or from any other person and without regard to whether such stockholder has the power to exercise or direct the exercise of voting power over any specific fraction of the shares of stock of the

Corporation issued and outstanding, or (ii) grants to any stockholder the right to have his or her stock redeemed or purchased by the Corporation or any other stockholder of the Corporation. Without limiting the generality of the foregoing, the Corporation expressly elects not to be governed by or be subject to the provisions of sections 78.378 through 78.3793 of the Nevada Revised Statutes or any similar or successor statutes adopted by any state which may be deemed to apply to the Corporation from time to time.

## ARTICLE X
## PRINCIPAL OFFICE AND RESIDENT AGENT

The name of the initial resident agent and the address of such initial resident agent and the Corporation's principal office in the state of Nevada are as follows:

The Corporation Trust Company of Nevada
One East First Street
Reno, Nevada 89501

Either the registered office or the resident agent may be changed in the manner provided by law.

## ARTICLE XI
## AMENDMENTS

The Corporation reserves the right to amend, alter, change, or repeal all or any portion of the provisions contained in these Articles of Incorporation from time to time in accordance with the laws of the state of Nevada, and all rights conferred on stockholders herein are granted subject to this reservation.

## ARTICLE XII
## ADOPTION OR AMENDMENT OF BYLAWS

The initial bylaws of the Corporation shall be adopted by the board of directors. The power to alter, amend, or repeal the bylaws or adopt new bylaws shall be vested in the board of directors, but the stockholders of the Corporation may also alter, amend, or repeal the bylaws or adopt new bylaws. The bylaws may contain any provisions for the regulation or management of the affairs of the Corporation not inconsistent with the laws of the state of Nevada now or hereafter existing.

## ARTICLE XIII
## DIRECTORS

The original board of directors shall consist of three persons. The name and address of the persons who is to serve as the director until the first annual meeting of stockholders and until their successors are elected and shall qualify are as follows:

Jason S. Ellis                          3939 South Wasatch Blvd., Suite 1
                                        Salt Lake City, Utah  84124

Brett Bradshaw                          3939 South Wasatch Blvd., Suite 1
                                        Salt Lake City, Utah  84124

Vernon G. Dickman                       3939 South Wasatch Blvd., Suite 1
                                        Salt Lake City, Utah  84124

## ARTICLE XIV
### INCORPORATOR

The name and mailing address of the sole incorporator signing these Articles of Incorporation is as follows:

Jason S. Ellis                          3939 South Wasatch Blvd., Suite 1
                                        Salt Lake City, Utah  84124

The undersigned, being the sole incorporator of the Corporation herein before named, does make and file these Articles of Incorporation, hereby declaring that the facts herein are true.

DATED this ____ day of June, 2005.

_____
Jason S. Ellis

The Corporation Trust Company of Nevada hereby accepts appointment as resident agent for Mergence Corporation, as named in the foregoing Articles of Incorporation.

_____
The Corporation Trust Company of Nevada

Jason S. Ellis                          3939 South Wasatch Blvd., Suite 1
                                        Salt Lake City, Utah 84124

Brett Bradshaw                          3939 South Wasatch Blvd., Suite 1
                                        Salt Lake City, Utah 84124

Vernon G. Dickman                       3939 South Wasatch Blvd., Suite 1
                                        Salt Lake City, Utah 84124

### ARTICLE XIV
### INCORPORATOF

The name and mailing address of the sole incorporator signing these Articles of Incorporation is as follows:

Jason S. Ellis                                    3939 South Wasatch Blvd., Suite 1
                                                  Salt Lake City, Utah 84124

The undersigned, being the sole incorporator of the Corporation herein before named, does make and file these Articles of Incorporation, hereby declaring that the facts herein are true.

DATED this 28th day of June, 2005.

_____
Jason S. Ellis

The Corporation Trust Company of Nevada hereby accepts appointment as resident agent for Mergence Corporation, as named in the foregoing Articles of Incorporation.

_____
The Corporation Trust Company of Nevada
Hiedi Liasch
Assistant Secretary

EXHIBIT 4

| | |
|---|---|
| DISTRICT COURT<br>CITY AND COUNTY OF DENVER, COLORADO<br><br>Denver City & County Building<br>Clerk of the Court, Civil Division<br>1437 Bannock St., Room 256<br>Denver, CO  80202 | |
| Plaintiff:   Q ADVISORS LLC<br><br>v.<br><br>Defendant:   MERGENCE CORPORATION | ▲ COURT USE ONLY ▲ |
| John S. Phillips #24884<br>Sean C. Grimsley #36422<br><br>BARTLIT BECK HERMAN PALENCHAR &<br>SCOTT LLP<br>1899 Wynkoop Street, 8th Floor<br>Denver, CO  80202<br><br>Telephone Number:  (303) 592-3100<br>Facsimile Number:  (303) 592-3140<br>Email:   john.phillips@bartlit-beck.com<br>           sean.grimsley@bartlit-beck.com | Case Number:   2015CV30955<br><br>Div.:      Ctrm: 280 |
| AMENDED COMPLAINT | |

Plaintiff Q Advisors LLC ("Q Advisors"), for its Amended Complaint against Mergence

Corporation ("Mergence") states as follows:

### Parties

1.      Q Advisors is a Colorado limited liability company headquartered in the City and

County of Denver, Colorado. Q Advisors is an investment bank that specializes in assisting

companies with business transactions such as mergers and acquisitions, debt and equity

financings, and recapitalizations.

2.      Mergence is a Delaware corporation headquartered in Salt Lake City, Utah at 3939 South Wasatch Boulevard. Until November 2013, Mergence directly or indirectly owned Spring Communications, Inc., which was known and did business variously as "Spring," "Spring Mobile," "Spring Retail Group," and "Spring Communications Holding." Mergence referred to these Spring entities and its Spring Mobile business "Spring Retail Group." Mergence also itself did business as "Spring Retail Group" at the same business address as the Spring entities at 3939 South Wasatch Boulevard in Salt Lake City.

3.      Though not currently named as a Defendant, Jason S. Ellis is an individual whose principal residence is in Utah. He is and has at all relevant times been President and Chief Executive Officer of Spring Mobile and numerous other Spring entities (such as Chief Executive Officer of Spring Retail Group, President of Spring Communications, Inc., President of Spring Communications Holding, Inc., and the like) and also President and Treasurer of Mergence. Ellis is and has at all relevant times been a member of the Board of Directors of Mergence. Ellis is currently President and Chief Executive Officer of Spring Mobile, which (like Mergence) is located at 3939 South Wasatch Boulevard in Salt Lake City.

4.      Though not currently named as defendants, other individuals who are important to this action are Brett M. Bradshaw ("Bradshaw") and Vernon G. Dickman ("Dickman"). Both Bradshaw and Dickman are members of the Board of Directors of Mergence. Bradshaw is also currently Senior Vice President of Sales and Operations of Spring Mobile, which (like Mergence) is located at 3939 South Wasatch Boulevard in Salt Lake City. Dickman is the Founder of Spring Mobile and was, as of at least 2013, a Member of the Board of Directors and Chairman of the Board of Spring Mobile and numerous other Spring entities.

2

5.    On information and belief, each of Ellis, Bradshaw, and Dickman were and are shareholders or beneficial owners of Mergence – Ellis (23.5%), Bradshaw (7.5%), and Dickman (69%) – and each personally benefited from the sale of Spring in November 2013 and from the breaches described below.

**Jurisdiction and Venue**

6.    Plaintiff's claims arise under the contract attached to this Complaint as Exhibit A (the "Contract") and common law.

7.    This Court has subject matter jurisdiction over this action pursuant to Article 6, Section 9, of the Colorado Constitution.

8.    This Court has personal jurisdiction over the Defendant because Mergence, Spring, and Ellis have had numerous, substantial contacts with the State of Colorado and the City and County of Denver. For example, between December 2012 and July 2013, Mergence, Spring, and Ellis placed dozens of telephone calls and sent dozens of e-mails to Q Advisors at Q Advisors' offices in the City and County of Denver. These contacts related to the negotiation of the Contract, the signing of the Contract, representations about Mergence's and Spring's business activities, financial condition, and financing needs, communications with Fifth Third bank representatives located in Denver, requests for services by Q Advisors to be provided in Denver, and the actual provision of services in Denver by Q Advisors to Mergence and Spring under the Contract. Spring has also had substantial ongoing business operations through at least two retail locations located in the City of County of Denver today.

9.    Venue is proper in the City and County of Denver pursuant to C.R.C.P. 98(c) because, among other things, Mergence, Spring, and Ellis requested that Q Advisors perform the services in the City and County of Denver, the Contract was in fact performed and the services

3

were in fact provided by Q Advisors at Q Advisors' offices in the City and County of Denver, the damages have been felt and incurred by Q Advisors in the City and County of Denver, and Q Advisors is a resident of the City and County of Denver. The financing transaction in which Q Advisors assisted Mergence and Spring was done by the lending team of Fifth Third Bank located in the City and County of Denver. Spring currently transacts business in the City and County of Denver.

## Statement of Facts

10.     In late 2012, Ellis and Spring's Chief Financial Officer Kent Forsgren asked Q Advisors to provide financial investment banking services to Mergence and Spring, including exploring possible financing transactions for Spring.

11.     In order to convince Q Advisors to enter into the Contract, Ellis informed Q Advisors that Mergence and Spring envisioned "a larger deal with Spring all in," meaning that Spring would likely be sold in the future. Mergence and Spring also informed Q Advisors that Mergence's largest shareholder (Dickman) intended to sell Spring "within twenty-four to thirty-six months."

12.     The parties negotiated the Contract between December 20, 2012 and January 18, 2013. Ellis, who was the President of both Mergence and Spring, and Spring's Chief Financial Officer Kent Forsgren, negotiated the terms on behalf of Spring and "Mergence dba Sprint Retail Group." Q Advisors' Michael Crawford ("Crawford") negotiated on behalf of Q Advisors.

13.     Ellis and Crawford each signed the Contract on or about January 18, 2013.

14.     At the time Ellis signed the Contract, Ellis held himself out as an officer and agent of Mergence Corporation and an officer and agent of Spring.

15.     Ellis signed the Contract as "President."

4

16.     The Contract provides that "Mergence Corporation (dba Spring Retail Group) ("Mergence" or the "Company")" engaged Q Advisors "to provide financial advisory services on an exclusive basis (the "Services"), to the Company in connection with the private placement to qualified institutional buyers" of debt.

17.     The Contract provides that Mergence would compensate Q Advisors for Q Advisors' work.

18.     Section 15 of the Contract provides that "In the event Mergence elects to pursue a sale or recapitalization of the Company, whether this letter is in effect or within thirty-six (36) months of its termination, Q Advisors and Mergence **shall negotiate in good faith a new engagement letter** under which Q Advisors would be the Company's exclusive financial advisor for that assignment/transaction." (Emphasis added in bold.)

19.     Section 15 also reflects the parties' intent and agreement to "terms of an engagement that are commercially reasonable and that, when taken as a whole, are not materially inconsistent with those available at the time from investment banks or other organizations with experience and qualifications substantially similar to those of Q Advisors." The terms of such engagements are well-known, and the parties themselves had a history of two other engagements.

20.     With Q Advisors' assistance, Spring completed a debt transaction with Fifth Third Bank in July 2013.

21.     Between December 2012 and July 2013, Mergence and Spring officers and agents sent numerous e-mails to Q Advisors in Denver, Colorado in connection with the services Q Advisors provided under the Contract. Mergence and Spring officers and agents placed numerous telephone calls to Q Advisors in Denver, Colorado in connection with the services Q

Advisors provided under the Contract. Q Advisors performed substantially all the services under the Contract at Q Advisors offices in Denver, Colorado.

22.     Without telling Q Advisors, the officers and directors of Mergence and Spring discussed the possible sale of Spring at various times between August 2013 and November 2013.

23.     Without telling Q Advisors, Mergence and Spring agreed that Spring would be sold.

24.     Without telling Q Advisors, Mergence sold Spring to a public company named Gamestop Corp. in November 2013 in a transaction with a total enterprise value of approximately $97 million. Q Advisors had originally introduced Gamestop to Mergence and Spring Retail Group in connection with an earlier transaction for Mergence and Spring in 2012.

25.     Mergence and Spring never told Q Advisors that Spring was being sold at any time before Spring was sold to Gamestop in November 2013.

26.     Mergence and Spring never negotiated a new engagement letter with Q Advisors in connection with the November 2013 sale of Spring, as the Contract required.

27.     Defendant has never paid Q Advisors any fees in connection with the November 2013 sale of Spring.

28.     Defendant has failed and refused to pay Q Advisors any fees in connection with the November 2013 sale of Spring.

29.     Mergence has failed to pay Q Advisors what they owe under the Contract.

### First Claim for Relief
### (Breach of Contract – Mergence)

30.     Plaintiff incorporates by reference all of the foregoing paragraphs.

31.     The Contract between Q Advisors and Mergence is valid and enforceable.

32.     Q Advisors performed its obligations under the Contract.

6

33.     Mergence breached its obligation to engage and pay Q Advisors for the sale of

Spring according to the terms of the Contract.

34.     Q Advisors has suffered damage because of Mergence's breach of the Contract.

## Second Claim for Relief

### (Breach of Covenant of Good Faith and Fair Dealing – Mergence)

35.     Plaintiff incorporates by reference all of the foregoing paragraphs.

36.     The Contract included an implied covenant of good faith and fair dealing.

37.     Mergence breached the covenant of good faith and fair dealing by failing to

inform Q Advisors that Mergence and Spring were pursuing a sale of Spring, by failing to inform

Q Advisors that it had agreed to sell Spring, by failing to engage Q Advisors in connection with

the sale, by hiding its intentions for Spring and the implications of that sale for Q Advisors under

the Contract, and by its bad faith failure and refusal to pay Q Advisors what it owes under the

Contract.

38.     Q Advisors has suffered damage because of Mergence's breach.

## Prayer for Relief

WHEREFORE, Plaintiff requests a judgment in its favor and against Defendant,

including the following:

A.     Compensatory damages;

B.     Costs, as provided by applicable law; and

C.     Such further and additional relief as the Court may deem just and equitable.

## Jury Demand

Plaintiff demands trial by jury of all issues so triable.

7

Dated: May 5, 2015             Respectfully submitted,

John S. Phillips #24884
Sean C. Grimsley #36422
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP

Attorneys for Plaintiff

Address of Plaintiff Q Advisors:

Q Advisors LLC
1899 Wynkoop Street, Suite 200
Denver, Colorado 80202

*Document filed electronically.  See C.R.C.P. 121, § 1-26.  Original on file.*

8

## CERTIFICATE OF SERVICE

I certify that on this 5th day of May, 2015, I served a true and correct copy of the foregoing on:

Steven G. Loosle
Platte S. Nielson
Kruse Landa Maycock & Ricks, LLC
136 East South Temple, Suite 2100
P.O. Box 45561
Salt Lake City, Utah 84145-0561
sloosle@klmrlaw.com
pnielson@klmrlaw.com

Thomas P. McMahon
Aaron D. Goldhamer
Jones & Keller, P.C.
1999 Broadway, Suite 3150
Denver, Colorado 80202
tmcmahon@joneskeller.com
agoldhamer@joneskeller.com

John S. Phillips