# EXHIBIT 6

Memorandum in Opposition to Utah Stay Motion, with
Exhibits 2-4 Excluded to Avoid Duplication

Steven G. Loosle (4874)
Platte S. Nielson (13312)
KRUSE LANDA MAYCOCK & RICKS, LLC
136 East South Temple, Suite 2100
P. O. Box 45561
Salt Lake City, Utah  84145-0561
Telephone:  (801) 531-7090
sloosle@klmrlaw.com
pnielson@klmrlaw.com
*Attorneys for Plaintiff*

IN THE THIRD JUDICIAL DISTRICT IN AND FOR
SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| MERGENCE CORPORATION, dba SPRING RETAIL GROUP, a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>Q ADVISORS LLC, a Colorado limited liability company,<br><br>Defendant. | **MEMORANDUM IN OPPOSITION TO MOTION TO STAY PROCEEDINGS**<br><br>**(Oral Argument Requested)**<br><br>Civil No. 150901798<br>Judge James Gardner |

Defendant Q Advisors LLC ("Q Advisors") has moved the Court to stay these proceedings until resolution of the lawsuit between the parties currently pending in Colorado state court. Plaintiff Mergence Corporation, dba Spring Retail Group, a Delaware corporation ("Mergence-Delaware") hereby submits this memorandum in opposition to Q Advisors' motion to stay. The Court should not exercise its discretion to stay this action because the applicable factors to be considered by the Court weigh against granting a stay. Q Advisors' motion to stay these proceedings should be denied.

## FACTUAL BACKGROUND

**A.     The parties.**

1.      Mergence-Delaware is a Delaware corporation with its principal place of business and primary operations in Salt Lake City, Utah.  Mergence-Delaware is a holding company for technology businesses.  (*See* Declaration of Jason S. Ellis, ¶ 2, filed concurrently herewith.)

2.      Q Advisors is a Colorado limited liability company headquartered in Denver, Colorado.  It specializes in assisting companies with business transactions such as mergers and acquisitions, debt and equity financings, and recapitalizations.  Q Advisors is registered with the United States Securities and Exchange Administration as a broker-dealer.  Q Advisors is also registered in the states of California and Colorado as a broker-dealer, but not in Utah.  (*See* FINRA BrokerCheck, pp. 8-9, attached hereto as Exhibit 1.)

**B.     Q Advisors helps Mergence-Delaware sell one of its Utah subsidiaries, Simply Mac.**

3.      On March 15, 2012, Mergence-Delaware entered into an agreement with Q Advisors whereby Q Advisors would provide investment banking services in connection with the sale of a subsidiary of Mergence-Delaware known as Simply Mac, Inc. ("Simply Mac"), a Utah corporation ("Engagement Letter No. 1").  (*See* a copy of Engagement Letter No. 1 attached as Exhibit A to Declaration of Jason S. Ellis.)  At the time of Engagement Letter No. 1, the principal place of business of Mergence-Delaware and Simply Mac was in Salt Lake City, Utah. (Declaration of Jason S. Ellis, ¶ 3.)

4.      Paragraph eight of Engagement Letter No. 1 provides that "This letter agreement shall be governed by and construed in accordance with the laws of the State of Utah as applied to contracts made and performed in such state." (Engagement Letter No. 1, p. 5.)

5.      Pursuant to Engagement Letter No. 1, Q Advisors assisted Mergence-Delaware in the sale of Simply Mac, and Q Advisors received fees of $690,000 plus expenses for its services. Q Advisors has never claimed that it is owed additional fees in connection with the sale of Simply Mac. (Declaration of Jason S. Ellis, ¶ 4.)

6.      The sale of Simply Mac took place in two transactions, the first in October, 2012, and the second in November, 2013.  (*See* excerpts from the first Stock Purchase Agreement attached as Exhibit B to the Declaration of Jason S. Ellis.)  The Stock Purchase Agreement shows that in addition to Mergence-Delaware, the other selling shareholders were four individuals who were Utah residents, including Steve Bain, Tyler Dickman, Kent Thomas, and Kent Forsgren. (*Id.*)

**C.      Q Advisors helps raise capital for Mergence-Delaware's subsidiary Spring Communications Holding, Inc., which had its principal place of business in Utah.**

7.      On January 18, 2013, Mergence-Delaware entered into a second agreement with Q Advisors whereby Q Advisors would provide investment banking services ("Engagement Letter No. 2"). (*See* a copy of Engagement Letter No. 2 attached as Exhibit C to the Declaration of Jason S. Ellis.)  Pursuant to Engagement Letter No. 2, Q Advisors agreed to provide services in raising capital "in connection with a private placement to qualified institutional buyers." (*Id.* at p. 1.)

8.      Paragraph eight of Engagement Letter No. 2 provides that "This letter agreement shall be governed by and construed in accordance with the laws of the State of Utah as applied to contracts made and performed in such state." (*Id.* at p. 5.)

9.      Paragraph 15 of Engagement Letter No. 2 also provided that in the event Mergence-Delaware pursued a sale or recapitalization of Mergence-Delaware, the parties would "negotiate in good faith a new engagement letter under which Q Advisors would be [Mergence-Delaware's] exclusive financial advisor for that assignment/transaction." (*Id.* at p. 5.)  Paragraph 15 does not

set forth any material or essential terms – including pricing or payment terms – with respect to the possible future agreement to be negotiated by the parties.

10.     At the time of Engagement Letter No. 2, Mergence-Delaware was the 100% owner of a subsidiary known as Spring Communications Holding, Inc., a Delaware corporation ("Spring Communications"). Spring Communications in turn was the 100% owner of various corporate entities, including Spring Communications, Inc., a Utah corporation ("Spring"). (Declaration of Jason S. Ellis, ¶ 7.)

11.     At all times relevant to Engagement Letter No. 2, the principal place of business of Mergence, Spring Communications, and Spring was Salt Lake City, Utah. (*Id.* ¶ 8.)

12.     In 2013, Spring operated 60 stores as an exclusive retailer of AT&T wireless devices and services. The stores were located in many different states, and a few of those stores were located in Colorado. (*Id.* ¶ 9.)

13.     Pursuant to Engagement Letter No. 2, Q Advisors assisted Spring Communications and its subsidiaries, including Spring, in obtaining financing from Fifth Third Bank. Spring Communications and its subsidiaries entered into a loan and security agreement with Fifth Third Bank in connection with this financing transaction. This financing transaction closed in July 2013. (*Id.* ¶¶ 10-11.)

14.     Mergence-Delaware was not a party to the loan and security agreement and did not receive any of the proceeds from the financing. (*Id.* ¶ 11; *see also* excerpts from loan and security agreement for this financing transaction attached as Exhibit D to the Declaration of Jason S. Ellis.)

15.     Q Advisors was paid for the services it performed under Engagement Letter No. 2. Specifically, Spring Communications and related entities paid $670,000 in fees plus expenses to

Q Advisors for its investment banking services in raising the debt capital pursuant to Engagement Letter No. 2.  Q Advisors has never claimed that it is owed additional fees related to this transaction. (Declaration of Jason S. Ellis, ¶ 12.)

**D.    Mergence-Delaware sells Spring Communications without the help of Q Advisors.**

16.    In October 2013, Mergence-Delaware sold 100% of its shares in Spring Communications to GameStop Corp. ("GameStop), a company with its principal office in Texas. (*Id.* ¶¶ 13-14; *see also* excerpts from the stock purchase agreement attached as Exhibit E to the Declaration of Jason S. Ellis.)

17.    In its Counterclaim, Q Advisors seeks compensation related to the sale of Spring Communications to GameStop. (*See* Counterclaim; *see also* Declaration of Jason S. Ellis, ¶ 14.)

18.    Q Advisors had no involvement in the transaction between Mergence-Delaware and GameStop for the sale of Spring Communications. Neither Mergence-Delaware nor Spring Communications had any need for Q Advisors' services or involvement.  Q Advisors has none of the files or documents related to this transaction, all of which are stored in the records of Mergence-Delaware in Salt Lake City, Utah or the offices of GameStop in Texas.  None of the events related to this transaction occurred in Colorado.  None of the individuals who were involved in this transaction reside in Colorado, but reside in Utah and Texas. (Declaration of Jason S. Ellis, ¶ 15.)

19.    Mergence-Delaware did not retain the services of any investment banker in connection with the sale of Spring Communications to GameStop because it did not need any such services for this transaction. (*Id.* ¶ 16.)

20.    As noted above, Spring did have operations in Colorado at the time of the sale of Spring Communications to GameStop in October 2013. However, Mergence-Delaware has never

had any employees, officers, agents, offices, bank accounts, or phone listings in Colorado. Mergence-Delaware has never advertised or registered to do business in Colorado nor has it sold any products or services in Colorado. (*Id.* ¶ 17.)

**E.      Q Advisors sues Mergence-Nevada and Jason Ellis for not negotiating a new agreement with Q Advisors in connection with the sale of Spring Communications to GameStop.**

21.      On March 17, 2015, Q Advisors filed a complaint in Colorado state court against Mergence Corporation, a Nevada Corporation ("Mergence-Nevada") and Jason S. Ellis, the president of Mergence-Nevada.   In the complaint, Q Advisors alleged that the parties to Engagement Letter No. 2 are Mergence-Nevada and Q Advisors and that Mergence-Nevada breached paragraph 15 of Engagement Letter No. 2 and the implied covenant of good faith and fair dealing because it did not negotiate a new engagement letter with Q Advisors prior to the sale of Spring Communications to GameStop.  The Colorado complaint named Ellis personally as a defendant based on Q Advisors' theory that Ellis, as an officer of Mergence-Nevada, was personally liable for Engagement Letter No. 2 because Mergence-Nevada was not permitted to transact business at the time of Engagement Letter No. 2.  (*See* copy of Q Advisors' Colorado complaint attached as Exhibit 2.)

22.      Q Advisors sued Mergence-Nevada under Engagement Letter No. 2 despite the fact that the actual party to Engagement Letter No. 2 – Mergence-Delaware – had held itself out to Q Advisors as a Delaware corporation. (*See id.* ¶ 19.)

23.      Mergence-Nevada is an actual entity that is separate and distinct from Mergence-Delaware.  It is a Nevada corporation that was formed in August 2005.  Mergence-Nevada has

never conducted any business in Colorado or with Q Advisors. (Affidavit of Jason Ellis, ¶¶ 3, 4, and 7, attached hereto as Exhibit 3.)

**F.      Mergence-Delaware files a complaint against Q Advisors in this Court.**

24.      On March 18, 2015, Mergence-Delaware filed this action against Q Advisors seeking a judgment from this Court declaring that Mergence-Delaware owes no fees to Q Advisors as a result of the sale of Spring Communications to GameStop. In support of its claim for declaratory relief, Mergence-Delaware asserts in its complaint that Mergence-Delaware is a party to Engagement Letter No. 2; that Mergence-Delaware has not been sold or recapitalized since Engagement Letter No. 2; that Q Advisors has already been paid in full for the services it rendered under Engagement Letter No. 2; that Q Advisors provided no services to Mergence-Delaware or Spring Communications in connection with Mergence-Delaware's sale of Spring Communications to GameStop; and that Utah law does not recognize a duty to negotiate an agreement.

25.      Mergence-Delaware did not name Mergence-Nevada or Ellis as parties to this Utah action because they are not parties to or liable under Engagement Letter No. 2.

26.      Q Advisors was served with the Utah complaint on March 31, 2015. It answered the Utah complaint and filed a counterclaim against Mergence-Delaware on April 30, 2015.

**G.      Mergence-Nevada and Ellis move to dismiss Q Advisors' Colorado complaint and Q Advisors moves to add Mergence-Delaware as a party to the Colorado complaint.**

27.      On March 30, 2015, Mergence-Nevada and Ellis moved the Colorado state court to dismiss Q Advisors' complaint on account of their not having transacted business in Colorado within the meaning of Colorado's long-arm statute and not having sufficient minimum contacts with Colorado to be subject to personal jurisdiction there. They provided evidence to the court that Mergence-Nevada had never conducted business in Colorado, had never transacted business

with Q Advisors, was not a party to Engagement Letter No. 2, and had not sold Spring Communications to GameStop.

28.     In response to the motion to dismiss for lack of personal jurisdiction, Q Advisors conceded that Mergence-Nevada was not a party to Engagement Letter No. 2.   However, Q Advisors opposed dismissal of the Colorado complaint and moved the court for permission to amend its complaint to drop Mergence-Nevada and Ellis as defendants to the action and to add a new party, Mergence-Delaware, as the sole defendant.

29.     On May 5, 2015, the Colorado state court ruled on the parties' respective motions to dismiss and for leave to amend.  The court dismissed Mergence-Nevada and Ellis as defendants to the Colorado suit, but, under the liberal standard applied to motions for leave to amend, permitted Q Advisors to amend its complaint to add Mergence-Delaware as the sole defendant. Q Advisors filed its amended complaint against Mergence-Delaware on the same day, May 5, 2015.  (*See* copy of Q Advisors' Amended Complaint attached hereto as Exhibit 4.)

30.     Mergence-Delaware accepted service of the amended complaint on May 6, 2015. Its deadline to answer or otherwise respond to the amended complaint is May 26, 2015. Mergence-Delaware intends to move the Colorado court to dismiss the Colorado amended complaint for lack of personal jurisdiction and/or to stay the Colorado action pending resolution of this Utah action.

## ARGUMENT

**A.     It is not imperative that the Court exercise its discretionary stay powers in this matter.**

The fact that the parties have another similar action pending in Colorado does not necessitate a stay of this case. The Supreme Court of Utah explained the following in *Power Train, Inc.* v. *Stuver*, 550 P.2d 1293, 1294 (Utah 1976):

{00299114/1 }                                    8

> where two identical actions between the same parties are initiated, first in one state and then in another, it is generally held that such identical actions can co-exist in different states, provided that a judgment in one may be pleaded in bar or in abatement to the other. An action in personam pending in one state is not sufficient ground to sustain a plea in abatement to an action on the same cause between the same parties in a second state.

(internal citations omitted).  This principle and standard applies in this case.  The parties' suits in Utah and Colorado are based upon the same set of facts and circumstances, and a judgment in one action would preclude, through *res judicata*, a subsequent inconsistent judgment in the other.  The parties' separate suits can co-exist.  There is no requirement for a stay and the Court need not feel compelled to order a stay on account Q Advisors' motion.

It is true, however, that a Utah court has discretion to stay a case on its docket if there is already an identical action between the parties pending in another state, but such a decision must be made cautiously after careful analysis of specific factors set forth in Utah law.  *See id.* at 1294-1295.  This memorandum shows how each of the applicable stay factors to be considered by the Court weigh against staying this matter in deference to the Colorado action.  Q Advisors' motion to stay this matter should therefore be denied.

**B.     The Colorado action between Q Advisors and Mergence-Delaware was not the first-filed suit between the parties and it should not be given priority.**

Q Advisors argues that this Court should give priority to the Colorado action, and therefore stay this Utah action, because the Colorado action was filed first.  This is incorrect.  Q Advisors' amended complaint alleging causes of action against Mergence-Delaware was not filed in Colorado until May 5, 2015.  Mergence-Delaware was not made a party to the Colorado action until May 5, 2015.  On the other hand, Mergence-Delaware filed this Utah action against Q Advisors on March 18, a full 47 days before Mergence-Delaware was added as a defendant to

the Colorado action. Furthermore, Mergence-Delaware achieved service of process on Q Advisors in connection with its Utah complaint before Q Advisor's achieved service of process on Mergence-Delaware in connection with its Colorado complaint. The fact that Q Advisors sued Mergence-Nevada before Mergence-Delaware filed this suit is irrelevant since "Utah law has long recognized the importance of the separate legal identity of corporations and has been unwilling to permit parties to ignore those distinctions." *Sachs v. Lesser*, 2007 UT App 169, ¶ 51, 163 P.3d 662. A lawsuit against Mergence-Nevada is not the same as a lawsuit against Mergence-Delaware.

This action should be given priority over the Colorado suit not only for the reason that it was filed and served first, but for all the reasons set forth below demonstrating why Utah is the most appropriate and convenient forum given the facts, available evidence, and controlling law of the parties' dispute. After all, the determination regarding whether to stay or not stay this action does not hinge upon which party filed first, but on the consideration of the applicable stay factors set forth in Utah case law. The first-to-file rule is not mechanically applied, but is left to the discretion of the court. *See, e.g., Hospah Coal Co. v. Chaco Energy Co.*, 673 F.2d 1161, 1164 (10th Cir. 1982).

## C.     The applicable factors to be considered by the Court weigh against granting a stay.

Q Advisors misapplies several of the factors the Court must consider in determining whether it is appropriate to order a stay of this matter. Q Advisors also ignores other relevant factors, such as the key factor regarding which state's law applies. Below is a list of relevant factors, as referenced in *Power Train*, which Utah courts should consider when deciding whether to grant a stay in light of parties having actions pending simultaneously in different jurisdictions:

the importance of discouraging multiple litigation designed solely to harass an adverse party, and of avoiding unseemly conflicts with the courts of other jurisdictions;

whether the rights of the parties can best be determined by the court of the other jurisdiction because of the subject matter, the availability of witnesses, or the stage to which the proceedings in the other court have already advanced;

the relative ease of access to proof;

the availability of compulsory process for witnesses;

all other practical problems that would make the trial of the case easy, expeditious and inexpensive;

whether the controversy is dependent upon the application of the law of this State which the courts herein more properly should decide than those of another jurisdiction.

*Id.* at 1295 (internal citations omitted); *see also Nationwide Mut. Ins. Co. v. Mayer,* 833 P.2d 60, 62 (Colo. App. 1992) (Colorado court of appeals applying these stay factors and citing *Power Train*).  As explained below, each of the factors above weigh against ordering a stay of this Utah action in deference to the parties' pending Colorado action.

  **1.**  **The parties' dispute is governed by and dependent upon the application of Utah law, making it more proper for this Court to decide the case than the Colorado state court.**

  The parties' dispute centers on whether Mergence-Delaware breached paragraph 15 of Engagement Letter No. 2.  Paragraph eight in Engagement Letter No. 2 specifies that the Agreement is governed by Utah law, meaning resolution of the parties' dispute turns upon application of Utah law.  In addition, Q Advisors' claim for damages resulting from Mergence-Delaware's alleged breach of paragraph 15 turns on whether current Utah law should be reversed, modified, or extended, as current Utah law provides that indefinite and incomplete agreements to negotiate an agreement in the future – which paragraph 15 of Engagement Letter No. 2 plainly is

– are unenforceable. *See King v. Nev. Elec. Inv. Co.*, 893 F. Supp. 1006, 1015-18 (D. Utah 1994). Certainly, this Court is better positioned than the Colorado court to not only apply Utah law, but to decide whether Utah law should be reversed, modified, or extended.

It is well established that indefinite and incomplete agreements to negotiate an agreement in the future are not enforceable under Utah law. In *King*, the agreement at issue contained a provision very similar to paragraph 15 of Engagement Letter No. 2, as it required the parties to negotiate a mining agreement in the future, but did not contain any material terms of the contemplated future mining agreement. *Id.* at 1015-16. Plaintiffs alleged that defendant breached the provision by not negotiating a mining agreement with them. *Id.* at 1017. The provision at issue in *King* states in relevant part:

> During the Option Period, NEICO and Andy King . . . will negotiate in good faith to conclude a Mine Management Agreement (MINE AGREEMENT) under which Andy King will operate the GENWAL MINE for us. The MINE AGREEMENT would take effect upon the closing of the Option Agreement by NEICO or its nominee purchasing all of the stock of GENWAL.

*Id.* at 1015.

The court in *King* found that the provision was nothing more than an agreement to negotiate a new agreement, that it "leaves open essentially every material and/or major term of the contemplated Mine Agreement," and that, accordingly, it was "too indefinite and uncertain to be enforceable." *Id.* at 1017. The court cited the Tenth Circuit as support for its ruling that Utah law does not enforce incomplete or indefinite agreements to negotiate a new agreement.

> As concerns an agreement to enter into a contract, the general rule is that where the agreement itself contains all essential terms it may be specifically enforced even though the parties contemplated the subsequent execution of a formal contract. *The converse of this proposition is that an agreement to enter into a contract will not be specifically enforced where the agreement is incomplete or indefinite as to substantial and material matters.* . . .

Utah would appear to be in accord with the general contract law set forth above.
. . .

*Id.* (citing *D.H. Overmyer Co. v. Brown*, 439 F.2d 926, 929 (10th Cir. 1971)) (emphasis added).

The court also summarized general contract law in Utah to support its ruling, explaining that

> A condition precedent to the enforcement of any contract is that there be a meeting of the minds of the parties, which must be spelled out, either expressly or impliedly, with sufficient definiteness to be enforced. This statement reflects the well-established rule in Utah that an agreement will only be enforced where its terms are set forth with sufficient definiteness to allow the court to enforce the agreement of the parties.
>
> Sufficient definiteness is required so that the Court is not left with the task of writing an agreement for the parties. The court cannot fabricate the kind of contract the parties ought to have made and enforce it. Although it is not necessary that the contract provide for every collateral matter or possible contingency, the parties themselves must have set forth with sufficient definiteness at least the essential terms of the contract.

*Id.* at 1016 (internal citations and quotations omitted); *see also Candland v. Oldroyd*, 248 P. 1101, 1102 (Utah 1926) ("So long as there is any uncertainty or indefiniteness, or future negotiations or considerations to be had between the parties, there is not a completed contract. In fact, there is no contract at all.").

The court in *King* specified that its analysis on agreements to negotiate a new agreement applied to claims for specific performance and to claims for damages. *Id.* at 1017. It cited decisions from the Second and Eighth Circuit courts explaining how damages are impossible to calculate in cases of indefinite agreements to negotiate a new agreement and how such agreements are unenforceable because they don't provide an appropriate remedy. *Id.* (citing *Necchi v. Necchi Sewing Machine Sales Corp.*, 348 F.2d 693, 698 (2nd Cir. 1965) (holding that it would be impossible for the court to assess damages stemming from an agreement that was not negotiated

or entered into by the parties); *Ohio Calculating, Inc. v. CPT Corp.*, 846 F.2d 497, 501 (8th Cir. 1988) (holding that agreement to negotiate in good faith was not enforceable because it "provide[d] neither a basis for determining the existence of a breach nor for giving an appropriate remedy.")). The court in *King* found the reasoning of these decision to be "sound."

It is important to note that the plaintiffs in *King*, like Q Advisors, asserted not only a claim for breach of contract for defendant's failure to abide by the provision requiring negotiation of a mining agreement in the future, but they also asserted a claim for breach of the duty of good faith and fair dealing on the same grounds. However, the court rejected this claim, reasoning that

> [T]he court finds as a matter of law that the agreement to negotiate is unenforceably vague and indefinite. Consequently, there is no enforceable contract to support plaintiff's claim for breach of the attendant duty of good faith and fair dealing.

*King*, 893 F. Supp. at 1020.

Given the application of Utah law and Q Advisors' need to reverse, modify, or extend Utah law in order to prevail on its claims, this Court should hear and decide the parties' dispute. It would not be prudent to leave resolution of these Utah law issues to the Colorado court.

**2.      The Colorado court is not better positioned to determine the parties' rights.**

This factor inquires as to whether the Colorado state court is in a better position to determine the parties' rights in light of the subject matter of the parties' dispute, available witnesses, and the progress of the Colorado action. The answer to this inquiry is no, as each of these considerations demonstrate that this Court, not the Colorado state court, is in the best position to hear and decide the parties' dispute.

With respect to subject matter, as set forth above, it is clear that this Court is better positioned than the Colorado court to hear and decide this case because Utah law governs and controls the parties' claims.

Regarding availability of witnesses, none of the potential witnesses involved with the sale of Spring Communications – which transaction forms the basis of the parties' dispute – resides in Colorado. None of the events related to this transaction occurred in Colorado and none of the files or documents for this transaction are stored in Colorado. As described in Mergence-Delaware's initial disclosures filed with this Court on May 20, 2015, most of the potential witnesses reside in Utah. Such witnesses would be more readily available and accessible for purposes of being deposed or testifying at a trial in Utah as opposed to in Colorado.

Q Advisors asserts that key witnesses to this case are located in Colorado, but all such witnesses relate not to the complained-of sale of Spring Communications, but to the services Q Advisors provided in obtaining financing from Fifth Third Bank and in the sale of Simply Mac. There is no dispute regarding Q Advisors' performance of these services or payment of fees for these services. What is at dispute between the parties is the sale of Spring Communications, and that transaction and the potential witnesses who were involved in that transaction have no connection to Colorado. Utah is far more convenient forum with respect to the availability of witnesses.

Q Advisors' assertion that the Colorado action has progressed beyond this Utah action is not true. Mergence-Delaware was not a party to the briefing in Colorado on Mergence-Nevada and Ellis's motion to dismiss or Q Advisors' motion for leave to amend. Indeed, Mergence-Delaware was not made a party to the Colorado action until May 5, 2015. Mergence-Delaware

has not filed an answer to Q Advisors' amended complaint in Colorado nor has it provided any initial disclosures to Q Advisors in the Colorado action.  Also, no discovery has been done in the Colorado action.  On the other hand, in the Utah action, Q Advisors has filed an answer to Mergence-Delaware's complaint and it has also filed a counterclaim against Mergence-Delaware. In addition, Mergence-Delaware has provided its initial disclosures to Q Advisors and has served Q Advisors with Mergence-Delaware's first set of interrogatories and requests for production of documents.  The dispute between Mergence-Delaware and Q Advisors has progressed further in this Utah action than it has in the Colorado action.

Utah also has an important interest in resolving this dispute under the state's securities laws.  Q Advisors is a securities broker-dealer that has rendered multiple services for Utah businesses, but it has never been licensed in Utah.  *See* UTAH CODE ANN. § 61-1-3(1) and § 61-1-13(1)(c).  Q Advisors bears the burden of establishing an exception to the licensing requirement. UTAH CODE ANN. § 61-1-14.5.

   **3.**     **It makes practical and economic sense for the parties' dispute to proceed in Utah, not Colorado.**

This factor references the importance of discouraging multiple litigation designed solely to harass an adverse party.  This factor does not weigh in favor of staying this action, as Mergence-Delaware did not file this suit against Q Advisors in order to harass Q Advisors.  Mergence-Delaware filed this action because it was not a party to Q Advisors' suit in Colorado and because it made no sense to initiate litigation in Colorado regarding a contract governed by Utah law and a transaction between parties in Utah and Texas. Mergence-Delaware agrees with Q Advisors that it makes little practical or economic sense for the parties and both courts to expend resources

litigating the parties' dispute in two different jurisdictions. But given the circumstances, it does make sense practically and economically for the litigation to proceed in Utah, not Colorado.

The issues to be litigated by the parties are whether paragraph 15 of Engagement Letter No. 2 is enforceable and whether Mergence-Delaware violated paragraph 15 or a covenant of good faith and fair dealing when it sold Spring Communications to GameStop without the assistance of Q Advisors. Utah law governs and controls both of these issues. The transaction involving Mergence-Delaware, Spring Communications, and GameStop occurred in Utah and Texas, not Colorado. None of the persons directly involved in the complained of transaction are in Colorado. The majority of potential witnesses qualified to testify about the transaction with GameStop are in Utah, and others are in Texas. The relevant discovery pertaining to the transaction with GameStop is not housed in Colorado, but in Utah with Mergence-Delaware. It makes no economic or practical sense to litigate in Colorado state court the enforceability of paragraph 15 and the hypothetical damages stemming from an alleged breach thereof by way of a transaction that occurred between Mergence-Delaware in Utah and GameStop in Texas.

This factor weighs against granting a stay, as Utah is the most practical forum in which to litigate the parties' dispute. As mentioned above, Mergence-Delaware intends to move the Colorado court to dismiss the Colorado action for lack of personal jurisdiction and/or to stay the Colorado action pending resolution of this Utah action. After all, Mergence-Delaware has never had any employees, officers, agents, offices, bank accounts, or phone listings in Colorado, nor has it ever advertised, registered to do business, or sold any products or services in Colorado. Q Advisors points out that Spring had operations in Colorado at the time Q Advisors helped raise debt capital pursuant to Engagement Letter No. 2. Spring is a subsidiary of Spring

Communications, and Spring Communications is a subsidiary of Mergence-Delaware. The operations of Mergence-Delaware's subsidiaries in Colorado do not subject Mergence-Delaware to personal jurisdiction in Colorado. *See Good v. Fuji Fire & Marine Ins. Co.*, 271 F. App'x 756, 759 (10th Cir. 2008) ("For purposes of personal jurisdiction, 'a holding or parent company has a separate corporate existence and is treated separately from the subsidiary in the absence of circumstances justifying disregard of the corporate entity.'" (quoting *Quarles v. Fuqua Indus., Inc.*, 504 F.2d 1358, 1362 (10th Cir. 1974) and citing *Benton V. Cameco Corp.*, 375 F.3d 1070, 1081 (10th Cir. 2004)). Moreover, Mergence-Delaware no longer has an interest in Spring Communications or its Spring entities.

Q Advisors also argues that Colorado is a more convenient venue because a majority of the services it performed under Engagement Letter No. 2 were performed in Colorado. However, Q Advisors rendered services as a securities broker-dealer for companies with their principal places of business in Utah, giving this dispute a far greater connection to Utah than Colorado. In both Engagement Letter No. 1 and No. 2, Q Advisors agreed in paragraph eight that "This letter agreement shall be governed by and construed in accordance with the laws of the state of Utah *as applied to contracts made and performed in such state*." (emphasis added.) In other words, contrary to Q Advisors' assertions, it contractually agreed that the agreement in question was made and performed in Utah, not Colorado. Furthermore, those services, and payment for those services, are not at issue in this case. The transaction presently at issue between the parties is Mergence-Delaware's transaction in selling Spring Communications. Q Advisors had no involvement in that transaction and the transaction took place between Mergence-Delaware in Utah and GameStop in Texas. The transaction has no connection to Colorado.

4.      **Evidence and proof related to parties' dispute is more easily accessible in Utah.**

This factor weighs in favor of not granting a stay because most of the relevant evidence is stored by Mergence-Delaware in Salt Lake City, Utah.   None of the events related to the complained-of sale of Spring Communications occurred in Colorado and none of the files or documents for this transaction are stored in Colorado.  Also, the majority of potential witnesses reside in Utah, making their appearance at trial in Utah, if necessary, less complicated and burdensome.

5.      **Many of the potential witnesses could not be compelled to testify at trial in Colorado because they are Utah residents.**

Most of the potential witnesses who have knowledge about or who had involvement in Mergence-Delaware's transaction with GameStop are residents of Utah.  As a result of residing in Utah, most of these individuals would not be required to comply with a subpoena to testify at trial in Colorado as part of the parties' Colorado action.  Even if such witnesses voluntarily agreed to appear at trial in Colorado, the travel and related expenses would likely be inconvenient, burdensome, and expensive for the witnesses and parties.  On the other hand, compelling these same Utah residents to testify at trial here in Utah as part of this Utah action would not be an issue.  None of the potential witnesses who were actually involved with the GameStop transaction reside in Colorado.  This factor weighs in favor of not granting a stay of this Utah matter.

D.      **Mergence-Delaware's complaint for declaratory relief is procedurally proper.**

Q Advisors argues that this Utah declaratory relief action should be stayed or dismissed because it was procedurally improper for Mergence-Delaware to file it after Q Advisors had filed its complaint in Colorado.  Q Advisors' argument is unavailing and the cases it cites in support of its position are distinguishable from this case.

At the time Mergence-Delaware filed its complaint in this action, it was not named as a party to the Colorado lawsuit filed by Q Advisors. Q Advisors filed its Colorado complaint against Mergence-Nevada and Ellis, not Mergence-Delaware. Although Q Advisors later claimed that this was a simple mistake, it specifically alleged in in its complaint that the Mergence corporation liable under Engagement Letter No. 2 was "never" a Delaware corporation, even though it held itself out as such. That Mergence-Delaware was not a party to the Colorado action at the time it filed this declaratory relief action distinguishes this case from the cases cited in Q Advisors' memorandum in support of motion to stay proceedings. *See Hercules, Inc. v. Utah State Tax Comm'n*, 1999 UT 12, ¶¶ 2-4, 974 P.2d 286 (holding that it was improper for plaintiff to file a declaratory relief action seeking review of an interlocutory order from a tax commission proceeding in which plaintiff was also a party); *McRae & Deland v. Feltch*, 669 P.2d 404, 405 (Utah 1983) (deciding that it was procedurally improper for plaintiffs to file a declaratory relief action involving identical questions currently pending in another proceeding in which plaintiffs were also parties); *Hospah Coal Co. v. Chaco Energy Co.*, 673 F.2d 1161 (10th Cir. 1982) (holding that it was procedurally improper for persons named as defendants in a pending action in Texas to file a declaratory judgment action in New Mexico against the plaintiffs in the Texas action).

Mergence-Delaware filed this action against Q Advisors because it was not named as a party to Q Advisors' initial Colorado complaint; because the events forming the basis for the parties' dispute (Mergence-Delaware's sale of Spring Communications to GameStop) arose in and are connected to Utah, not Colorado; because Engagement Letter No. 2 by its express terms is governed by Utah law and the contract was made and performed in Utah; because nearly all the evidence and potential witnesses relevant to the complained-of sale of Spring Communications are

located in Utah; and because Mergence-Delaware has never done business in Colorado and is not subject to jurisdiction there. Mergence-Delaware was not forum shopping. It was simply filing suit in the forum most appropriate, practical, and convenient to resolve the parties' dispute.

## CONCLUSION

The parties' pending action in Colorado stay court does not necessitate a stay of this Utah action. This action was filed first, has progressed further than the parties' Colorado action, and should be given priority. Each of the applicable stay factors weigh against staying this matter. For the foregoing reasons, the Court should deny Q Advisors' motion to stay proceedings.

DATED this 20th day of May, 2015.

KRUSE LANDA MAYCOCK & RICKS, LLC

/s/ Steven G. Loosle
Steven G. Loosle
Platte S. Nielson
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of May, 2015, I electronically filed the foregoing

MEMORANDUM IN OPPOSITION TO MOTION TO STAY PROCEEDINGS with the Clerk

of the Court by using the electronic filing system which will send a notice of electronic filing to

the following:

> Royce B. Covington
> J. Mason Kjar
> PARR BROWN GEE & LOVELESS, P.C.
> 101 South 200 East, Suite 700
> Salt Lake City, UT  84111
> *Attorneys for Q Advisors, LLC*

/s/ Lynn Javadi

EXHIBIT 1



FINCA

**BrokerCheck Report**

## Q ADVISORS LLC

CRD# 127232

Report #71113-96466, data current as of Tuesday, May 19, 2015.

| Section Title | Page(s) |
| --- | --- |
| Report Summary | 1 |
| Firm Profile | 2 - 6 |
| Firm History | 7 |
| Firm Operations | 8 - 13 |



**FINCA**

**About BrokerCheck®**

BrokerCheck offers information on all current, and many former, registered securities brokers, and all current and former registered securities firms. FINRA strongly encourages investors to use BrokerCheck to check the background of securities brokers and brokerage firms before deciding to conduct, or continue to conduct, business with them.

- **What is included in a BrokerCheck report?**
  BrokerCheck reports for individual brokers include information such as employment history, professional qualifications, disciplinary actions, criminal convictions, civil judgments and arbitration awards. BrokerCheck reports for brokerage firms include information on a firm's profile, history, and operations, as well as many of the same disclosure events mentioned above.
  Please note that the information contained in a BrokerCheck report may include pending actions or allegations that may be contested, unresolved or unproven. In the end, these actions or allegations may be resolved in favor of the broker or brokerage firm, or concluded through a negotiated settlement with no admission or finding of wrongdoing.

- **Where did this information come from?**
  The information contained in BrokerCheck comes from FINRA's Central Registration Depository, or CRD® and is a combination of:
  - o information FINRA and/or the Securities and Exchange Commission (SEC) require brokers and brokerage firms to submit as part of the registration and licensing process, and
  - o information that regulators report regarding disciplinary actions or allegations against firms or brokers.

- **How current is this information?**
  Generally, active brokerage firms and brokers are required to update their professional and disciplinary information in CRD within 30 days. Under most circumstances, information reported by brokerage firms, brokers and regulators is available in BrokerCheck the next business day.

- **What if I want to check the background of an investment adviser firm or investment adviser representative?**
  To check the background of an investment adviser firm or representative, you can search for the firm or individual in BrokerCheck. If your search is successful, click on the link provided to view the available licensing and registration information in the SEC's Investment Adviser Public Disclosure (IAPD) website at http://www.adviserinfo.sec.gov. In the alternative, you may search the IAPD website directly or contact your state securities regulator at http://www.finra.org/Investors/ToolsCalculators/BrokerCheck/P455414.

- **Are there other resources I can use to check the background of investment professionals?**
  FINRA recommends that you learn as much as possible about an investment professional before deciding to work with them. Your state securities regulator can help you research brokers and investment adviser representatives doing business in your state.

Thank you for using FINRA BrokerCheck.



Using this site/information means that you accept the FINRA BrokerCheck Terms and Conditions. A complete list of Terms and Conditions can be found at
brokercheck.finra.org

For additional information about the contents of this report, please refer to the User Guidance or www.finra.org/brokercheck. It provides a glossary of terms and a list of frequently asked questions, as well as additional resources. For more information about FINRA, visit www.finra.org.

FINRA

**Q ADVISORS LLC**

CRD# 127232

SEC# 8-65975

## Main Office Location

1899 WYNKOOP STREET
SUITE 200
DENVER, CO  80202
Regulated by FINRA Denver Office

## Mailing Address

1899 WYNKOOP STREET
SUITE 200
DENVER, CO  80202

## Business Telephone Number

303-996-9660

# Report Summary for this Firm

This report summary provides an overview of the brokerage firm. Additional information for this firm can be found in the detailed report.

## Firm Profile

This firm is classified as a limited liability company.

This firm was formed in Colorado on 07/26/2002.

Its fiscal year ends in December.

## Firm History

Information relating to the brokerage firm's history such as other business names and successions (e.g., mergers, acquisitions) can be found in the detailed report.

## Firm Operations

**This firm is registered with:**

- the SEC
- 1 Self-Regulatory Organization
- 2 U.S. states and territories

Is this brokerage firm currently suspended with any regulator?  **No**

This firm conducts 2 types of businesses.

This firm is not affiliated with any financial or investment institutions.

This firm does not have referral or financial arrangements with other brokers or dealers.

## Disclosure Events

Brokerage firms are required to disclose certain criminal matters, regulatory actions, civil judicial proceedings and financial matters in which the firm or one of its control affiliates has been involved.

Are there events disclosed about this firm?    **No**



## Firm Profile

This firm is classified as a limited liability company.

This firm was formed in Colorado on 07/26/2002.

Its fiscal year ends in December.

## Firm Names and Locations

This section provides the brokerage firm's full legal name, "Doing Business As" name, business and mailing addresses, telephone number, and any alternate name by which the firm conducts business and where such name is used.

**Q ADVISORS LLC**

**Doing business as Q ADVISORS LLC**

**CRD#** 127232

**SEC#** 8-65975

**Main Office Location**

1899 WYNKOOP STREET
SUITE 200
DENVER, CO 80202
**Regulated by FINRA Denver Office**

**Mailing Address**

1899 WYNKOOP STREET
SUITE 200
DENVER, CO 80202

**Business Telephone Number**

303-996-9660



# Firm Profile

This section provides information relating to all direct owners and executive officers of the brokerage firm.

## Direct Owners and Executive Officers

| | |
|---|---|
| **Legal Name & CRD# (if any):** | Q CONSULTING LLC |
| **Is this a domestic or foreign entity or an individual?** | Domestic Entity |
| **Position** | MEMBER AND MANAGER |
| **Position Start Date** | 12/2002 |
| **Percentage of Ownership** | 50% but less than 75% |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | SCOTT, PATRICK ADAM KENNEDY |
| | 3045772 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | MEMBER |
| **Position Start Date** | 01/2006 |
| **Percentage of Ownership** | 25% but less than 50% |
| **Does this owner direct the management or policies of the firm?** | No |
| **Is this a public reporting company?** | No |

| | |
|---|---|
| **Legal Name & CRD# (if any):** | BROWN TROUT EQUITY MANAGEMENT LLC |
| **Is this a domestic or foreign entity or an individual?** | Domestic Entity |
| **Position** | MEMBER |
| **Position Start Date** | 01/2007 |
| **Percentage of Ownership** | 10% but less than 25% |

©2015 FINRA. All rights reserved. Report 71113 05455 about a Q ADVISORS LLC. Data current as of Tuesday, May 19, 2015.



Firm Profile

## Direct Owners and Executive Officers (continued)

| | |
|---|---|
| Does this owner direct the management or policies of the firm? | No |
| Is this a public reporting company? | No |
| Legal Name & CRD# (if any): | DEHAVEN, RICHARD GERARD |
| | 5463464 |
| Is this a domestic or foreign entity or an individual? | Individual |
| Position | MEMBER |
| Position Start Date | 10/2012 |
| Percentage of Ownership | 5% but less than 10% |
| Does this owner direct the management or policies of the firm? | No |
| Is this a public reporting company? | No |
| Legal Name & CRD# (if any): | COLLINS, ELIZABETH SARAH |
| | 4714831 |
| Is this a domestic or foreign entity or an individual? | Individual |
| Position | FINOP |
| Position Start Date | 08/2014 |
| Percentage of Ownership | Less than 5% |
| Does this owner direct the management or policies of the firm? | No |
| Is this a public reporting company? | No |
| Legal Name & CRD# (if any): | QUINN, MICHAEL SCOTT |
| | 4666153 |

©2015 FINRA. All rights reserved.   Report 71112-06456 about O ADVISORS LLC. Data current as of Tuesday, May 19, 2015.



# Firm Profile

## Direct Owners and Executive Officers (continued)

| | |
|---|---|
| Is this a domestic or foreign entity or an individual? | Individual |
| Position | CHIEF COMPLIANCE OFFICER |
| Position Start Date | 09/2006 |
| Percentage of Ownership | Less than 5% |
| Does this owner direct the management or policies of the firm? | Yes |
| Is this a public reporting company? | No |

©2015 FINRA. All rights reserved.   Report 744412-95456 about C-ADVISORS LLC. Data current as of Tuesday, May 19, 2015.



# Firm Profile

This section provides information relating to any indirect owners of the brokerage firm.

## Indirect Owners

| | |
|---|---|
| Legal Name & CRD# (if any): | CRAWFORD, FRANK MICHAEL |
| | 1569486 |
| Is this a domestic or foreign entity or an individual? | Individual |
| Company through which indirect ownership is established | BROWN TROUT EQUITY MANAGEMENT LLC |
| Relationship to Direct Owner | MEMBER |
| Relationship Established | 01/2005 |
| Percentage of Ownership | 75% or more |
| Does this owner direct the management or policies of the firm? | Yes |
| Is this a public reporting company? | No |

| | |
|---|---|
| Legal Name & CRD# (if any): | QUINN, MICHAEL SCOTT |
| | 4666153 |
| Is this a domestic or foreign entity or an individual? | Individual |
| Company through which indirect ownership is established | Q CONSULTING LLC |
| Relationship to Direct Owner | PRESIDENT |
| Relationship Established | 03/2000 |
| Percentage of Ownership | 75% or more |
| Does this owner direct the management or policies of the firm? | Yes |
| Is this a public reporting company? | No |



# Firm History

This section provides information relating to any successions (e.g., mergers, acquisitions) involving the firm.

No information reported.

©2015 FINRA. All rights reserved. Report 7141312 0E4EE about O ADVECORP LLC. Data current as of Tuesday, May 12, 2015.



## Firm Operations

### Registrations

This section provides information about the regulators (Securities and Exchange Commission (SEC), self-regulatory organizations (SROs), and U.S. states and territories) with which the brokerage firm is currently registered and licensed, the date the license became effective, and certain information about the firm's SEC registration.

**This firm is currently registered with the SEC, 1 SRO and 2 U.S. states and territories.**

| Federal Regulator | Status | Date Effective |
|---|---|---|
| SEC | Approved | 11/17/2003 |

### SEC Registration Questions

This firm is registered with the SEC as:

A broker-dealer:                                                        Yes

A broker-dealer and government securities broker or dealer:            No

A government securities broker or dealer only:                        No

This firm has ceased activity as a government securities broker or dealer:   No

| Self-Regulatory Organization | Status | Date Effective |
|---|---|---|
| FINRA | Approved | 11/17/2003 |

©2015 FINRA. All rights reserved. Report #44443-96456 about LO ADVISORS LLC. Data current as of Tuesday, May 19, 2015.



## Firm Operations

### Registrations (continued)

| U.S. States & Territories | Status | Date Effective |
|---|---|---|
| California | Approved | 11/18/2003 |
| Colorado | Approved | 12/12/2003 |

©2015 FINRA. All rights reserved. Report 714119 06266 about O ADVISORS LLC. Data current as of Tuesday, May 19, 2015.



# Firm Operations

## Types of Business

This section provides the types of business, including non-securities business, the brokerage firm is engaged in or expects to be engaged in.

**This firm currently conducts 2 types of businesses.**

### Types of Business

Private placements of securities

Other - MERGERS AND ACQUISITIONS AND RESTRUCTURING

### Other Types of Business

This firm does not effect transactions in commodities, commodity futures, or commodity options.

This firm does not engage in other non-securities business.

Non-Securities Business Description:

©2015 FINRA. All rights reserved.   Report# 74113-05/05 about C ADVISORS LLC. Data current as of Tuesday, May 12, 2015.



Firm Operations

**Clearing Arrangements**
This firm does not hold or maintain funds or securities or provide clearing services for other broker-dealer(s).

**Introducing Arrangements**

This firm does not refer or introduce customers to other brokers and dealers.

©2015 FINRA. All rights reserved.   Report 71113-95456 about O-ADVISOR086 LLC. Data current as of Tuesday, May 19, 2015.



# Firm Operations

## Industry Arrangements

This firm does not have books or records maintained by a third party.

This firm does not have accounts, funds, or securities maintained by a third party.

This firm does not have customer accounts, funds, or securities maintained by a third party.

### Control Persons/Financing

This firm does not have individuals who control its management or policies through agreement.

This firm does not have individuals who wholly or partly finance the firm's business.

©2015 FINRA. All rights reserved.



# Firm Operations

## Organization Affiliates

This section provides information on control relationships the firm has with other firms in the securities, investment advisory, or banking business.

**This firm is not, directly or indirectly:**
- in control of
- controlled by
- or under common control with

the following partnerships, corporations, or other organizations engaged in the securities or investment advisory business.

**This firm is not directly or indirectly, controlled by the following:**
- bank holding company
- national bank
- state member bank of the Federal Reserve System
- state non-member bank
- savings bank or association
- credit union
- or foreign bank

©2015 FINRA. All rights reserved. Report #74142-06455 about IA 6269CORP LLC. Data current as of Tuesday, May 19, 2015.

FINЯA

End of Report

This page is intentionally left blank.